LEVI & KORSINSKY, LLP
Shannon L. Hopkins (admitted *pro hac vice*)
(State of Connecticut Juris No. 435545)
Gregory M. Potrepka (admitted *pro hac vice*)
(State of Connecticut Juris No. 437326)
David C. Jaynes (to be admitted *pro hac vice*)
(State of California Juris No. 338917)
P. Cole von Richthofen (to be admitted *pro hac vice*)
(State of Connecticut Juris No. 444159)
1111 Summer Street, Suite 403
Stamford, CT 06905
shopkins@zlk.com
gpotrepka@zlk.com
Telephone: 203-992-4523

*Lead Counsel for Lead Plaintiff Jeffery S. Lew*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffery S. Lew, Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>ON Semiconductor Corporation; Hassane El-Khoury, Thad Trent, and Simon Keeton,<br><br>Defendants. | No. CV-24-00594-PHX-SMB<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED<br><br>AMENDED COMPLAINT |

DATED this 3rd day of June, 2024.

*/s/ Gary A. Gotto*
Gary A. Gotto
Liaison Counsel for Plaintiff Lew

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1
II. JURISDICTION AND VENUE ..... 5
III. PARTIES ..... 6
A. Plaintiffs ..... 6
B. Defendants ..... 6
C. Relevant Non-Party ..... 8
IV. SUBSTANTIVE ALLEGATIONS ..... 8
A. Onsemi Manufactures and Sells Semiconductors ..... 8
B. Historically, Defendants Routinely Warned Investors that Onsemi Was Subject to Risks Relating to Customer Cancellation of Purchase Orders on Short Notice and Uncertainty in End-User Demand ..... 11
C. In 2020, the COVID-19 Pandemic Disrupts Supply Chain Reliability in the Semiconductor Market, Motivating Customers to Place Redundant Orders with Multiple Suppliers and Artificially Inflating Demand Market-Wide ..... 13
D. In 2021, Defendants Introduce LTSAs that Purportedly Provide “Better Visibility” and a “2-Year” “Committed Long-Term Demand Outlook,” to Make Short-Term Cancellations “A Thing of the Past” ..... 15
E. In 2022, Defendants Stop Issuing the Order Cancellation and Demand Uncertainty Risk Warnings and Instead Assure Investors That the Minimum Purchase Commitments in LTSAs Are Not Subject to Cancellation ..... 18
F. Defendants’ Unqualified Representations That Onsemi Would Enforce “Take or Pay” Provisions in an LTSA, or Renegotiate to Obtain an Offsetting Benefit, Were False ..... 24
V. DEFENDANTS’ FALSE AND MISLEADING STATEMENTS AND OMISSIONS THROUGHOUT THE CLASS PERIOD ..... 27
A. 2023 Q1 Earnings Call ..... 28
B. 2023 Q1 Report on Form 10-Q ..... 39
C. May 16, 2023 Financial Analyst Day ..... 42
D. May 23, 2023 JPMorgan Chase Conference ..... 47
E. 2023 Q2 Report on Form 10-Q ..... 53
F. 2023 Q2 Earnings Call ..... 56
G. August 30, 2023 Deutsche Bank Conference ..... 61

H. September 7, 2023 Citi Conference ..... 65

VI. DEFENDANTS REVEAL THE TRUTH ..... 68

VII. POST CLASS PERIOD EVENTS ..... 72

A. Onsemi Files Its 2023 Annual Report With the SEC Which Revises the Company's Risk Factors, Thereby Confirming That LTSAs Carry the Same Risks That Investors Ascertained From Defendants' Corrective Disclosures ..... 72

VIII. ADDITIONAL SCIENTER ALLEGATIONS ..... 74

A. The Individual Defendants' Primary Roles in Negotiating, Signing, Executing, and Monitoring the LTSAs Raise a Strong Inference of Scienter ..... 75

B. Defendants' Extensive, Detailed Commentary on the LTSAs Raises a Strong Inference of Scienter ..... 78

C. Defendants' Prior Notice of Large, "Significant" Customers Violating LTSAs Without Penalty Raises a Strong Inference that Defendants Made the Misrepresentations with Scienter ..... 81

D. The Defendants' Removal of Relevant Risk Warnings Raises a Strong Inference that the Misrepresentations Were Made with Scienter ..... 82

E. LTSAs Are Integral to Onsemi's Core Operations ..... 84

F. Defendants Received Notice Before the Class Period that a Large Automotive Customer Would Not Take Delivery of $200 Million in Minimum Purchase Commitments in 2023, But Continued Representing LTSAs Were "IronClad" ..... 87

G. Defendants Had Motive to Inflate the Price of Onsemi Stock in Order to Increase Their Compensation ..... 89

H. Defendant El-Khoury's Suspicious Insider Trades During the Class Period Are Indicative of Motive to Defraud ..... 91

IX. LOSS CAUSATION ..... 94

X. CLASS ALLEGATIONS ..... 99

XI. PRESUMPTION OF RELIANCE ..... 101

XII. NO STATUTORY SAFE HARBOR ..... 103

XIII. COUNTS ..... 105

XIV. PRAYER FOR RELIEF ..... 109

XV. DEMAND FOR A JURY TRIAL ..... 109

1. Lead Plaintiff Jeffery S. Lew ("Lead Plaintiff") brings this class action pursuant Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), individually and on behalf of himself and all persons and entities similarly situated, other than Defendants (defined at Section III.B., *infra*), who purchased or otherwise acquired ON Semiconductor Corporation ("Onsemi" or "Company") common stock between May 1, 2023 and October 27, 2023, inclusive (the "Class Period").

2. Lead Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the investigation of his undersigned attorneys ("Lead Counsel"), which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding Onsemi; (ii) Defendants' other public statements, including transcripts of interviews and calls Defendants participated in; (iii) interviews with an individual who is a former employee of Onsemi ("Confidential Witness" or "CW"); (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Onsemi and the industry in which the Company operates; and (v) pertinent court filings.

## I. NATURE OF THE ACTION

3. Lead Plaintiff brings this securities class action alleging that Onsemi and certain of its executive officers knowingly or recklessly made false and/or misleading statements to Onsemi investors concerning the durability of the Company's long-term

supply agreements ("LTSAs"), the product volumes and revenues purportedly "committed" under the LTSAs, and the "ironclad" nature of the LTSAs in guaranteeing a "win-win" for Onsemi in the event that customers sought to amend them.

4. Onsemi manufactures and sells semiconductors. Throughout the Class Period, Onsemi's periodic filings with the SEC falsely represented that the Company's newly-adopted (and frequently-touted) practice of requiring customers to sign LTSAs provided the Company with protection against the risks of fluctuating customer demand by requiring customers to agree to minimum purchase commitments that could not be cancelled. In other words, LTSAs were Onsemi's secret sauce to curb previously experienced demand volatility that was rife within the semiconductor industry, and detrimental customer cancellations would, in Defendant El-Khoury's words, be "a thing of the past."

5. Throughout the Class Period, Defendants falsely touted that "*our LTSA* is a multiyear in duration, where both volume and pricing is locked in" and that there was "committed revenue under *the structure* of the take-or-pay with *our LTSA*."[1] Thus, Defendants claimed, the LTSAs' minimum purchase commitments "secured" and "locked in" revenues with "volume commitments" from customers and created "align[ment] on pricing and volume through the duration of the LTSAs" that was "non-cancellable." Defendants further assured investors that the LTSAs were "take or pay" contracts that were "legally binding agreement[s]" that made the customer "legally liable" for the minimum

[1] Emphasis is added throughout unless otherwise specified.

purchase commitments and ensured that, even if a customer experienced lower than expected demand and thus sought to amend an LTSA, Onsemi would never be "left holding the bag" because the Company would only agree to amend the LTSA if it could "offset" the change by taking additional "share" of a customer's business, thereby providing a "win-win" benefit for Onsemi.

6. Unbeknownst to investors, the LTSAs were not "ironclad" because customers were allowed to breach them with no penalty to the customer. Moreover, Defendants' promise that Onsemi would not allow a customer to amend the agreement without there being a benefit to Onsemi was illusory as Defendants did not intend to enforce the LTSAs.

7. Indeed, by the start of the Class Period, Defendants had already allowed a customer to breach the LTSA with no penalty to the customer and no benefit to Onsemi. According to one former Onsemi employee, "if you really read one [LTSA], it doesn't hold water." CW1 had reviewed an Onsemi LTSA for a commercial customer and explained that "there was no penalty" or other mechanism to force the customer to place the agreed-upon purchase orders. CW1 also recalled that, immediately prior to the Class Period around March 2023, a large military customer had indefinitely delayed placing orders that were required under the terms of an LTSA. The matter was reported to Michel De Mey, Vice President & General Manager at Onsemi, who reported directly to Defendant El-Khoury, but nothing was done to enforce the LTSA against the customer. Yet, throughout the Class Period, Defendants gave investors the false impression that Onsemi's revenue stream was not subject to volatility due to the LTSAs.

8. Lead Plaintiff cogently and compellingly avers that Defendants' misrepresentations were knowingly or recklessly false when made, including by alleging that Defendants El-Khoury and Trent: (a) were admittedly responsible for negotiating, signing, executing, and managing the LTSAs with customers, were aware of the LTSAs' terms and conditions, and tracked relevant metrics and Key Performance Indicators; (b) frequently spoke publicly, in detail, about the LTSAs, demonstrating their deep knowledge of the terms and conditions of the LTSAs and the manner in which the LTSAs were executed, (c) had previous experience—both at Onsemi and in their positions at other companies—in which customers entered into LTSAs and subsequently refused to place the required purchase orders or sought to amend those agreements due to changes in demand; (d) previously warned about identical risks in the 2019 and 2020 Forms 10-K, but removed those risk warnings from subsequent SEC filings; (e) admitted that LTSAs were integral to Onsemi's "core" business; and (f) were personally motivated to artificially inflate Onsemi's stock price to advance their own pecuniary interests.

9. On October 30, 2023, Defendants revealed that a large automotive customer under an LTSA had called their bluff by refusing to place required purchase orders for $200 million of products, thereby admitting Defendants' prior statements were false because the LTSAs did not provide the "ironclad" protection Defendants claimed, nor did they guarantee purchase order volumes. Rather, Defendants had discretion to, and did, amend the LTSAs on terms unfavorable to the Company. Indeed, Defendant El-Khoury admitted as much during the October 30, 2023 earnings call when he asserted that Onsemi's "LTSAs continue to provide demand visibility and stability *in pricing*" but conspicuously omitted

any mention of an LTSA benefit relating to *volumes* that he had previously included in earlier misrepresentations. Defendant El-Khoury's statements also revealed that the "win-win" that Onsemi would purportedly achieve if it agreed to amend an LTSA to accept lower customer purchase volumes was illusory.

10. These admissions were excoriated by securities analysts. For example, Truist concluded that the "LTSAs are proving not bulletproof" and were not "ironclad" as the Company had previously misrepresented. As a result of Defendants' corrective disclosures, the price of Onsemi common stock plunged $18.18 per share in a single day—nearly 22% on abnormally high trading volume—from a closing price of $83.52 per share on October 27, 2023, to a closing price of $65.34 per share on October 30, 2023.

11. Thus, Defendants' false and misleading statements served to artificially inflate the price of Onsemi's common stock throughout the Class Period, causing massive investor losses when the price of the stock precipitously declined as the truth about Onsemi's LTSAs was revealed. Lead Plaintiff hereby seeks damages individually and on behalf of the Class.

## II. JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Onsemi's principal place of business and principal executive offices are located in this District, in Scottsdale, Arizona. Moreover, Defendants entered a stipulation with Lead Plaintiff on March 15, 2024 agreeing on the propriety of this Court as venue for this litigation. *See* ECF Nos. 19, 20.

14. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

15. Lead Plaintiff Jeffery S. Lew purchased Onsemi common stock during the Class Period, as set forth in his Certification of Plaintiff Pursuant to Federal Securities Laws (ECF No. 9-1) which Lead Plaintiff incorporates by reference herein, at prices artificially inflated by Defendants' materially false and misleading public statements and omissions, and was damaged thereby.

### B. Defendants

16. At all times relevant to this action, Defendant ON Semiconductor Corporation was a public corporation, organized and existing under the laws of the State of Delaware with its principal place of business and principal executive offices located in Scottsdale, Arizona. At all relevant times, the Company's common stock was traded on the

Nasdaq Global Select Market ("NASDAQ"), a national exchange, under the ticker symbol "ON."

17. Defendant Hassane El-Khoury was, at all times during the Class Period, the President, Chief Executive Officer, and a director of Onsemi. Defendant El-Khoury began his tenure as CEO in December 2020 and remains CEO as of the date of this filing.

18. Defendant Thad Trent was, at all times during the Class Period, the Executive Vice President, Chief Financial Officer, and Treasurer of the Board of Directors of Onsemi. Defendant Trent began his tenure as CFO and Treasurer of Onsemi in February 2021.

19. Defendants El-Khoury and Trent are collectively referred to hereinafter as the "Individual Defendants" and, together with Onsemi, comprise the "Defendants." The Individual Defendants, because of their positions with Onsemi, possessed the power and authority to control the contents of the Company's filings with the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and investors. Each of the Individual Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### C. Relevant Non-Party

20. CW1 was employed at Onsemi for 30 years before leaving the Company in July 2023. CW1 worked most recently as a Project Manager in the Advanced Solutions Group business unit at Onsemi, and was responsible for a team that developed products for military and aerospace customers, including defense firms and the U.S. government. CW1 reported to Cale Entzel, who reported to Terry Danzer, who reported to Michel De Mey, the Military and Aerospace Business Unit Manager, who reported directly to CEO Hassane El-Khoury. De Mey is currently the Vice President and General Manager of the Industrial Solutions Division at Onsemi.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Onsemi Manufactures and Sells Semiconductors

21. Onsemi manufactures and sells semiconductor components for various electronic devices worldwide and serves original equipment manufacturers ("OEMs"), distributors, and electronic manufacturing service providers. Onsemi's semiconductors are used by customers in a variety of industries such as industrial, medical, aerospace/defense, communications, networking, computing, and automotive, including both traditional combustion vehicles and electric vehicles ("EVs").

22. Historically, most of Onsemi's products were silicon ("Si") semiconductors that were sold into and widely used in the computing, consumer, and communications industries.

23. More recently, developments in the markets for EVs, 5G wireless, and industrial power storage solutions have made new chips made with silicon carbide ("SiC")

an important part of Onsemi's portfolio of products. SiC semiconductors can operate at much higher voltages, temperatures, and frequencies than traditional Si chips, meaning SiC products are a more popular choice than Si for applications in burgeoning industries such as EVs, solar power conversion, 5G wireless, and aerospace.

24. Accordingly, Onsemi's revenues have shifted over time, away from the computing, consumer, and communications industries and towards automotive and industrial. Moreover, Onsemi has experienced a significant ramp in the production and sales of SiC products as the Company has focused on serving customers in the growing EV and power storage markets.

25. While automotive accounted for 32% of total revenues in 2020, by the end of 3Q 2023, automotive accounted for 53% of total revenues. *See* Figure 1.

**Figure 1.**




Source: Jefferies, company data; ON has reported 3 segments starting 3Q21.

26. Onsemi operates both a direct sales model, in which the Company sells semiconductor products directly to OEMs or the OEMs' suppliers, and an indirect sales model, in which the Company sells semiconductors to distributors who then sell them to end-users. Onsemi's sales are made primarily pursuant to orders that are booked as far as 52 weeks in advance of delivery. Onsemi often refers to customer orders as "bookings," because they represent orders for products to be manufactured and delivered at a future date, and the Company's manufacturing capacity (*i.e.*, the capital, resources, and facilities needed to produce such products) needs to be allocated to accommodate such orders.

27. Onsemi, like most of its competitors in the semiconductor industry, relies upon a "backlog" to monitor purchase orders and bookings (planned or expected future purchase orders) and to forecast demand from customers. The Company's "backlog" on a given date consists of (1) existing purchase orders and (2) forecasted demand from customers (*i.e.*, bookings), in each case scheduled to be shipped in the current or future period. Onsemi describes its backlog as influenced by "several factors, including market demand, pricing and customer order patterns in reaction to product lead times."

28. Onsemi uses its backlog to prepare quarterly "Outlooks" that are communicated to investors in press releases contemporaneously with the Company's earnings announcements for the fiscal quarter most recently ended. Onsemi's Outlooks describe, *inter alia*, the Company's expected revenue and gross margin for the coming quarter.

### B. Historically, Defendants Routinely Warned Investors that Onsemi Was Subject to Risks Relating to Customer Cancellation of Purchase Orders on Short Notice and Uncertainty in End-User Demand

29. Historically in the semiconductor industry, backlog quantities and shipment schedules under outstanding purchase orders have been frequently revised to reflect changes in customer needs, and semiconductor manufacturers often have had little or no notice before customers made adjustments that impact the backlog. Indeed, for many years prior to the Class Period, Onsemi warned investors in the Company's annual Form 10-K filings with the SEC that customers were permitted to cancel orders on short notice without incurring any penalties.

30. For example, in Onsemi's Form 10-K filed with the SEC on February 19, 2020, for the year ended December 31, 2019 (the "2019 Form 10-K"), the Defendants warned investors that the Company did not have long-term supply arrangements with its customers, which made it difficult for the Company to predict end-user demand and subjected Onsemi to the risk that purchase orders may be canceled on short notice. The 2019 Form 10-K stated:

> ***Uncertainties regarding the timing and amount of customer orders could lead to excess inventory and write-downs of inventory that could materially adversely affect our financial condition and results of operations.***
>
> Our sales are typically made pursuant to individual purchase orders or customer agreements, and we generally do not have long-term supply arrangements with our customers requiring a commitment to purchase. Our customers may cancel orders 30 days prior to shipment for standard products and, generally prior to start of production for custom products without incurring a penalty. We routinely generate inventory based on customers' estimates of end-user demand for their products, which is difficult to predict. This difficulty may be compounded when we sell to OEMs indirectly through distributors or contract manufacturers, or both, as our forecasts for demand

> are then based on estimates provided by multiple parties, which may vary significantly. In times of under supply for certain products, some customers could respond by inflating their demand signals. As markets level off and supply capacity begins to match actual market demands, we could experience an increased risk of inventory write-downs, which may materially adversely affect our results of operations and our financial condition. In addition, our customers may change their inventory practices on short notice for any reason. Furthermore, short customer lead times are standard in the industry due to overcapacity. The cancellation or deferral of product orders, the return of previously sold products, or overproduction of products due to the failure of anticipated orders to materialize could result in excess obsolete inventory, which could result in write-downs of inventory or the incurrence of significant cancellation penalties under our arrangements with our raw materials and equipment suppliers. Unsold inventory, canceled orders and cancellation penalties may materially adversely affect our results of operations, and inventory write-downs, which may materially adversely affect our financial condition.

2019 Form 10-K at 22-23 (the "Order Cancellation and Demand Uncertainty Risk Warnings") (emphasis in original). The Order Cancellation and Demand Uncertainty Risk Warnings were repeated in substantially the same form by Defendants in Onsemi's Form 10-K filed February 16, 2021 for the year ended December 31, 2020 (the "2020 Form 10-K") which was signed by Defendant El-Khoury, as well as the Company's then-current Chief Financial Officer, Onsemi's Chief Accounting Officer, and members of the Board of Directors.

31. Defendant El-Khoury signed the 2020 Form 10-K, including certifying that he "reviewed this annual report" and that "this report does not contain any untrue statement of a material fact," demonstrating that El-Khoury was aware that the Company was subject to these risks in 2021. The Order Cancellation and Demand Uncertainty Risk Warnings were also incorporated by reference into Onsemi's quarterly reports on Forms 10-Q filed

with the SEC on May 3, 2021 (reporting results for Q1 2021), August 2, 2021 (Q2 2021), and November 1, 2021 (Q3 2021).

32. As discussed in Section IV.E., *infra*, beginning with the Company's Form 10-K filed with the SEC on February 14, 2022, for the year ended December 31, 2021 (the "2021 Form 10-K"), signed by Defendants El-Khoury and Trent, Onsemi conspicuously removed the Order Cancellation and Demand Uncertainty Risk Warnings, signaling to investors that any uncertainties relating to predictions of end-user demand and customer cancellation of purchase orders were nonexistent or no longer material enough to warrant publication of these risk factors.

### C. In 2020, the COVID-19 Pandemic Disrupts Supply Chain Reliability in the Semiconductor Market, Motivating Customers to Place Redundant Orders with Multiple Suppliers and Artificially Inflating Demand Market-Wide

33. The COVID-19 pandemic constrained production capacity and disrupted supply chains around the globe. This disruption was acute for semiconductor manufacturers and their customers.

34. For years leading up to the pandemic, demand for semiconductors had been rising, but in the first months of 2020, as the pandemic spread rapidly across the globe, demand for semiconductors plummeted and semiconductor manufacturers correspondingly curtailed operations at certain of their manufacturing facilities and cancelled plans to invest in additional manufacturing capacity. Shortly thereafter, an industry recovery began and demand rapidly increased for semiconductors, in part because of the huge increase in computer hardware needed to support remote work and school.

35. Demand for semiconductors in late 2020 quickly rose above pre-pandemic levels, causing bottlenecks in the supply chain resulting in industry-wide semiconductor shortages, commonly known as the "chip shortage". This shortage, which began in late 2020 and slowly eased through the end of 2023, was particularly felt by automotive companies who had cancelled orders for semiconductors at the beginning of the pandemic, only to find themselves competing for semiconductor capacity when chip foundries reopened in the second calendar quarter of 2020 when pandemic-related government mandates began lifting.

36. During the chip shortage, many customers who were unable to obtain the components they needed from semiconductor suppliers placed purchase orders with multiple suppliers in hopes of obtaining the components as quickly as possible. After a customer received the semiconductor components it needed from one supplier, that customer would then cancel its pending orders with other suppliers, to the detriment of the other suppliers. Thus, customer behavior during the pandemic resulted in an artificially-inflated demand signal, causing further financial and operational harm to semiconductor suppliers when customers inevitably canceled their redundant orders.

37. Some semiconductor manufacturers, including Onsemi and Cypress Semiconductor (a semiconductor manufacturer at which Defendant El-Khoury was president and CEO before he joined Onsemi in December 2020), responded to these supply chain issues and artificial demand signals by requiring customers to sign long-term supply agreements ("LTSAs") that specified minimum purchase commitments and product pricing. Locking in a minimum amount of purchase orders and product pricing would, in

theory, permit semiconductor manufacturers to have a guarantee that if they invested in building additional manufacturing capacity, those capital expenditures ("CapEx") would have a positive return for the company because manufacturers like Onsemi could then reliably anticipate that such capacity (*e.g.*, a new fabrication facility) would generate new revenue and be operated at (or near) full utilization, thereby minimizing the Company's costs of goods sold.

**D. In 2021, Defendants Introduce LTSAs that Purportedly Provide "Better Visibility" and a "2-Year" "Committed Long-Term Demand Outlook," to Make Short-Term Cancellations "A Thing of the Past"**

38. During Onsemi's earnings conference call for the first fiscal quarter of 2021 held on May 3, 2021 (the "Q1 2021 Earnings Call"), Defendant El-Khoury stated that the Company was "working with our strategic customers to secure long-term agreements to provide better supply and price visibility over the next few years." Defendant El-Khoury elaborated: "My goal is to have an organization that is able to react quickly to changing business condition and is able to make decisions efficiently and objectively in the best interest of shareholders."

39. When speaking to investors, leading up to and throughout the Class Period, Defendant El-Khoury frequently referred to Onsemi's LTSAs in the singular (*i.e.*, "our LTSA") to broadly describe that Onsemi had a uniform policy for the agreements, for example when falsely touting "our LTSA is a multiyear in duration, where both volume and pricing is locked in" and that there was "committed revenue under the structure of the take-or-pay with our LTSA." Moreover, Defendants did not caveat or carve out exceptions for particular customers when describing the LTSAs to investors.

40. Long-term supply agreements between Onsemi and its customers were important to investors, who peppered Defendants with questions about the LTSAs in the years leading up to, and throughout, the Class Period. For example, during the Q1 2021 Earnings Call, securities analysts asked the Company for more information about Onsemi's ability to obtain long-term agreements with customers and the impact such long-term agreements would have on the Company's business.

41. In response to analyst questions during the Q1 2021 Earnings Call, Defendant El-Khoury explained that the long-term supply agreements were intended to increase confidence in the Company's outlook, create better visibility into customer demand, and enable Onsemi to invest in building production capacity only if that additional capacity would be supported by customer demand:

> As far as the long-term agreements, I look at them as more outlook confidence. If you look out over the next few years, we want to be able to spare capacity. We want to be able to potentially build or shift capacity into the strategic products we want. And we are engaged with customers to make sure that their demands over the next few years are met. And that comes with a 2-way where we make sure the investments are made in the areas where we see the growth. And from the customer side, the investment is made in order to give us the visibility and the long-term agreement for us to make sure that we are building for the right demand.
>
> So it's a win-win for our strategic customers. We've been working with a lot of them in order to make sure that [the inventory shortage, production capacity constraint, and inflated demand signal] we experienced in 2021 does not occur again. And that only comes with a steady and outward-looking demand signal that they will commit to.

42. During the same call, in response to a question from Jefferies analyst Mark John Lipacis about trends in customers' inventory purchases, Defendant El-Khoury

explained that the purpose of the long-term supply agreements was to make customer demand predictable and mitigate the risk of order cancellations on short notice:

> For me, the focus is a productive engagement with the customer, where they are confident in their demand signal, and I'm confident in my investment in order to meet that [demand]. The short-term cancellation, all of that, I think, is going to be a thing of the past.
>
> And that's going to be the difference between a strategic customer and a nonstrategic customer, it's the ones that we are able to run a healthy and profitable, but more importantly, a predictable business with. That's where our focus has been. And part of it is part of those long-term agreements.

43. On August 2, 2021, during Onsemi's earnings call for the second quarter of 2021, Defendant El-Khoury told investors that when Onsemi entered into LTSAs, the Company benefitted through "committed" long-term demand and that the "better visibility" of demand allowed better CapEx planning:

> Long-term supply agreements, or LTSAs, are a win-win for both customers and us by guaranteeing supply to the customer and at the same time, providing better visibility and allowing us to better plan our capital allocation towards capacity expansion with a committed long-term demand outlook.

44. Defendant Trent also extolled the purported benefits of LTSAs. For instance, on August 5, 2021, at the Company's first annual Analyst Day, Defendant Trent touted the Company's "better visibility" into demand, which "allows us to plan better and plan our capital allocation and our investments in capacity."

45. Defendant Trent also asserted that the long-term supply agreements gave the Company assurance of its "capacity needs multiple years out[,]" stating:

> And with our engagement with our customers and our long-term agreements that we're putting in place, we can plan much better on the capacity needs multiple years out. And we'll build the capacity based on the demand that we see based on commitments from our customers rather than build it and they

> will come. So this will give us an advantage as well, and again, as I've said, be much more capital efficient for the company.
>
> * * *
>
> We've got long-term service agreements that give us better visibility with our customers to plan our capacity and our capital allocation.
>
> * * *
>
> It's definitely flexible. I mean we'll flex it with the revenue growth, right? And because we have the long-term agreements with many customers, we're seeing -- we've got better visibility of what that revenue growth looks like. And obviously, we're taking kind of a risk-based approach to this. We'll evaluate that. But if we're not seeing that revenue growth come through, we can definitely throttle back our CapEx investments as well.

46. El-Khoury added, based on "firsthand" knowledge, that the strategic benefits of the long-term supply agreements would begin ramping up in 2021 and 2022 and explained that the "milestones" investors would see included, eliminating cancellations, greater visibility into demand, and "committed volume[s]" under contract for at least two years in advance:

> It's a long-term agreement to share a much deeper level of road mapping and a much tighter coupling of design between products and end product -- our products and end products. And it goes back on the efficiency. When you have been engaged with a customer, it's not off the shelf. When you have engagement with the customer where their design makes or breaks based on the delivery of your technology versus anything else, that will start the design in much ahead of time. And then the milestones are from cancellation to visibility to committed volume 2 years from now because we have to build the capacity, back to John's point, where when you start seeing that as you approach, then you start making the throttle investment versus let's build all the capacity on hope, and then you can't anymore.

**E. In 2022, Defendants Stop Issuing the Order Cancellation and Demand Uncertainty Risk Warnings and Instead Assure Investors That the Minimum Purchase Commitments in LTSAs Are Not Subject to Cancellation**

47. After almost a full year of familiarizing investors with the Company's LTSAs

and their purported benefits, on February 14, 2022, Defendants filed Onsemi's annual report with the SEC on Form 10-K for the year ended December 31, 2021 (the "2021 Form 10-K"). The "Risk Factors" section of the 2021 Form 10-K was conspicuously modified from the 2020 Form 10-K as Defendants had removed the Order Cancellation and Demand Uncertainty Risk Warnings.

48. Instead, the Defendants represented in the 2021 Form 10-K—and later in the 2022 Form 10-K filed with the SEC on February 6, 2023 in substantially the same form—that the Company entered long-term supply agreements in 2021 that were "not subject to cancelation":

> During 2021, we entered into a number of long-term supply arrangements with certain strategic end-customers, which generally include minimum purchase commitments. Pricing terms on product development agreements are negotiated at the beginning of a project. Almost all of our contracts have default provisions, and certain of our contracts in the public sector are terminable at any time for convenience of the contracting agency.
>
> * * *
>
> ***Historically, a significant portion of our backlog was cancellable, however, [] our current agreements, including orders subject to minimum purchase commitments under our longer-term supply arrangements, are not subject to cancellation***.

49. Defendants' representations that LTSAs were "not subject to cancellation," and their concomitant removal of all risk warnings concerning the uncertainty of customer orders (and the potential financial impact of such uncertainty), signaled to investors that Onsemi's new practice of entering LTSAs eliminated the uncertainty that had previously existed in the Company's business and affirmed Defendant El-Khoury's May 2021 statements that "short-term cancellation" was "going to be a thing of the past."

50. Investors took notice, and Defendants would reiterate their view of the durability of the Company's LTSAs again and again. For example, on August 8, 2022 during the KeyBanc Capital Markets' 23rd Annual Technology Leadership Forum ("2022 KeyBanc Forum"), KeyBanc's John Nguyen Vinh questioned whether the value of LTSAs would endure "when things truly do soften"—*i.e.,* during a market correction wherein customer demand softens—because "there's a lot of skepticism from investors that … these [long-term supply agreements] hold," and pointed out that over the last week or so "a few of [Onsemi's] peers announced that they're trying to decimate and renegotiate some of their long-term wafer purchase commitments[.]"

51. In response, Defendant El-Khoury explained that Onsemi's LTSAs were "legally binding" agreements and that customers were liable for the price *and volumes* agreed upon in the LTSAs:

> [The] LTSA is a legally binding document between us and the customer that discloses on a part number basis, multiple years that extend into '24, '25 and sometimes '29, that has volume and price in it over that period of time. And it's legally binding.
>
> * * *
>
> [T]he LTSA guarantees somebody is going to pick up the bat phone and call me because there's a liability in there.

52. Defendant El-Khoury assured investors that the LTSAs ensured that the Company would receive early notifications from customers of changes in demand that would allow the Company to adjust its manufacturing strategy and proactively manage its business rather than reacting to changed conditions:

> So first, I'm going to get a call, and I'm going to get a call ahead of everybody else to figure out what are we going to do about it. Now if it's a demand issue, where they say, I thought it's 1 million, now it's 800. There's that 200-unit gap. If I get it ahead of time, I can manage my business differently.

53. Defendant El-Khoury continued by explaining that if a customer sought to reduce the volume of its orders contrary to the legally binding LTSA, Onsemi, based on "visibility and [] dialogue way ahead [of time,]" would agree to volume changes *only* if it could "offset" that change by taking additional "share" of a customer's business:

> So yes, there's maybe some change in volume and so on that I would offset with that customer where I say, okay, if this is not ramping as fast as you think, well, how about the other one that's ramping, I'll take that share. But that gives us that visibility and the dialogue way ahead of just backlog disappearing.

54. Defendant Trent echoed Defendant El-Khoury's assurances, stating:

> We're going to get these notifications from our customers early, [which] allows us to adjust our manufacturing strategy. We're not holding a bunch of inventory. We're not pushing inventory into the distribution channel. So we can manage proactively once we have those discussions with customers versus reacting, which is what our industry has done in the past.

55. The comments by Defendants El-Khoury and Trent at the 2022 KeyBanc Forum assured investors that LTSAs were legally binding agreements that protected the Company's expected revenues, because if a customer had softening demand for one product, any amendment to the volumes agreed upon in the LTSAs would include the Company taking a "share" of another product that the customer was ramping up that would "offset" the impact of any agreement to reduce volumes.

56. A few days later, during the August 31, 2022 Deutsche Bank Technology Conference, Defendant El-Khoury reiterated that the LTSA's "guaranteed" notice of

changes in demand up to 6 months in advance and explained that the LTSAs include "take-or-pay" provisions and are legally binding:

> So what does the LTSA do? The LTSA gets me a phone call, guaranteed, because these are legal binding agreements with take-or-pay for volume and price.
>
> So as soon as the customer sees the demand saying, oh, in 6 months, we're going to have that softness or 10% down, they're going to pick up the ba[t] phone, and they're going to call me[.]

57. Defendant El-Khoury again explained that Onsemi was willing to renegotiate the legally binding, take-or-pay LTSAs in circumstances of changes in end-user demand, but only as long as the amended agreement was a net benefit to the Company. For example, Defendant El-Khoury suggested that the Company might be willing to take 10% fewer purchase orders of one product if, in exchange, the customer was willing to give Onsemi a greater share of the customers total business:

> Then you say, okay, take that 10%, either give me different share. If there's something where we're dual source on some other product that I can use those same wafers at the same capacity, no problem. Or take that and let's extend the LTSA for 2 years. So I get 2 more years of visibility for a 10% fluctuation. If we're that accurate, I'll take it because it's the visibility to manage the uncertainty in the outer years. That's what the LTSAs do.

58. Whether Onsemi would actually enforce the LTSAs would continue to be of great interest to investors leading up to the Class Period. For example, on December 6, 2022, during the NASDAQ Investor Conference, analyst Joseph Lawrence Moore of Morgan Stanley asked the Defendants about the Company's LTSAs, inquiring: "How long do the commitments go out? How much do you hold people to those commitments in different types of economic environments?"

59. In response, Defendant El-Khoury explained that although the LTSAs were a recent development at Onsemi, both El-Khoury and Trent had a lot of experience implementing and executing LTSAs at other companies prior to joining Onsemi.

60. Defendant El-Khoury further described the Company's LTSAs as "take-or-pay agreements where the customer commits to taking products" that include a "contractual obligation for volume and price," and explained that the length of the LTSAs could be as much as 7 or 8 years, but on average were 4 to 5 years in duration.

61. Defendant El-Khoury then addressed "how enforceable" the LTSAs were, explaining: "Let me just say it at a high level, they are legally binding agreements. So we'll start with that."

62. Defendant El-Khoury also assured investors that when a customer sees demand softening, the LTSAs guaranteed that Onsemi would receive a call from the customer "way in advance"—"6 month or 9 month" in advance—which would allow the Company to proactively manage the upcoming changes in demand. Defendant El-Khoury contrasted this with what frequently occurred in prior years, explaining that "before [the implementation of LTSAs], backlog will disappear 30 days before you ship, [and] you're stuck with inventory[.]"

63. Defendant Trent added that the Company's LTSAs often included the customer investing capital upfront, making the relationship between the Company and the customer "very much like a long-term partnership[.]" Defendant Trent further asserted that this level of engagement with the customer meant that "in a downturn, we expect to pick up market share[.]"

**F. Defendants' Unqualified Representations That Onsemi Would Enforce "Take or Pay" Provisions in an LTSA, or Renegotiate to Obtain an Offsetting Benefit, Were False**

64. CW1, who was employed at Onsemi for 30 years, worked as a Project Manager in the Advanced Solutions Group division in 2022 and 2023 supporting aerospace and defense customers.

65. CW1 stated that, as a Project Manager working on the development and qualification of new products for customers, CW1 attended weekly meetings with customers to develop and qualify new products and to establish a forecast for production. CW1 stated that the forecast developed with the customer was input into a planning tool and was used to inform the production team about how many semiconductor wafers per week or month they would need to produce for the customer.

66. CW1 recalled developing a product with a military customer (who CW1 was not at liberty to identify by name) in late 2022 that was scheduled to ramp up production in 2023 pursuant to the terms of an LTSA. CW1 recalled that the value of the contract was considered "significant" to Onsemi and stated that the customer was required to order 50,000 semiconductor wafers worth about $6 or $7 million.

67. CW1 recalled that the military customer placed a few small orders after production began, but that the bulk of the orders required under the LTSA were scheduled to be ordered in February and March of 2023.

68. However, CW1 explained, despite Onsemi's customer service team telling the production team to "get ready" for the largest purchase orders, the customer's purchase orders never came and instead were pushed out indefinitely by the customer. CW1

explained that when a customer wasn't going to place an order as contemplated by the LTSA, "I knew well in advance, a quarter before, that it wasn't going to occur" because the customer would inform Onsemi of softening demand in advance of their forecasts and production schedule.

69. CW1 stated that in "early" in 2023, after CW1 learned that the customer failed to place the purchase orders as required under the LTSA, CW1 alerted management to the situation, including Michel De Mey who reported directly to Defendant El-Khoury at that time. CW1 recalled that the response "was crickets" and described management as "shrugging their shoulders" at the situation in hopes that the order would come in 2024. When CW1 left the Company in July 2023, the military customer had still not placed the purchase orders required under the LTSA. As CW1 explained, "there was no penalty" for the customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," a fact CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

70. In addition to Onsemi failing to enforce the LTSA with the military customer, CW1 also explained that CW1 had reviewed one of Onsemi's LTSAs in Q1 2023 for a commercial customer, and CW1 did not see any provisions in the LTSA that would penalize the customer for not placing the purchase orders specified in the LTSA. Nor did CW1 see any provisions in the LTSA that guaranteed Onsemi would receive advance notice of softening demand. Thus, CW1 believed that Onsemi's description of the LTSAs as "watertight" was inaccurate because "if you really read one, it doesn't hold water." CW1 added that an LTSA "was only good" to Onsemi "if customers were buying things. And

then if a customer were to go away, there was no penalty to that customer for not ordering things."

71. CW1's experience with the military customer not placing orders required by an LTSA, and CW1's reading of an LTSA, contradicted what the Individual Defendants had been representing to the market.

72. For example, just a few months earlier, on January 5, 2023 during a presentation at JPMorgan's 21st Annual Tech/Auto Forum, Defendant El-Khoury had assured investors that even if Onsemi's customers experienced lower end-user demand and wanted to cancel purchase orders agreed upon in the LTSAs, Onsemi was "not going to be left holding the bag" and assured investors that any renegotiation of the LTSA "has to be a win-win" because the LTSAs were enforceable "take or pay" contracts.

73. Likewise, during the same presentation, Defendant Trent attempted to bolster investors' perception of the LTSAs and their value, asserting that the manner in which Onsemi's LTSAs "held up" in the face of "softness" in "consumer and compute" demand was "our proof point that says we can enforce these with win-win situations with our customers."

74. And one month later, on February 6, 2023, Defendants filed Onsemi's Form 10-K for the year ended December 31, 2022 (the "2022 Form 10-K") in which Defendants once again represented that "our current agreements, including orders subject to minimum purchase commitments under our longer-term supply arrangements, are not subject to cancellation."

75. Despite the lack of penalties in the LTSAs for customers who delayed or cancelled purchase orders, despite the Defendants' non-enforcement of LTSAs after at least one major customer indefinitely delayed placing the purchase orders required by an LTSA, and despite the Company's undisclosed interest in making unilateral concessions on LTSAs to large customers, Defendants continued throughout 2023 to announce more LTSAs with new and existing customers that purportedly "secured" and "locked in" more than $17 billion of revenue over the lifetime of the LTSAs — including $9 billion from SiC products alone, of which $1 billion was "committed" in 2023—and continued asserting that Onsemi would never renegotiate an LTSA unless it was a win for the Company.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS THROUGHOUT THE CLASS PERIOD

76. Throughout the Class Period, Defendants made materially false and/or misleading statements and omissions relating to the Company's LTSAs, including statements regarding the supposed "ironclad" nature of the "non-cancellable" LTSAs in protecting Onsemi against customer demand volatility, and the "committed" revenues under the LTSAs. Defendants moreover represented that, in the event that demand softened for customers under LTSAs, Defendants would only allow a renegotiation if it would result in a "win-win" for Onsemi and the customer. Specifically, Defendants during the Class Period made the statements enumerated below, which materially misled investors and artificially inflated the price of ON common stock.

77. Lead Plaintiff asserts that the portions of the statements set forth in this section, *infra,* that are bolded and underlined (**example**) are alleged to be false and/or misleading when made; all other portions of statements are included for context.

**A. 2023 Q1 Earnings Call**

78. The Class Period begins on May 1, 2023, when Onsemi held an earnings call at 9:00 a.m. Eastern Time to reports its financial and operating results for the Company's first fiscal quarter of 2023, ended March 31, 2023 (the "2023 Q1 Earnings Call"). On the call, Defendants boasted to investors about the reliability of Onsemi's revenue projections based on the supposed certainty that LTSAs provided to the Company.

79. On the 2023 Q1 Earnings Call, Defendant El-Khoury falsely asserted that the Company's LTSAs "secured" business with strategic customers and ensured that customer demand was "committed". Specifically, during his opening remarks on the 2023 Q1 Earnings Call, Defendant El-Khoury stated:

> **A significant part of our business is secured by long-term supply agreements** and pricing in these agreements is fixed for multiple years.
>
> * * *
>
> **We also improved our demand visibility across all markets with commitments from our customers, new and existing in the form of LTSAs. These LTSAs also helped reduce our exposure to the volatility in the consumer and computing markets.**

80. Defendant El-Khoury's foregoing statements were materially false and misleading, or omitted material facts necessary to make them not misleading, because they misrepresented the LTSAs as: (i) providing "secur[ity]" and "commitments from our customers[;]" (ii) generating a higher level of "demand visibility across all markets" for

Onsemi; and (iii) "reduc[ing]" Onsemi's "exposure to the volatility" in the markets in which it operated. Contrary to El-Khoury's statements, Onsemi's LTSAs permitted customers to not place or to indefinitely delay placing orders for the minimum purchase commitments with no penalty, Onsemi's management had the discretion to not enforce the terms of the LTSAs or to amend the LTSAs in a manner unfavorable to the Company, and Onsemi was actively experiencing unexpected fluctuations in demand when customers failed to place—or indefinitely delayed placing—required purchase orders, as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the 2023 Q3 Earnings Call that Onsemi's LTSA "provide[s] demand visibility and stability *in pricing*," but conspicuously omitting any mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he

stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

81. During the 2023 Q1 Earnings Call, when analyst Vivek Arya of BofA Securities asked whether there were "any changes one way or another" in the Company's "automotive outlook Q2 through Q4," Defendant El-Khoury boldly asserted that the LTSAs ensured "very, very, predictable" revenues because the LTSAs contained both price and volume commitments:

> Absolutely, no changes. **It's actually very, very predictable, and that's really the benefit that we've been talking about with the LTSAs that have us really, with our customers, align on** pricing and **volume through the duration of the LTSAs.**

82. Defendant El-Khoury's statements were materially false and misleading, or omitted material facts necessary to make them not misleading, because they misrepresented that: (i) Onsemi's LTSAs "aligned" the Company and its customers on the product "volume" customers would buy under the agreements; and thus (ii) "the benefit" of the LTSAs was to make Defendants' outlook for Onsemi's automotive business "very, very predictable." Contrary to El-Khoury's statements, the Company's LTSAs did not align customers on purchase volumes, nor did the LTSAs provide the benefit of strong predictability, because customers under LTSAs were allowed to indefinitely misalign their

purchasing with the amounts in the agreements, including not purchasing any volume at all, as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the 2023 Q3 Earnings Call that Onsemi's LTSA "provide[s] demand

visibility and stability *in pricing*," but conspicuously omitting any mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

83. During the 2023 Q1 Earnings Call, analyst Rajvindra S. Gill of Needham and Company asked the Defendants for more information about the LTSAs, specifically referencing the $17.6 billion of revenues that Defendants had boasted was secured by the agreements. In response, Defendant Trent reassured investors that the Company's LTSAs had the effect of "locking that up" and giving the Company "better predictability of our business":

> Yes. So the LTSAs, we continue to stack those up another $1 billion this quarter to $17.6 billion. It's broad. It's across the board. There's silicon carbide. There's non silicon carbides. **But when we think about how we're engaging with our customers that want assurance of supply, they're looking at the entire portfolio and locking that up with us for multiple years.** And again, keep in mind, these LTSAs, on average, are 4 to 5 years.

84. Defendant Trent's statements were materially false and misleading, or omitted material facts necessary to make them not misleading, because they misrepresented that the Company's LTSAs were "locking … up" Onsemi's sales to customers for the duration of the agreements. Contrary to Trent's statements, Onsemi's LTSAs did not lock customers into buying supply; instead, the LTSAs and the Company's management allowed customers to indefinitely delay buying such supply without penalty, and the Defendants had the discretion to not enforce the LTSAs, as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time

CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the 2023 Q3 Earnings Call that Onsemi's LTSA "provide[s] demand visibility and stability *in pricing*," but conspicuously omitting any mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept

lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

85. During the 2023 Q1 Earnings Call, Defendants incorporated by reference the Company's Form 10-Ks, Form 10-Qs, and other filings with the SEC, stating at the beginning of that call: "Important factors that can affect our business including factors that could cause actual results to differ from our forward-looking statements are described in our most recent Form 10-Ks, Form 10-Qs, other filings with Securities and Exchange Commission and in our earnings release for the first quarter of 2023."

86. Onsemi's 2022 Form 10-K filed with the SEC on February 6, 2023, signed by both El-Khoury and Trent, which Defendants incorporated into the 2023 Q1 Earnings Call by reference, stated in relevant part:

> Historically, a significant portion of our backlog was cancellable, **however, our current agreements, including orders subject to minimum purchase commitments under our longer-term supply arrangements, are not subject to cancellation[.]**

87. The foregoing statement was materially false and misleading, or omitted material facts necessary to make it not misleading, because it misrepresented that Onsemi's LTSAs subjected customers to "minimum purchase commitments," and that the agreements were not cancellable and were thus firm for Onsemi. Contrary to this statement, the Company's LTSAs permitted customers to forgo placing even the minimum purchase orders as planned for under the agreements, and Onsemi management had the discretion to not enforce the minimum purchase requirements, as evidenced by the following:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to

enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the 2023 Q3 Earnings Call that Onsemi's LTSA "provide[s] demand visibility and stability *in pricing*," but conspicuously omitting any mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

**B. 2023 Q1 Report on Form 10-Q**

88. On May 1, 2023, Onsemi filed its Form 10-Q with the SEC reporting the Company's financial and operational results for its first fiscal quarter of 2021, ended March 31, 2023 (the "2023 Q1 Form 10-Q"). The 2023 Q1 Form 10-Q was signed by Defendants El-Khoury and Trent.

89. The 2023 Q1 Form 10-Q contained a portion dedicated to notes for Onsemi's consolidated financial statements. In a note on the Company's "Revenue and Segment Information," the 10-Q stated:

> **A significant portion of the Company's orders are firm commitments that are non-cancellable, including certain orders or contracts with a duration of less than one year. Certain of the Company's customer contracts are multi-year agreements that include committed amounts ("Long-term Supply Agreements" or "LTSA's").**

90. These statements in the 2023 Q1 Form 10-Q were materially false and misleading, or omitted material facts necessary to make them not misleading, because they misrepresented that Onsemi's LTSAs "committed amounts" of product to be purchased by customers, and misrepresented that the agreements were "firm" and "non-cancellable." In contrast to what was stated in the Form 10-Q, Onsemi's LTSAs allowed customers to forgo placing purchase orders as agreed to under the LTSAs, and Company management had the discretion to not enforce customers' LTSA commitments or to amend the LTSAs in a manner unfavorable to the Company, thus making the agreements infirm and illusory, as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the

order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the 2023 Q3 Earnings Call that Onsemi's LTSA "provide[s] demand visibility and stability *in pricing*," but conspicuously omitting any mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of

purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

**C. May 16, 2023 Financial Analyst Day**

91. During the 2023 Analyst Day presentation held on May 16, 2023, Defendants issued materially false and misleading statements about Onsemi's LTSAs with customers and how these agreements purportedly protected the Company's revenues and margins.

92. In Defendant Trent's opening remarks, Defendant Trent assured investors that the LTSAs, which had previously been represented as "locking" customers into certain volumes of purchase orders, minimized the risk of investing in new manufacturing capacity because they provided certainty that the new manufacturing capacity would be utilized:

> **We'll make those investments, but we've got great visibility as we actually bring capacity on because of the LTSAs.**
>
> * * *
>
> **The LTSAs that we have with our customers, minimize the risk of building capacity and not being able to fill it.**

93. Defendant Trent's statements during the 2023 Analyst Day presentation were materially false and misleading, or omitted material facts necessary to make the statements

not misleading, because they misrepresented that Onsemi's LTSAs: (i) provided Defendants with "great visibility" as to the Company's needs for planning manufacturing capacity; and thus (ii) "minimized the risk" that Onsemi would build capacity for which it had no orders to manufacture product for. In reality, and contrary to Trent's statements, the Company's LTSAs allowed customers to indefinitely forgo placing purchase orders as contemplated under the agreements, and thus the LTSAs did not mitigate the risk that Onsemi would build manufacturing capacity without purchase orders to fill it, as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the 2023 Q3 Earnings Call that Onsemi's LTSA "provide[s] demand visibility and stability *in pricing*," but conspicuously omitting any mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he

stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

94. During the question-and-answer portion of the 2023 Analyst Day, Defendant El-Khoury asserted that "**our LTSA is a multiyear in duration, where both volume** and pricing **is locked in. So that anchors on the value.**"

95. Defendant El-Khoury's statements during the 2023 Analyst Day presentation were materially false and misleading, or omitted material facts necessary to make the statements not misleading, because they misrepresented that the "value" to Onsemi of its LTSA model was purportedly "anchor[ed]" because sales volumes with customers were "locked in" for multiple years. Contrary to El-Khoury's statements, the purported value of LTSAs to Onsemi was not anchored because customers under LTSAs were permitted to indefinitely forgo ordering the product volumes that were supposedly "locked in" to the agreements, as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time

CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the October 30, 2023 Earnings Call ("2023 Q3 Earnings Call") that Onsemi's LTSA "provide[s] demand visibility and stability *in pricing*," but conspicuously omitting any mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants'

misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

**D. May 23, 2023 JPMorgan Chase Conference**

96. On May 23, 2023, Defendants El-Khoury and Trent spoke in a panel discussion on behalf of Onsemi at JPMorgan's 51st Annual Technology, Media and Communications Conference (the "2023 JPMorgan Conference"), which was attended by investors, analysts, and industry representatives.

97. At the 2023 JPMorgan Conference, Defendant El-Khoury further assured investors that the form of LTSA that Onsemi employed was "solid" and achieved "revenue committed by [the] customer," stating:

> We have a solid technology. **And more importantly, we have a solid LTSA or revenue committed by customer that we talked last week in Analyst Day is at a $9 billion lifetime revenue for silicon carbide.**

98. Defendant El-Khoury's foregoing statement was materially false or misleading when made, or omitted material facts necessary to make the statement not misleading, because it misrepresented that Onsemi's LTSAs "committed" revenue from the Company's customers. Contrary to El-Khoury's statement, Company management had the discretion to not enforce the take-or-pay terms of the LTSAs against customers to secure Onsemi the revenues contemplated by the LTSAs, thus undermining the "committed" nature of Onsemi's revenue under the agreements, as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was

no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the 2023 Q3 Earnings Call that Onsemi's LTSA "provide[s] demand visibility and stability *in pricing*," but conspicuously omitting any mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

99. During the 2023 JPMorgan Conference, analyst Harlan Sur asked how Onsemi was handling "periods of macro uncertainty and end-market weakness" wherein "customers are wanting to reschedule" and "move backlogs," specifically querying whether customer pushouts had "started to stabilize." In response, Defendant Trent assured investors that Onsemi was receiving calls from customers quarters in advance of any reduction in purchase orders, which allowed Onsemi to "solve[]" the issue and create "a win for both companies":

> Yes. So let's back up and talk about our business. Our LTSAs [are] what we're managing, right? And when customers are coming in, they need help with LTSAs. We're getting the call quarters in advance of something is going to get solved. **<u>If we can create a win-win with that customer, we'll try and help that customer. And there's got to be a win for both companies.</u>** We saw a lot of that happening late last year. We've actually seen in the first quarter and even so far in the second quarter is that's actually stabilized and

> actually coming down a little bit, which gives you some confidence in the second half as well. Again, think about the visibility we have with the LTSAs and the fact that we're getting less of those requests. There's pockets of them. But late last year, we saw a lot more uncertainty, and I think people remain cautious. So that allows us to really have a dialogue with our customers versus historically, they place a PO, and that PO would disappear 30 days before it shifted. Now we're getting that call in advance, and we're able to help those customers. But it is kind of slowing in terms of the rescheduled request.

100. Defendant Trent's foregoing statements were false or misleading when made, or omitted material facts necessary to make them not misleading, because they misrepresented that if a customer under an LTSA called the Company to reschedule its orders, Onsemi management would only renegotiate the LTSA "if" it could generate a "win-win"—*i.e.,* an outcome that was contingent on being beneficial for "both companies." Contrary to Trent's statements, Onsemi management had the discretion to allow customers to indefinitely push out—or simply forgo placing—orders as required under their LTSAs without achieving a corresponding "win" for the Company, such as (but not limited to) enforcing a penalty payment from the customer, as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the

required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(c) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that

> "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

**E. 2023 Q2 Report on Form 10-Q**

101. On July 31, 2023, Defendants filed Onsemi's Form 10-Q with the SEC, reporting the Company's financial and operating results for its second fiscal quarter of 2023 ended June 30, 2023 (the "2023 Q2 Form 10-Q"). The 2023 Q2 Form 10-Q was signed by Defendants El-Khoury and Trent, who each certified its contents as accurate.

102. In a portion of the 2023 Q2 Form 10-Q titled "Revenue and Segment Information," the 10-Q provided, in relevant part:

> **<u>A significant portion of the Company's revenue orders are firm commitments that are non-cancellable, including certain orders or contracts with a duration of one year or less. Certain customer contracts are multi-year agreements that include committed amounts ("Long-term Supply Agreements" or "LTSAs").</u>**

103. These statements in the 2023 Q2 Form 10-Q were materially false and misleading, or omitted material facts necessary to make them not misleading, because they misrepresented that Onsemi's LTSAs included "committed amounts" of product to be purchased by customers, and misrepresented that the agreements were "firm" and "non-cancellable." In contrast to what was stated in the 10-Q, Onsemi's LTSAs allowed customers to indefinitely forgo placing purchase orders as agreed to under the LTSAs, and Company management had the discretion to not enforce customers' LTSA commitments, thus making the agreements infirm and illusory, as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the 2023 Q3 Earnings Call that Onsemi's LTSA "provide[s] demand visibility and stability *in pricing*," but conspicuously omitting any

mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

**F. 2023 Q2 Earnings Call**

104. On July 31, 2023, Defendants hosted a conference call to discuss the Company's financial results for its second fiscal quarter of 2023, ended June 30, 2023 (the "2023 Q2 Earnings Call").

105. During the 2023 Q2 Earnings Call, El-Khoury emphasized during prepared remarks that Onsemi's LSTAs represented customer commitments for sales volume, stating:

> LTSAs have become an integral part of the way we do business with our strategic customers. **LTSAs continue to provide us with extended visibility,** stability in pricing **and volume commitments while allowing us to plan for long-term capacity.**

106. Defendant El-Khoury's foregoing statement was materially false and misleading, or omitted material facts necessary to make it not misleading, because it misrepresented that Onsemi's LTSAs included "volume commitments" that customers were to purchase, which purportedly gave the Company "extended visibility" into customer demand such that it could allocate manufacturing capacity for the "long-term." In actuality and at odds with El-Khoury's statement, Onsemi's LTSAs permitted customers to indefinitely delay placing purchase orders for committed volumes with no penalty, Company management had discretion to not enforce the terms of the LTSAs including volume commitments, and Onsemi was actively experiencing short-term fluctuations in customer demand when customers failed to place purchase orders, thus acutely affecting Onsemi's ability to plan capacity, as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the 2023 Q3 Earnings Call that Onsemi's LTSA "provide[s] demand visibility and stability *in pricing*," but conspicuously omitting any

mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

107. During the 2023 Q2 Earnings Call, Defendants incorporated by reference the Company's Form 10-Ks, Form 10-Qs, and other filings with the SEC, stating at the beginning of that call: "Important factors that can affect our business, including factors that could cause actual results to differ from our forward-looking statements are described in our most recent Form 10-K, Form 10-Q and other filings with the Securities and Exchange Commission and in our earnings release for the second quarter of 2023."

108. Onsemi's 2022 Form 10-K filed with the SEC on February 6, 2023, which Defendants incorporated into the 2023 Q2 Earnings Call by reference, stated in relevant part:

> Historically, a significant portion of our backlog was cancellable, **however, our current agreements, including orders subject to minimum purchase commitments under our longer-term supply arrangements, are not subject to cancellation[.]**

109. The foregoing statement was materially false and misleading, or omitted material facts necessary to make it not misleading, because it misrepresented that Onsemi's LTSAs subjected customers to "minimum purchase commitments," and that the agreements were not cancellable and were thus firm for Onsemi. Contrary to this statement, the Company's LTSAs permitted customers to forgo placing even the minimum purchase orders as planned for under the agreements, and Onsemi management had the discretion to not enforce the minimum purchase requirements, as evidenced by the following:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA

would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the 2023 Q3 Earnings Call that Onsemi's LTSA "provide[s] demand visibility and stability *in pricing*," but conspicuously omitting any mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the

LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

**G. August 30, 2023 Deutsche Bank Conference**

110. On August 30, 2023, Defendants El-Khoury and Trent spoke in a panel discussion at Deutsche Bank's 2023 Technology Conference (the "2023 Deutsche Bank Conference"). During the question-and-answer portion of the panel, an analyst asked El-Khoury whether demand for Onsemi's non-SiC automotive products was plateauing. In

response, Defendant El-Khoury explained that Onsemi's LTSAs ensured that the Company would always get a "win-win" in the event an LTSA customer's demand dropped, stating in relevant part:

> We have engagements with customers. If they have a weak -- softness in their market and they have an LTSA, we're going to get the call 6 months in advance. And that call basically goes along, hey, our run rate is not where we thought it would be in this certain area. We're going to have potentially some inventory. What are the options? If I can ship that to somebody else that I've been under shipping to, we're going to redirect it. So somebody gets more supply to meet their demand, and somebody is not going to get oversupply that's going to sit in inventory.
>
> **So that LTSA and the conversations we're having with the customer to have a win-win, although we may take some down and amend it, saying, yes, no problem, net-net, it's a win-win. And that's exactly what the LTSAs have provided us.** And the structure we put in, given that it's a legally binding agreement, have forced that conversations for us to have a -- to land in a much better spot than we would have otherwise been.

111. During the 2023 Deutsche Bank Conference, El-Khoury and Trent were asked directly by host analyst Ross Clark Seymore "what do you do if you've seen customers not want as much" under LTSAs, and "to the extent demand weakens, how concrete are those enforced because you have a longer-term partnership with these companies?" In response, El-Khoury stated, in relevant part:

> **Because the customer is legally liable like you said, they're going to place the call at the first sign of softness they have because they have a small bag to carry also, not just ON Semi. And that makes the partnership a win-win as far as trying to find a solution**.
>
> * * *
>
> Now if I don't have another customer to give that capacity to, then we have to talk about is it a different cost structure now because lower volume, different impact. So all of these are -- every customer has different constraints. And we are going to sit down and work with the customer -- because all these customers, like you said, are strategic. That's why we have

an LTSA with them to begin with. **So we're going to sit with the customer, and we're going to find a win-win.**

112. Defendant E-Khoury's foregoing statements were materially false or misleading when made, or omitted material facts necessary to make the statements not misleading, because they misrepresented that customers were "legally liable" under the LTSAs and that if a customer was expecting lower demand (*i.e.*, "softness"), Company management would only permit a customer to amend the LTSA if it could generate a corresponding "win" for Onsemi. Contrary to El-Khoury's statements, Onsemi management had the discretion to permit customers to indefinitely push out—or even simply forgo placing—orders as required under the LTSAs without gaining a corresponding "win" for the Company, as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected

purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) CW1 also reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things."

(c) Defendant El-Khoury later admitted that Onsemi's LTSA did not "lock[] in" volumes (*see* Section VI, *infra*), explaining during the 2023 Q3 Earnings Call that Onsemi's LTSA "provide[s] demand visibility and stability *in pricing*," but conspicuously omitting any mention of the purported LTSA benefit relating to *volumes* that had previously been included during earlier misrepresentations.

(d) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(e) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to

Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

**H. September 7, 2023 Citi Conference**

113. On September 7, 2023, Defendants El-Khoury and Trent spoke in a panel discussion at the 2023 Citi Global Technology Conference (the "2023 Citi Conference").

114. During the 2023 Citi Conference, the host analyst questioned Defendants "how ironclad" Onsemi's LTSAs were:

> So one question on the long-term contracts. How ironclad are those? I mean I would imagine that in the part of your business like industrial that had somewhat of a correction, there might have been some renegotiations going on there. Are these tough nuggies guys. You said you're going to take the product, this is like the product you're going to take? Is it, okay, well, you don't have to take as much product, but we'll charge you some sort of cancellation fee or something like that? Or how does it work?

In response, Defendant El-Khoury stated, in relevant part:

> Historically, backlog disappeared 30 days before I ship it, and you're left holding the bag. So the LTSAs, somebody is going to get the bat phone and call and say, we got a problem, 6 months, 9 months from now, let's have a conversation. **<u>So we'll have the conversation, but it has to be a win-win.</u>**

* * *

> **<u>So all of these are win-win. Now, if the customer is not interested in a win-win, but a win/lose, that's where it's ironclad. It's a legally binding agreement that both parties in a win-win will renegotiate an amendment. But net of that, we're not going to be left holding the bag.</u>**

115. El-Khoury's foregoing statements were materially false or misleading when made, or failed to state facts necessary to make the statements not misleading, because they misrepresented that if a customer called months in advance of slowing demand in order to renegotiate its LTSA, the obligations on the customer were "ironclad" because Onsemi management would only allow an amendment that generated a corresponding "win" for the Company. In actuality, and in contrast to the foregoing statements, Onsemi's LTSAs were not ironclad because management had the discretion to permit customers to indefinitely push out—or forgo placing—purchase orders, thus allowing a "win-lose", as evidenced by:

(a) According to CW1, Onsemi was informed "a quarter before" (*i.e.*, fourth quarter 2022) that orders scheduled for February and March of 2023 from a "significant" military customer subject to an LTSA would not be placed as required by the LTSA. Instead, the purchase orders were indefinitely delayed, and were never made by the time CW1 left Onsemi in July 2023. When CW1 raised this issue to Defendant El-Khoury's direct report in "early" 2023, management responded with "crickets," "shrugg[ed]" it off and hoped that the required orders would be placed in the future, rather than deciding to

enforce the LTSA against the customer. As CW1 explained, "there was no penalty" for the military customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(b) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted that, contrary to Defendants' misrepresentations, Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes on a discretionary "case by case" basis, and that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit.

(c) During the 2023 Q3 Earnings Call (*see* Section VI, *infra*), Defendant El-Khoury admitted that a large automotive customer subject to Onsemi's LTSA was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded that any offsetting "win" to Onsemi was illusory as he stated "[w]e're not commenting on" any timeline to recognize such a benefit, thereby creating a volatile 20% swing in Onsemi's annual SiC demand for 2023, leading UBS Securities analysts to conclude that "[t]he bloom is 'off the rose' with respect to ON's long term supply

agreements" and "this [quarter] shows the very limited value of LTSAs[.]"

## VI. DEFENDANTS REVEAL THE TRUTH

116. On October 30, 2023 at 9 a.m. E.T., Onsemi held an earnings call before the stock market opened for trading that day to disclose the Company's financial and operating results for its third fiscal quarter of 2023 ended September 29, 2023 (the "2023 Q3 Earnings Call"). During the 2023 Q3 Earnings Call, Defendants shocked investors and analysts when they revealed that the LTSAs, which Defendants had spent over two years extolling to investors as an "ironclad" buffer from demand fluctuations, lacked the durability that Defendants falsely represented.

117. Specifically, Defendant El-Khoury explained that "for the full year, a single automotive OEM's recent reduction in demand will impact our $1 billion target and we now expect to ship more than $800 million of silicon carbide in 2023[.]" Thus, Onsemi would not achieve the forecasted $1 billion in SiC revenue in 2023, but instead would fall $200 million—or 20%—short of the revenue that had previously been represented as "secured" and "locked in" by "legally binding" LTSAs.

118. During the 2023 Q3 Earnings Call, Defendants conspicuously never announced that Onsemi would receive an offsetting benefit for agreeing to amend the "legally binding" LTSA with the automotive OEM. In other words, Onsemi had not achieved a "win-win" to compensate for the $200 million shortfall. In fact, Defendants confirmed on the 2023 Q3 Earnings Call that they had no idea at that time if the automotive OEM's "recent demand softness" would ever reverse course, and that they would just have

to "wait" and see. Specifically, in response questioning from Piper Sandler & Co. analyst Harsh V. Kumar, Defendants El-Khoury and Trent stated:

> **Hassane S. El-Khoury**
> . . . . As far as the EV, yes, it is a single customer. I wouldn't say it is broad as far as in this immediate quarter. But we still expect it to grow in Q4. So it is not a -- I don't want to paint it as any decline or any issue in demand for EVs. EV demand is going to grow. It's going to grow in the fourth quarter and it's going to grow in 2024. It just didn't grow as much as we expected it to. And ***that's demand-driven, whether it's short-term demand or anything different, we'll have to wait*** until we get closer to '24.
>
> **Thad Trent**
> Just to be clear, on the silicon carbide, the expectation of being over $800 million, the impact there is 1 customer. It's the ***recent demand softness*** at 1 customer.

119. When further pressed about the durability of Onsemi's LTSAs by UBS Securities analyst Timothy Michael Arcuri, Defendant El-Khoury completely redefined how Defendants had previously described their so-called "win-wins"—admitting that the LTSAs were not enforced with respect to the automotive OEM, and that, previously unbeknownst to investors, Defendants renegotiated LTSAs on a "case by case" basis which could result in indefinitely delayed or illusory benefits for Onsemi over some unspecified "longer term." With respect to the SiC customer specifically responsible for the guidance cut, Defendants refused to even commit to an offsetting win *by 2025*, stating:

> **Timothy Michael Arcuri**
> I just wanted to ask a question also on the 2023 silicon carbide cut from $1 billion down to $800 million. You guys had always talked about LTSAs being legally binding and it didn't seem like they would be subject to any changes in EV ramps. It sounded like a little bit of a higher bar than what we hear from others. So can you talk about that? …

> **Hassane S. El-Khoury**
> … So the LTSAs are legally binding. Therefore, for us to agree or even acknowledge that pushout or even the demand in general, ***outside of silicon carbide in Q4***, there has to have been, which there is, a win-win for us and the customer. We've always said, if anything, the LTSAs give us a phone call. We get the phone call way ahead of time in certain areas when the customer knows that it's coming. And we're able to manage with the customer for a win-win, ***whether that win-win is a quarter later or a year later or a longer term that depends on case by case***. So we manage it with the customer because ***what we don't want is, of course, enforce the LTSA at the expense of just shipping inventory if demand is lower***. So we take it very cautiously. We have – it has to be a win for us but also a win for the customer and that's what keeps the strategic customers engaged.
>
> **Timothy Michael Arcuri**
> Got it. Got it. Sure. So given that, is the commitment still to $4.5 billion ***between '23 and '25***, so that we still have [$3.7 billion] left between '24 and '25?
>
> **Hassane S. El-Khoury**
> ***We're not commenting on that***. What I have commented is, obviously, if you take the growth rate that I described in 2024, you can compare it to where we were before. So no change in our outlook.

120. The sudden revelation—just two months before the end of the year—that a customer subject to an LTSA had weakening demand and would not take delivery of $200 million of SiC products in 2023 was in stark contrast to Defendants' earlier claims that the LTSAs made customers "legally liable" for minimum purchase commitments, even in the face of weakening demand (*i.e.,* "softness") and that the call from the customer "guarantee[d]" by the LTSAs would give Onsemi enough time to proactively manage its business rather than merely react to sudden changes in demand.

121. Additionally, the announcement that the Company would only achieve $800 million of SiC revenues in 2023—$200 million less than Onsemi's LTSA customers had "committed" for 2023—clearly contradicted the Defendants earlier assurances that the

LTSAs were legally enforceable "take or pay" contracts with minimum purchase commitments that "locked in" revenues, such that Onsemi would achieve $1 billion in SiC revenues in 2023.

122. Defendant El-Khoury also admitted that the earlier misrepresentation that "our LTSA is a multiyear in duration, where both *volume* and pricing is locked in" was false, stating instead that "LTSAs continue to provide demand visibility and stability in *pricing*," conspicuously omitting any mention of benefits relating to customer purchase *volume* commitments.

123. Notwithstanding Defendants' claims that any amendment to Onsemi's LTSAs "has to be a win-win"—a purportedly "ironclad" provision of LTSAs—and that LTSAs covered "committed revenue," analysts understood that the $200 million reduction in the Company's 2023 SiC revenue revealed the true state of affairs: that LTSAs did not "commit[] revenue" or "lock[] in" product sales volume.

124. On October 30, 2023, BofA Securities analysts put it bluntly regarding the basis for the Company's stock valuation: "[b]y guiding down Q4 [Onsemi] has created doubts about the durability of its [SiC LTSAs], a key part of the bull thesis." UBS Securities ("UBS") likewise noted that "[t]he bloom is 'off the rose' with respect to [Onsemi]'s [LTSAs]" and that it was "cutting [their] C2024 [earnings per share]," while Goldman Sachs & Co. LLC concluded that the disclosure "brings into question . . . the viability of LTSAs."

125. On this news, the price of Onsemi common stock plummeted $18.18 per share, or nearly 22%, from a close of $83.52 per share on October 27, 2023, to close at $65.34 per share on October 30, 2023.

## VII. POST CLASS PERIOD EVENTS

### A. Onsemi Files Its 2023 Annual Report With the SEC Which Revises the Company's Risk Factors, Thereby Confirming That LTSAs Carry the Same Risks That Investors Ascertained From Defendants' Corrective Disclosures

126. Soon after the truth about the Company's LTSAs became known to investors, the Defendants added and corrected language in the Company's annual filings to more accurately describe the business and the risks associated with the business.

127. Specifically, in Onsemi's annual report for the year ending December 31, 2023, filed with the SEC on Form 10-K on February 5, 2024 (the "2023 Form 10-K"), Defendants added language to the description of the Company's business under the heading "Customers" which explained that the Company's long-term supply agreements contained provisions that allowed for renegotiation:

> During 2023, we continued to enter into long-term supply agreements with certain strategic end-customers, which generally include minimum purchase commitments or amended existing terms based on mutual agreements. **Certain of our agreements, subject to our standard terms and conditions, have provisions allowing for renegotiation upon mutual agreement**.

128. Absent from this new description of the LTSAs were any of the previous claims that LTSAs would not be amended unless such amendment would be a "win" for the Company.

129. Defendants also added risk warnings to the 2023 Form 10-K explaining that the Company would amend terms of LTSAs when they believe doing so advances the long-term customer relationship, not only when amendment includes an offsetting benefit for the Company:

> Furthermore, **certain customers, from time to time, have sought and may seek to amend the delivery or other terms of their long-term supply agreements** with us. When any such contractual amendments are made, **the timing,** pricing **or amount of products delivered under such long-term supply agreements may be modified in circumstances where we believe it advances the long-term customer relationship** or provides us with other benefits. Such an event could have an impact on our results of operations.

130. Absent from this risk warning was any of the previous claims that any amendment to the LTSAs would "net-net" benefit the Company or that the benefits received by the Company would "offset" any volumes that were conceded.

131. The Defendants also added details to Note 3 to the Financial Statements in the 2023 Form 10-K which, in addition to specifying the amount of revenues expected to be realized under the existing LTSAs, warned that "the actual revenue recognized for the remaining performance obligation [under LTSAs] in future periods may significantly fluctuate from these estimates."

132. Thus, after failing to provide such details and risk warnings regarding the Company's LTSAs in the 2022 Form 10-K (and quarterly reports filed throughout the Class Period), Defendants added material information to the 2023 Form 10-K that contradicted their earlier false and misleading statements and admitted much of the previously-concealed information concerning LTSAs, their limitations, and their risks.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

133. The facts alleged herein create a strong inference that Defendants acted with scienter when issuing the misrepresentations alleged in this complaint.

134. Evidence that Defendants knew or recklessly disregarded that Onsemi's LTSAs were not "ironclad," did not "lock in" revenues, and the Company's revenues were still subject to the risks that customers would not place the purchase orders required in the LTSAs includes the following: (a) Defendants El-Khoury and Trent were directly responsible for negotiating, signing, executing, and managing the LTSAs with customers, were aware of the LTSAs terms and conditions, and tracked relevant metrics and Key Performance Indicators ("KPIs"); (b) Defendants frequently spoke publicly, in detail, about the LTSAs, demonstrating their deep knowledge of the terms and conditions of the LTSAs and the manner in which the LTSAs were executed, (c) Defendants El-Khoury and Trent had previous experience—both at Onsemi and in their positions at other companies—in which customers entered into LTSAs and subsequently refused to place the required purchase orders or sought to amend those agreements due to changes in demand; (d) Defendants previously warned about such risks in the 2019 and 2020 Form 10-Ks, but removed those risk warnings from the 2021 and 2022 Form 10-Ks; (e) LTSAs were a core operation at Onsemi; (f) the Defendants received notice before the Class Period that an automotive customer would not take delivery of $200 million of products in 2023, despite being subject to an LTSA; (g) the Individual Defendants were motivated to artificially inflate Onsemi's stock price—even if only temporarily—to obtain greater compensation

and to sell stock at higher prices; and (h) Defendant El-Khoury's insider trades during the Class Period were highly unusual and suspicious.

### A. The Individual Defendants' Primary Roles in Negotiating, Signing, Executing, and Monitoring the LTSAs Raise a Strong Inference of Scienter

**Defendants Negotiated and Signed the LTSAs**

135. Defendants El-Khoury and Trent and Onsemi's Head of Sales were directly responsible for negotiating the Company's LTSAs, personally signed every LTSA, and required customers' board members or officers to countersign. On January 5, 2023 during a presentation at JPMorgan's 21st Annual Tech/Auto Forum, Defendant El-Khoury explained that Onsemi's LTSAs were not signed by low-level or mid-level employees of the contracting parties, but instead were signed by officers and board members of the companies involved in the agreement, including himself and Defendant Trent:

> And when I say by the customer signed, it's not -- not minimizing the title, but it's not a director of procurement that's going to sign the -- in Europe, it's a member of the Board. In North America, it has to be an officer of the company. ***For ourselves, it's me, Thad or our Head of Sales that sign***. So they are legally binding agreement, because they're liability for the customer because they're take or pay.

136. Defendants' direct involvement in the negotiation, approval, and signing of the LTSAs raises a strong inference that the misrepresentations were made with scienter, because Defendants would have been familiar with the specific terms and conditions of the LTSAs and would have known that the LTSAs were not "ironclad" and did not guarantee a benefit or "win" for the Company if the parties renegotiated or amended an LTSA.

**Defendants Closely Managed the Execution of the LTSAs**

137. Defendants' close management of the execution of the LTSAs also raises a strong inference that the misrepresentations were made with scienter.

138. CW1 confirmed that El-Khoury managed the LTSAs through the heads of business units and sales. CW1 stated that CW1's business unit was led by Michel De Mey at one point, and Terry Danzer at another, and that these business unit leaders reported directly to Defendant El-Khoury.

139. CW1 also attended "all-hands" meetings every quarter during CW1's tenure at Onsemi which occurred four weeks after the end of each quarter, after the Company's earnings calls with investors. CW1 stated that Defendants El-Khoury and Trent spoke at nearly all these meetings. CW1 recalled Defendant El-Khoury was very focused on LTSAs, stating "Hassane [El-Khoury] talked about them all the time" and "that's all he really spoke about."

140. CW1 heard from Onsemi's sales teams that Defendant El-Khoury was pushing sales managers to obtain more LTSAs with customers. CW1 stated that Defendant El-Khoury was deeply involved in the details of the LTSAs.

141. The Individual Defendants' deep involvement with and careful management of the execution of the LTSAs raises a strong inference that they knew the LTSAs' material terms as well as customers' compliance with the LTSAs, and, consequently, that Defendants' misrepresentations were made with scienter.

**<u>Defendants Monitored Relevant Metrics and KPIs Concerning the Revenues and Product Ramps, Including Those Covered by the LTSAs</u>**

142. The Individual Defendants also admittedly tracked key performance indicators ("KPIs") and used them to inform their decisions for Onsemi's business. On October 30, 2023, Defendant El-Khoury assured investors during the 2023 Q3 Earnings Call that "Thad [Trent] and I look at about 30 pages of KPIs that try to triangulate the health of the business…" and "these KPIs are what lead us to making … decisions." With respect to Onsemi's silicon carbide business in particular, El-Khoury had told investors during the 2022 Q2 Earnings Call that "I'm not worried about the metrics. ***I personally review*** those metrics. I'm a technology person other than a CEO…." (Emphasis added).

143. Moreover, the Individual Defendants' compensation was tied, in part, to the Company's revenues and other financial and strategic metrics, ensuring that Defendant El-Khoury and Defendant Trent carefully tracked Onsemi's contracts with its biggest customers. Specifically, the Individual Defendants' compensation for 2023 was tied to the achievement of certain metrics in new product revenue, SiC product revenue ramp, design wins, and operating margin.

144. Thus, through their tracking and review of Onsemi's KPIs and other relevant metrics, the Individual Defendants knew or recklessly disregarded that some customers—like the military customer described by CW1—were not placing orders as required by the LTSAs, raising an inference that Defendants' misrepresentations were made with scienter.

145. In sum, the Individual Defendants' primary roles in negotiating, signing, executing, managing, and monitoring the LTSAs raises a strong inference that the

misrepresentations were made with scienter. Given the Defendants' deep knowledge of and familiarity with the terms and provisions of the LTSAs and the execution and management of those LTSAs, Defendants would have known that the LTSAs were not "ironclad" and did not guarantee an offsetting benefit or "win" for Onsemi if the contracting parties agreed to renegotiate or amend the terms of an LTSA.

### B. Defendants' Extensive, Detailed Commentary on the LTSAs Raises a Strong Inference of Scienter

146. Before and throughout the Class Period, Defendants El-Khoury and Trent spoke publicly and extensively about the LTSAs, demonstrating their knowledge of the details of the LTSAs. Defendants spoke to investors and answered detailed questions about the LTSAs on no fewer than twenty-seven occasions, including:

| DATE | DEFENDANT | PUBLISHER | EVENT/CALL |
|---|---|---|---|
| 9/7/2023 | El-Khoury, Trent | Onsemi / Citigroup Inc. / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Citi's 2023 Global Technology Conference |
| 8/30/2023 | El-Khoury, Trent | Onsemi / Deutsche Bank AG / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Deutsche Bank's 2023 Technology Conference |
| 8/7/2023 | Trent | Onsemi / KeyBanc Capital Markets Inc. / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at KeyBanc's Technology Leadership Forum 2023 |
| 7/31/2023 | El-Khoury | Bloomberg | Scale Not an Issue for ON Semi, Says CEO El-Khoury |
| 7/31/2023 | El-Khoury | CNBC "Squawk on the Street" | Onsemi CEO: Strength in electrification of auto market has given us solid results and outlook |

| DATE | DEFENDANT | PUBLISHER | EVENT/CALL |
|---|---|---|---|
| 7/31/2023 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q2 2023 Earnings Call |
| 6/12/2023 | El-Khoury | Fortt Knox by CNBC | Hassane El-Khoury, onsemi CEO, on joining the Nasdaq 100 |
| 6/6/2023 | El-Khoury, Trent | Onsemi / BofA Securities / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Bank of America 2023 Global Technology Conference |
| 5/23/2023 | El-Khoury, Trent | Onsemi / JPMorgan Chase & Co / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at 51st Annual JPMorgan's Global Technology, Media and Communications Conference 2023 |
| 5/19/2023 | El-Khoury | Investor's Business Daily | Onsemi CEO: Silicon Carbide 'Still The Way That Everybody Is Going'—Including Tesla |
| 5/16/2023 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Analyst/Investor Day |
| 5/1/2023 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q1 2023 Earnings Call |
| 3/7/2023 | El-Khoury, Trent | Onsemi / Morgan Stanley / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Morgan Stanley Technology, Media & Telecom Conference |
| 2/6/2023 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q4 2022 Earnings Call |
| 1/5/2023 | El-Khoury, Trent | Onsemi / JPMorgan Chase & Co / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at JPMorgan 21st Annual Tech/Auto Forum |
| 12/6/2022 | El-Khoury, Trent | Onsemi / NASDAQ / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at |

| DATE | DEFENDANT | PUBLISHER | EVENT/CALL |
|---|---|---|---|
| | | | NASDAQ 47th Investor Conference |
| 11/29/2022 | El-Khoury, Trent | Onsemi / Credit Suisse AG / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Credit Suisse 26th Annual Technology Conference |
| 10/31/2022 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q3 2022 Earnings Call |
| 9/8/2022 | El-Khoury, Trent | Onsemi / Citigroup Inc. / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Citi's 2022 Global Technology Conference |
| 8/31/2022 | El-Khoury, Trent | Onsemi / Deutsche Bank AG / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Deutsche Bank's 2022 Technology Conference |
| 8/8/2022 | El-Khoury, Trent | Onsemi / KeyBanc Capital Markets Inc. / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at KeyBanc Capital Markets 23rd Annual Technology Leadership Forum |
| 8/1/2022 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q2 2022 Earnings Call |
| 6/8/2022 | El-Khoury, Trent | Onsemi / BofA Securities / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Bank of America 2022 Global Technology Conference |
| 5/2/2022 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q1 2022 Earnings Call |
| 2/7/2022 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q4 2021 Earnings Call |
| 11/1/2021 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q3 2021 Earnings Call |

| DATE | DEFENDANT | PUBLISHER | EVENT/CALL |
|---|---|---|---|
| 8/2/2021 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q2 2021 Earnings Call |

147. As an example of Defendants' commentary, on January 5, 2023 Defendant El-Khoury assured investors that the LTSAs required the approval and signature of one of three of Onsemi's top executive officers—and the signature of customers' board members or officers—and that the LTSAs were "legally binding" and enforceable. These statements were calculated to lend as much credibility as possible to the LTSAs to assure investors that the LTSAs provided Onsemi with material benefits, including reduced order volatility and locked in revenues "because they're take or pay" contracts. Defendant El-Khoury's commentary on the enforceability and benefits of the LTSAs demonstrates that El-Khoury knew the details of the LTSA provisions and raises a strong inference that Defendants' misrepresentations throughout the Class Period were made with scienter.

148. Defendants' pervasive public commentary about Onsemi's LTSAs demonstrates that Defendant El-Khoury and Defendant Trent were both deeply knowledgeable and intimately involved with the formation and execution of the LTSAs, raising a strong inference that the misrepresentations were made with scienter.

### C. Defendants' Prior Notice of Large, "Significant" Customers Violating LTSAs Without Penalty Raises a Strong Inference that Defendants Made the Misrepresentations with Scienter

149. As described in Section IV.F., *supra*, in early 2023, just a few months before the beginning of the Class Period, a large customer failed to place the purchase orders required by an LTSA. CW1 explained that CW1 raised this issue to Michel De Mey who

was Defendant El-Khoury's direct report. Thus, prior to the Class Period, the Individual Defendants knew or recklessly disregarded that a large, "significant" military customer indefinitely delayed orders required by the LTSA, evidencing that the LTSAs did not guarantee volumes and that there were still significant risks that customers would cancel or indefinitely delay orders that were required by LTSAs.

150. The Individual Defendants' prior notice of large customers indefinitely delaying purchase orders required by the LTSAs raises a strong inference that the Defendants' misrepresentations were made with scienter.

**D. The Defendants' Removal of Relevant Risk Warnings Raises a Strong Inference that the Misrepresentations Were Made with Scienter**

151. The Defendants' removal of relevant Order Cancellation and Demand Uncertainty Risk Warnings, the addition of language denying such risks, and the subsequent, post-Class Period reversal to warn of those risks, raises a strong inference that Defendants' misrepresentations were made with scienter. *See* Sections IV.B., IV.E., VII.A., *supra*.

152. Prior to the Class Period, in Onsemi's 2020 Form 10-K filed on February 16, 2021, the Defendants warned that the Company was subject to "[u]ncertainties regarding the timing and amount of customer orders[,]" end-user demand for customers' products was difficult to predict, customers may cancel orders 30 days prior to shipment without incurring a penalty, and customers may artificially inflate their demand signals, which "may materially adversely affect our results of operations, and inventory write-downs, which may materially adversely affect our financial condition."

153. That Onsemi's Form 10-K filed on February 16, 2021 included these risk warnings is evidence that these risks were material to Onsemi's business and that the Defendants were aware of and carefully considered these risks.

154. But in subsequent Form 10-Ks filed in February 2022 and February 2023 that were signed by both El-Khoury and Trent, the Defendants ceased warning investors of these risks. Instead, evidencing a knowing or reckless design to convince investors that LTSAs would eliminate previously experienced risks, Defendants chose to represent that "our current agreements, including orders subject to minimum purchase commitments under our longer-term supply arrangements, are not subject to cancellation."

155. That Defendants changed the language of the Form 10-Ks to cease warning of risks relating to demand uncertainty and customer order cancellations, and chose to affirmatively represent that "our current agreements…are not subject to cancellation[,]" is evidence that the Defendants made the misrepresentations throughout the Class Period after carefully considering the risks of the business, which raises a strong inference that the misrepresentations were made with scienter.

156. Furthermore, the risks articulated in the Order Cancellation and Demand Uncertainty Risk Warnings never simply disappeared during the Class Period. Indeed, that Defendants were forced to reintroduce relevant risk warnings after the Class Period is evidence the Form 10-Ks filed in February 2022 and February 2023 lacked warnings for materials risks that should have been included.

157. Thus, the removal of relevant risk warnings from the Onsemi's Form 10-Ks filed in February 2022 and February 2023, the addition of language in those Form 10-Ks

denying such risks, and the subsequent reversion after the Class Period to warn of the relevant risks is evidence that the Defendants acted with scienter when making misrepresentations about the LTSAs throughout the Class Period.

**E. LTSAs Are Integral to Onsemi's Core Operations**

158. The LTSAs that the Individual Defendants repeatedly touted throughout the Class Period were critical to Onsemi's core operations, which raises a strong inference that the misrepresentations they made regarding the LTSAs throughout the Class Period were made with scienter.

159. As alleged in Section VIII.A., *supra*, the Individual Defendants had personal knowledge of the terms of Onsemi's LTSAs due to their close involvement with the agreements. By Company policy, the LTSAs had to be signed by the Individual Defendants or Onsemi's head of sales. That these critical sales agreements could only be signed by a group of just three of the Company's high-ranking executives, limited to El-Khoury, Trent, and just one other individual, indicates El-Khoury's and Trent's fastidious knowledge of, and involvement in, Onsemi's LTSAs.

160. Cut by any metric, it would be absurd for the Individual Defendants to not have been intimately knowledgeable of the terms of Onsemi's LTSA and not know that they had discretion to take a loss for Onsemi to retain a strategic customer, because LTSAs were part of the Company's core operations.

161. Given the Company's LTSAs going into 2023 represented $16.6 billion in committed revenue, a staggering amount for a company that reported revenues of $8.326 billion for fiscal year 2022, it would be absurd for the Individual Defendants—Onsemi's

CEO and CFO—to not have closely tracked LTSAs and been fully aware of their terms and conditions.

162. Indeed, the Company's 2022 annual report, filed with the SEC on Form 10-K on February 6, 2023 and signed by Defendants El-Khoury and Trent, provided an "Overview" of Onsemi's business by stating "*our primary focus* continues to be on profitable revenue growth in our focused end-markets of *automotive* and industrial infrastructure, *as well as obtaining longer-term supply arrangements* with strategic end-customers."

163. Prior to and throughout the Class Period, Defendant El-Khoury repeatedly affirmed that he considered LTSAs, particularly for strategic automotive customers and for SiC products, to be "core" to Onsemi's operations. For example, El-Khoury reminded investors at a November 29, 2022 Credit Suisse technology conference how crucial LTSAs were to Onsemi, stating "on the core business, specifically on auto and industrial, you heard me talk about LTSAs," adding "I can tell you, for example, silicon carbide, 100% is LTSAs. Businesses where we are adding capacity are 100% on LTSA," going as far as to say "[w]e're not going to invest in [capital expenditure] unless there's a signed LTSA."

164. Similarly, El-Khoury stated in a February 6, 2023 earnings call that "LTSAs are not only for automotive, but they are for growth areas where we have been putting investments," to which Defendant Trent clarified that "[t]he place that we are not doing LTSA, obviously, is the non-core business that we're trying to exit." El-Khoury also stated at the 2022 KeyBanc Forum that Onsemi had "doubled down on silicon carbide" as a

"technology that we can … bring into our core market," while noting that "[s]trategically, auto and industrial is where … we're headed."

165. Indeed, as a result of Defendants' focus on securing LTSAs for SiC products, Onsemi reported that, as of the 2023 Analyst Day in May 2023, $9 billion of the company's then "over $17 billion of LTSAs"—over *half*—were for SiC products. Of that $9 billion in SiC revenue, Defendants represented on several occasions prior to and throughout the Class Period that $1 billion was "committed" to be recognized in 2023.

166. Thus, it would be absurd to suggest that the Individual Defendants, who were admittedly "doubling down" on SiC products in 2023 and considered automotive to be a "core" business, would not be aware that an automotive customer's LTSA— *representing at least* $200 million, or 20%, of Onsemi's 2023 SiC revenue—ran the risk of amendment or cancellation to the detriment of Onsemi.

167. Given Defendants removed the relevant risk warning from the Company's SEC filings (*see* Section VIII.D., *supra*), it would be especially absurd to suggest that the Individual Defendants were not aware of the risks to the Company's core operations, particularly that LTSA customers could seek to amend the agreements to the detriment of Onsemi and that Defendants had the discretion to agree to amendments that were not a "win" for the Company.

168. Thus, the LTSAs' critical importance to Onsemi's core operations raises a strong inference that the Defendants made the misrepresentations about the LTSAs throughout the Class Period with scienter.

### F. Defendants Received Notice Before the Class Period that a Large Automotive Customer Would Not Take Delivery of $200 Million in Minimum Purchase Commitments in 2023, But Continued Representing LTSAs Were "IronClad"

169. By Defendants' own admissions, Onsemi's LTSAs guaranteed that Onsemi received notice of customers' weakening demand six or nine months in advance, which would purportedly allow the Company time to negotiate a win-win for Onsemi. For example, during the 2022 KeyBanc Forum on August 8, 2022, Defendant El-Khoury explained that if a customer was experiencing weakening demand, "the LTSA guarantees somebody is going to pick up the bat phone and call me because there's a liability in there." El-Khoury added that "I'm going to get a call ahead of everybody else"—*i.e.*, Onsemi's competitors—"to figure out what are we going to do about it."

170. Leading up to the Class Period, El-Khoury repeatedly described that the "guarantee[d]" phone call from customers about weakening demand would come at least six months in advance and would give Onsemi the time needed to "move that capacity elsewhere…."

171. Defendants El-Khoury and Trent repeated these assurances of an early warning phone call throughout the Class Period. For example, on May 23, 2023 at the 2023 JPMorgan Conference, Defendant Trent stated that Onsemi was "getting the call quarters in advance of [softening customer demand]" and on September 7, 2023, during the 2023 Citi Conference, when asked "how iron clad are those [LTSAs]," Defendant El-Khoury explained that "[with] the LTSAs, somebody is going to get the bat phone and call and say, we got a problem, 6 months, 9 months from now, let's have a conversation."

172. Thus, by Defendants' own admissions, Defendants received notice *before* the Class Period that a major automotive customer would not be purchasing $200 million of SiC products in 2023 (the "Automotive Customer's Notice"), contrary to the customer's LTSA. Indeed, for Defendants to reveal the $200 million shortfall in the 2023 Q3 Earnings Call—which reported Onsemi's results for the quarter ended September 29, 2023—the Automotive Customer's Notice would have had to have been provided at least six months prior to the end of that quarter, or on March 29, 2023, thus giving Defendants notice well before the Class Period.

173. CW1 further corroborates that the Company received advance notice from customers under LTSAs when their demand for Onsemi product was expected to drop. As CW1 explained, when a customer wasn't going to place an order as contemplated by the LTSA, "I knew well in advance, a quarter before, that it wasn't going to occur."

174. Despite the Automotive Customer's Notice, which Onsemi received before the Class Period began, Onsemi did neither: a) negotiate a "win-win" with the customer; reallocate its production capacity to serve another customer in the capacity-constrained industry; or b) enforce the "take or pay" provisions of the LTSA. Indeed, Defendants revealed a whopping $200 million shortfall (one *fifth* of that year's supposedly "committed" SiC revenue) without disclosing a corresponding "win" for Onsemi.

175. Thus, Defendants' abjectly false representations throughout the Class Period were made with the knowledge or reckless disregard for the fact that Onsemi's LTSAs were not "ironclad," did not "lock in" revenues, could or would not be enforced at the discretion

of Onsemi's management, and did not guarantee that amendments to LTSAs would include a "win" or offsetting benefit for the Company.

### G. Defendants Had Motive to Inflate the Price of Onsemi Stock in Order to Increase Their Compensation

176. The Individual Defendants were motivated to artificially inflate the price of Onsemi's stock because their compensation was determined, in part, by the Company's stock price during the Class Period.

177. Onsemi has an executive compensation program which is administered by the Human Capital and Compensation Committee of the Company's Board of Directors (the "HCC"), which "strives to … [i]incentivize [Onsemi's] employees … to deliver superior returns to [Onsemi's] stockholders."

178. At the beginning of 2023, the HCC approved Onsemi's executive compensation program for 2023, which included a Long-Term Incentive Program ("LTI Program") that grants performance-based restricted stock units ("PBRSUs") contingent upon the Company's achievement of four separately scored, one-year goals.

179. To "link variable pay to stockholder value," the HCC specified that the number of PBRSUs granted to the Individual Defendants would increase or decrease by a multiplier which would be determined by Onsemi's total stockholder return ("TSR") relative to those of the Company's peers in the semiconductor industry. TSR is determined, in large part, by changes in stock price.

180. According to the TSR adjustment component, the number of PBRSUs that the Individual Defendants were to be awarded for 2023 performance would be multiplied

by 150% if Onsemi's TSR was in the top 25% of companies in its peer group for the relevant period. Conversely, if the Company's TSR fell in the bottom 25% of companies in the peer group, the Individual Defendants would earn 50% fewer PBRSUs.

181. Thus, if Onsemi's TSR—determined largely by changes in stock price—was in the top 75% of companies in its peer group, the Individual Defendants' PBRSU awards would be *three times greater* than if Onsemi's TSR was in the bottom 25%.

182. Considering that the target value of PBRSUs to be awarded to Defendant El-Khoury in 2023 was $10.5 million, the TSR multiplier could cause El-Khoury's PBRSU compensation to be reduced to as little as $5.25 million or increased as high as $15.75 million. Thus, Defendant El-Khoury was set to lose—or gain—$10.5 million depending on Onsemi's stock price at the end of 2023.

183. Similarly, Defendant Trent's PBRSU compensation could be as low as $1.8 million or as high as $5.4 million, depending on TSR multiplier. Thus, Defendant Trent was set to lose—or gain—$3.6 million depending on Onsemi's stock price at the end of 2023.

184. Thus, with Onsemi's executive compensation program tied to the Company's share price, the Individual Defendants were highly incentivized to artificially inflate the price of Onsemi stock, maintain that artificial inflation, and thereby maximize their 2023 compensation. Indeed, it appeared clear to CW1, who heard Defendant El-Khoury talk "all the time" at Company-wide meetings about Onsemi's LTSA strategy for SiC, that El-Khoury's focus on these items was all about pushing the price of Onsemi stock higher.

185. That the Individual Defendants had a personal, pecuniary motive in artificially inflating Onsemi's stock price supports a strong inference of scienter.

### H. Defendant El-Khoury's Suspicious Insider Trades During the Class Period Are Indicative of Motive to Defraud

186. Defendant El-Khoury's stock sales during the Class Period are suspicious in timing and amounts, especially when compared to his prior trading history, which provides circumstantial evidence of scienter.

187. Defendant El-Khoury made the false and misleading statements in the 2023 Q1 Earnings Call on May 1, 2023 which caused or maintained artificial inflation in Onsemi's stock.

188. Thereafter, El-Khoury engaged in a stock selling spree that was unprecedented for him when compared to his prior sales of Onsemi stock:

(a) On May 15, 2023, El-Khoury sold 5,000 shares (roughly 0.83% of his holdings) on the open market for an average of $81.76 per share, for approximate proceeds of $408,800.

(b) On June 7, 2023, El-Khoury sold 22,500 shares (roughly 3.77% of his holdings) on the open market for an average of $90.01 per share, for approximate proceeds of $2,025,225.

(c) On June 15, 2023, El-Khoury sold on the open market 600 shares for an average of $91.87 per share and 21,900 shares for an average of $91.41 per share (roughly 3.92% of his holdings), for total approximate proceeds of $2,057,001.

(d) On July 18, 2023, El-Khoury sold 20,000 shares (roughly 3.63% of his holdings) on the open market for an average of $105 per share, for approximate proceeds of $2,100,000.

189. In total, El-Khoury sold 70,000 shares (approx. 13.17% of his holdings) for estimated proceeds of $6,591,026 during the Class Period. Further still, the prices at which El-Khoury sold his ON stock on three of the four foregoing dates were well above the prices of Onsemi stock at *any point* leading up to, and after, the Class Period—*i.e.,* El-Khoury was able to benefit from the artificial inflation in the stock.

190. Defendant El-Khoury sold his shares during the Class Period at a weighted-average price of $94.16 per share, and a high of $105. For comparison, the highest closing price of Onsemi stock from its IPO in 2000 up until the Class Period was $86.88 per share, and the highest closing price Onsemi has reached since the end of the Class Period (as of time of writing) is $86.21 per share. Thus, by making false and misleading statements during the Class Period starting May 1, 2023, Defendant El-Khoury was able to artificially inflate Onsemi's stock price and capitalize on that artificial inflation by selling his shares.

191. Defendant El-Khoury's foregoing stock sales during the Class Period were not made pursuant to 10b5-1 trading plans, *a departure from all of his prior open market sales leading up to the Class Period*. That these trades were not made pursuant to any published 10b5-1 plan contributes to the suspiciousness of his trades, as it indicates that El-Khoury hastily unloaded his Onsemi stock following his misleading statements to take advantage of the artificially-inflated stock price. Indeed, El-Khoury's only other open market sales of ON stock prior to the Class Period, which were executed on March 15,

2023 and July 18, 2022, were made pursuant to previously-adopted 10b5-1 plans, and on April 17, 2023, which was not made pursuant to any 10b5-1 plan.

192. Furthermore, Defendant El-Khoury's Class Period stock sales, representing 13.17% of his holdings, were significantly more substantial than the portions sold in his prior open market sales (0.82%, 0.82%, and 6.74% of his holdings for April 17, 2023, March 15, 2023, and July 18, 2022, respectively), which further indicates that he sold during the Class Period to take advantage of Onsemi's artificially-inflated stock price.

193. Indeed, El-Khoury's stock sales during the Class Period totaled approximately $6,591,026 in proceeds, compared to the roughly $1,903,903 in proceeds El-Khoury made from *all* of his open market trades prior to the Class Period. On average, El-Khoury sold his shares on the open market at an average of $94.16 per share during the Class Period, a whopping $30.66 per share (~48%) higher than the average $63.49 per share he achieved in open market sales prior to the Period.

194. Defendant El-Khoury's series of four sales in May through July in 2023 also stand out as suspicious considering that he made only one sale in the comparable period in 2022.

195. Thus, the size, timing, manner, and price of Defendant El-Khoury's stock sales during the Class Period are highly suspicious, indicative that he sold to take advantage of the inflated stock price, and raise a strong inference that the misrepresentations were made with scienter.

**IX. LOSS CAUSATION**

196. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Onsemi's common stock and/or maintaining the artificial inflation in Onsemi's common stock prices, by publicly issuing and endorsing materially false and/or misleading statements and omitting to disclose material facts necessary to make those statements, as set forth herein, not materially false or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose materially adverse information and/or misrepresented the truth about the Company's business, operations, and prospects as alleged herein. Specifically, Defendants' statements were materially and objectively misleading when made, as set forth *supra*, and had the cause and effect of creating in the market an unrealistically positive assessment of Onsemi's LTSAs and the sales revenues that the LTSAs purportedly "locked in."

197. At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiff and the other members of the Class. As a result of their purchases of Onsemi common stock during the Class Period at artificially inflated prices, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

198. Beginning before the market opened for trading on October 30, 2023, Defendants issued corrective disclosures in the Company's 2023 Q3 Earnings Call. These corrective disclosures revealed, *inter alia*, that contrary to Defendants' representations, Onsemi's LTSAs were not "ironclad" protection for the Company and its revenue because

Defendants had the discretion to renegotiate the LTSAs to provide concessions to customers without securing a corresponding benefit to Onsemi and, thus, any such purported benefit Defendants promised would be a "win win" for Onsemi, was illusory.

199. Market analysts were surprised by Defendants' disclosures. During the 2023 Q3 Earnings Call itself, analyst Timothy Arcuri of UBS stated plainly to Defendants that "[y]ou guys had always talked about the LTSAs being legally binding and it didn't seem like they would be subject to any changes in EV ramps." Arcuri questioned "on the 2023 silicon carbide cut from $1 billion down to $800 million … [w]as that some structural change … from one of your customers," which El-Khoury did not answer, stating "I'm not going to comment on specific customer details."

200. In a report published immediately prior to the 2023 Q3 Earnings Call, William Blair anticipated that "[k]ey items to be addressed on the call" included "[l]ong-term supply agreements – will these offer the assurances during a volatile market, particularly if all end-markets remain weak?" But after the Defendants revealed during the 2023 Q3 Earnings Call that Onsemi's LTSAs did not "lock in" or "secure" revenues and did not provide the Company with a warning of softening demand "quarters in advance," William Blair published a subsequent report, dated October 31, 2023, explaining that "protection from LTSAs is in question" and that "yesterday's surprise brings the power of LTSAs back down to earth." William Blair elaborated, furthering questioning the value of Onsemi's LTSAs:

> **What Happened to LTSAs?** The management team has been very confident in its LTSA strategy providing visibility and preventing demand surprises. We have questioned the efficacy of these LTSAs when push comes to shove,

> because if your customer cannot use the product, it is bad business to make them take it, and even worse business to sue your customer over contract fulfillment. We have seen "iron-clad" LTSAs fall apart in cyclical downturns, like polysilicon, telecom, LEDs, and even memory over the years. Management noted the LTSA worked and gave them an "early phone call" for visibility. In fact, it was positioned that a win-win arrangement was struck to allow for a push out of the $200 million in SiC devices. If we agree this is pushed out and not lost business, the LTSA did not prevent the 20% shock or provide enough time to redeploy the capacity. If an LTSA with Tesla is fallible, how should investors interpret the LTSAs with four of the top five Chinese EV players?

201. Truist also understood the Company's $200 million shortfall as revealing that the LTSAs did not provide the protection the Defendants had claimed, reporting on October 30, 2023 that "the [revenue] miss contrasts mgmt's confident messaging" and "LTSAs are proving not bulletproof." On this news, Truist lowered its price target for Onsemi's stock from $122 per share to $81, a decline of 34%.

202. Writing in an October 31, 2023 report, Benchmark was similarly surprised by the Company's sudden $200 million reduction in revenue expectations and "disappointed the LTSA were unable to smooth [quarter-over-quarter] volatility[.]" Benchmark explained that "the 8.3% [quarter-over-quarter] December decline is the largest sequential 4Q decline since 2011, and well below seasonality despite the expected LTSA protection." With a new understanding the LTSAs could not smooth volatility and did not provide the revenue protection Defendants had previously claimed, Benchmark lowered its price target for Onsemi's stock from $125 per share to $88 per share, a decline of 30%.

203. Likewise, after the Defendants revealed during the 2023 Q3 Earnings Call that the Company would miss its expected SiC revenues by $200 million, UBS published a report on October 30, 2023—titled "Big Step Back In Confidence/Credibility on SiC

Story"—that corrected investors' previous understanding that LTSAs "locked in" revenues, explaining that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements" and "this Q shows the very limited value of LTSAs[.]" UBS elaborated that "rather than recommitting to the $4.5B LTSA for 2023-2025, ON is simply now suggesting it will 'outgrow the market' by 2x[.]'" Accordingly, UBS cut its price target for Onsemi's stock from $100 to $80, a 20% decline.

204. In other words, while the market had previously relied upon the Defendants' misrepresentations that the LTSAs locked in revenues and ensured the Company would receive a warning of softening demand from customers "quarters in advance," the October 30, 2023 announcement that annual SiC revenues would fall short by 20% because a customer subject to an LTSA had canceled its orders revealed to investors that the LTSAs had "very limited value" and did not provide the certainty that Defendants had previously represented.

205. As a result of the Defendants' corrective disclosures, the Company's stock price fell from a closing price of $83.52 per share on Friday, October 27, 2023 to a closing price of $65.34 per share on Monday, October 30, 2023, a decline of $18.18 per share, or nearly 22% on exceptionally heavy trading volume, thereby removing the artificial inflation caused and/or maintained by Defendants' false and misleading statements and causing economic loss to investors who had purchased Onsemi common stock during the Class Period. Accordingly, Onsemi lost nearly $7.9 billion in market capitalization on October 30, 2023. The timing and magnitude of the stock price decline, the statements in Defendants' corrective disclosures, and the market's reaction negate any inference that the

loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or facts specific to the Company that were unrelated to Defendants' fraudulent conduct.

206. As shown in Figure 2, *infra*, Defendants' materially false and misleading statements about LTSAs served to artificially inflate the price of Onsemi's common stock throughout the Class Period and when the truth became known, the artificial inflation in Onsemi's stock price was removed.

**Figure 2.**




207. Between August 1, 2022 and November 30, 2023, the period shown above in Figure 2, the average price of Onsemi's common stock *outside of the Class Period* was $70.69, while the average price *during the Class Period* was $91.93, more than $21.00 higher.

## X. CLASS ALLEGATIONS

208. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Onsemi common stock during the Class Period (the "Class"), other than Defendants, and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

209. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Onsemi common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Onsemi or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

210. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

211. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities

litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

212. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Onsemi;

(c) whether the Individual Defendants caused Onsemi to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the price of Onsemi common stock was inflated during the Class Period due to the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

213. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. PRESUMPTION OF RELIANCE

214. Lead Plaintiff and other members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, *inter alia*:

(a) Onsemi common stock traded in an efficient market (discussed *infra*);

(b) Defendants made public misrepresentations and/or failed to disclose facts during the Class Period to make their statements not misleading;

(c) the facts that Defendants misrepresented and/or failed to disclose were material to investors;

(d) the material misrepresentations and/or omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Onsemi common stock; and

(e) without knowledge of the misrepresented and/or omitted facts, Lead Plaintiff and other members of the Class purchased or otherwise acquired Onsemi common stock between the time that Defendants made material misrepresentations and/or omitted material facts and the time that the true facts were disclosed.

215. At all relevant times, the market for Onsemi stock was an efficient market as evidenced by, *inter alia*:

(a) Onsemi common stock met the requirements for listing, and was listed and actively traded on The Nasdaq Stock Market, a highly efficient and automated market;

(b) At all times throughout the Class Period, Onsemi had more than 430 million shares of common stock outstanding and a market capitalization exceeding $26 billion;

(c) As a regulated issuer, Onsemi filed periodic public reports with the SEC and NASDAQ;

(d) Onsemi regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e) Onsemi was followed by many securities analysts employed by major brokerage firm(s), including BofA Securities, Citigroup, Deutsche Bank, Goldman Sachs Group, JPMorgan Chase & Co., Mizuho Securities USA, Morgan Stanley, Needham & Company, Piper Sandler & Co., Stifel, Nicolaus & Company, Robert W. Baird & Co., Susquehanna Financial Group, TD Cowen, Truist Securities, UBS Securities, Benchmark, Truist Securities, Wells Fargo Securities, William Blair & Company, and Wolfe Research, who wrote reports

which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

216. As a result of the foregoing, the market for Onsemi common stock promptly digested current information regarding the Company from all publicly-available sources and reflected such information in the price of Onsemi common stock. Under these circumstances, all purchasers of Onsemi common stock during the Class Period suffered similar injuries through their purchase of the stock at artificially-inflated prices, and the presumption of reliance applies to such purchasers.

217. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are also grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Onsemi's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of revenue from Onsemi's LTSAs, that requirement is satisfied here.

## XII. NO STATUTORY SAFE HARBOR

218. The statutory safe harbor afforded by the PSLRA for forward-looking statements made under certain circumstances does not apply to Defendants' materially false and/or misleading statements as alleged in this pleading.

219. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

220. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include meaningful cautionary language required by the PSLRA.

221. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, *inter alia*, throughout the Class Period, Defendants had the discretion to amend or not enforce the terms of Onsemi's LTSAs in the interest of keeping strategic customers without obtaining a "win" or "offset[ting]" benefit for the Company.

222. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking

statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Onsemi who knew that the statement was false when made.

## XIII. COUNTS

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

223. Lead Plaintiff realleges each allegation as if fully set forth herein.

224. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants.

225. Defendants (a) employed devices, schemes and artifices to defraud; (b) made false or misleading statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

226. Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

227. Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

228. As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Lead Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

229. ON Semiconductor is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of respondeat superior, as those persons were acting as the officers, directors, and/or agents of Onsemi in taking the actions alleged herein.

230. Lead Plaintiff and the Class purchased Onsemi common stock, without knowing that Defendants had misstated or omitted material facts about the Company's financial performance or prospects. In so doing, Lead Plaintiff and the Class relied directly or indirectly on false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements. Lead Plaintiff and the Class were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

231. At the time of Defendants' false statements, misrepresentations and omissions, Lead Plaintiff and the Class were unaware of their falsity and believed them to be true. Led Plaintiff and the Class would not otherwise have purchased Onsemi common stock had they known the truth about the matters discussed above.

232. By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

233. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class have suffered damages in connection with their purchase of Onsemi common stock.

## **COUNT II**
## **For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

234. Lead Plaintiff realleges each allegation as if fully set forth herein.

235. This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants El-Khoury and Trent.

236. Each of the Individual Defendants, by reason of their status as senior executive officers and members of the board of directors of Onsemi, directly or indirectly, controlled the conduct of the Company's business and its representations to Lead Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Lead Plaintiff and the Class' investments in Onsemi common stock within the meaning of §20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

237. The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases, as evidenced by their signatures to the Company's Forms 10-Q and 10-K. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

238. The Individual Defendants knew or recklessly disregarded the fact that Onsemi's representations to its investors were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

239. By virtue of their high-level positions and their participation in and awareness of Onsemi's operations and public statements, the Individual Defendants were able to and did influence and control Onsemi's decision-making, including controlling the content and dissemination of the documents that Lead Plaintiff and the Class contend contained materially false and misleading information and on which Lead Plaintiff and the Class relied.

240. The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

241. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchase of Onsemi securities.

## XIV. PRAYER FOR RELIEF

**WHEREFORE,** Lead Plaintiff requests that the Court enter judgment as follows:

A. Certifying this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as a representative of the Class;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and members of the Class by reasons of the acts alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgement and post-judgment interest, as well as their reasonable experts' fees, costs, and attorneys' fees;

D. Granting Lead Plaintiff leave to amend this complaint to conform to the evidence; and

E. Awarding such other and further relief as the Court may deem just and proper.

## XV. DEMAND FOR A JURY TRIAL

Lead Plaintiff hereby demands trial by jury in accordance with Federal Rule of Civil Procedure 38(b).

DATED: June 3, 2024

Respectfully submitted,

/s/ *Gary A. Gotto*

**KELLER RORHBACK L.L.P**
Gary A. Gotto
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: 602-484-0088
Fax: 602-284-2822
ggotto@kellerrohrback.com

*Local Counsel for Lead Plaintiff Jeffery S. Lew and the Class*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
(State of Connecticut Juris No. 435545)
Gregory M. Potrepka (admitted *pro hac vice*)
(State of Connecticut Juris No. 437326)
David C. Jaynes (to be admitted *pro hac vice*)
(State of California Juris No. 338917)
P. Cole von Richthofen (to be admitted *pro hac vice*)
(State of Connecticut Juris No. 444159)

1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: djaynes@zlk.com
Email: cvrichthofen@zlk.com

*Lead Counsel for Lead Plaintiff Jeffery S. Lew and the Class*