**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffrey S. Lew, et al., | No. CV-24-00594-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| ON Semiconductor Corporation, et al., | |
| Defendants. | |

      Before the Court is Defendants ON Semiconductor ("Onsemi"), Hassane El-Khoury, and Thad Trent's (collectively, "Defendants") Motion to Dismiss Second Amended Complaint (Doc. 43). The parties have fully briefed the Motion (Doc. 45 (Plaintiff Jeffery S. Lew's ("Lew") Response); Doc. 47 (Defendants' Reply); *see also* Doc. 49 (Lew's Notice re: Supplemental Authority)). Defendants have also filed a Request for Judicial Notice in Support of Motion to Dismiss Second Amended Complaint (Doc. 44), which the parties have fully briefed (Doc. 46 (Lew's Opposition); Doc. 48 (Defendants' Reply to Lew's Opposition). Oral argument was held on June 27, 2025. Having considered the pleadings, relevant case law, and arguments of counsel, the Court will **grant** the Motion with leave to amend.

## I.    BACKGROUND

      This is a securities class action under the Securities Exchange Act of 1934 (the "Exchange Act"). (*See* Doc. 39 (Lew's Second Amended Complaint ("SAC")).) The "Class Period" relates to investors who purchased shares of Onsemi's common stock from

May 1, 2023 to October 27, 2023.

Onsemi manufactures and sells various silicon-based semiconductor products. (Doc. 39 ¶¶ 4, 16, 21–25.)  This lawsuit concerns Onsemi's agreements with customers that buy these products, and more specifically, silicon-carbide semiconductors used in the automotive and electric vehicle industry.  (*Id.*)  The customers often place orders (colloquially called "bookings") up to fifty-two weeks in advance, creating a "backlog" of purchase orders for fulfillment based on Onsemi's manufacturing capacity.  (*Id.*)  The number of existing orders, forecasted demand, pricing, and customer order patterns influence the backlog.  (*Id.* ¶¶ 26–27.)  Onsemi uses this backlog to prepare quarterly reports for investors, detailing expected revenue and gross margins, which are released along with the company's earnings announcements.  (*Id.* ¶ 28.)

The COVID-19 pandemic caused a chip shortage in the semiconductor industry due to the increase in at-home work and school and began to ease in 2023.  (*Id.* ¶¶ 30–36.)  The shortage led customers to place purchase orders with multiple suppliers, like Onsemi, in which after the customer would receive an order from one supplier, it would cancel its order with the other suppliers.  (*Id.* ¶ 36.)  This customer behavior artificially inflated the demand for the products, causing predictability issues for suppliers and manufacturers. (*Id.*)  Semiconductor manufacturers began utilizing long-term supply agreements ("LTSAs") to curb the artificial market fluctuations and to create predictability in the supply chain.  (*Id.* ¶¶ 29–30, 37.)  The LTSAs essentially lock in purchase commitments over the term of the agreements.  (*Id.* ¶¶ 29–30, 37.)

Onsemi did not utilize LTSAs in 2019 and 2020.  (*Id.* ¶¶ 29–30.)  Instead, it utilized short-term contracts.  (*Id.*)  During this time, Onsemi's annual Form 10-Ks for 2019 and 2020 included a notice of risk that uncertainties in the timing and amount of customer orders could lead to excess inventory or write-downs of inventory that could materially impact the company's financial condition.  (*Id.* ¶ 29–30.)  Beginning in 2021, Defendants started to require LTSAs and informed its investors of utilizing the new agreements.  (*Id.* ¶¶ 3–4, 31–32, 38–39, 47–52, 56, 61.)  Onsemi's 2021 Form 10-K indicated:

> Historically, a significant portion of our backlog was cancellable, however, under our current agreements, including orders subject to minimum purchase commitments under our longer-term supply arrangements, are not subject to cancellation.

(*Id.* ¶ 48.) Onsemi's 2022 Form 10-K, filed in February 2023, included the same language but added the following clause to the end: "unless otherwise mutually agreed." (*Id.* ¶ 49 (emphasis removed).) The LTSAs would span on average four to five years, added predictability to the purchase commitments, and required the customers to provide some offset for the lost sales if those orders are not achieved. (*Id.* ¶¶ 4, 38–39, 61.) In theory, Onsemi could guarantee positive returns on capital expenditures based on anticipated revenue from the anticipated purchase orders. (*Id.* ¶ 37.)

El-Khoury, Onsemi's Chief Executive Officer, represented at various times that the LTSAs were a "win-win" and intended to increase confidence in the company, add clarity and predictability to customer demand, and enable capital investments with support of the clearer outlook on customer demand. (*Id.* ¶¶ 39–42, 51–66.) El-Khoury also made public statements ensuring that the LTSAs were legally binding and the customers were liable for the price and volume commitments. (*Id.* ¶¶ 50–52.) El-Khoury characterized the LTSAs as "take-or-pay," indicating amendments to the minimum purchase agreements would only occur with a corresponding benefit or offset for Onsemi. (*Id.* ¶¶ 57–60.) He further represented that any modifications to the LTSAs would include Onsemi taking a share of the other products a customer was ordering to offset any reduction in volumes under the LTSAs. (*Id.* ¶ 56.) Additionally, El-Khoury indicated that Onsemi would receive word of fluctuations in a customer's demand further in advance, referencing six to ninth months as opposed thirty days under past agreements. (*Id.* ¶¶ 62–63.)

Lew alleges that these "ironclad" protection, however, went unenforced and Onsemi would allow customers to amend the agreements without conferring a benefit. (*Id.* ¶ 75.) In late-2022 to early 2023, an Onsemi employee (a confidential witness (the "CW Employee")) reported to his supervisor, who reported to El-Khoury, that a military customer was not placing orders according to its LTSA and he was concerned that there

was no penalty for failing to meet "significant" purchase commitments worth about $6 or $7 million. (*Id.* ¶¶ 67–74.) By July 2023, when the CW Employee left Onsemi, the customer had yet to place the orders. (*Id.*)

Throughout 2023, El-Khoury and Trent, Onsemi's Chief Financial Officer, continued to represent that the LTSAs were "legally binding" and effective in mitigating demand volatility and providing predicable revenues. (*Id.* ¶¶ 6, 75–88.) At some point before October 30, 2023, one of Onsemi automotive customers reneged its commitment to purchase $200 million of silicone carbide products. (*Id.* ¶¶ 8, 79.) Then on October 30, 2023, during Onsemi's Q3 earnings call, it informed investors that it renegotiated LTSAs on a case-by-case basis, which could result in a benefit to Onsemi over a "longer term" horizon. (*Id.*) Various securities analysts at leading investment banks began calling into question the strength of the LTSAs. (*Id.* ¶¶ 9, 79, 92, 96.) The news caused the common stock price to plunge 22% ($18.18 per share). (*Id.* ¶¶ 10, 97.)

Lew alleges that Defendants made false and misleading statements to artificially inflate the stock price, causing massive investor losses after the enforceability of the LTSAs became known, and seeks damages for himself and the proposed class. (*Id.* ¶ 11.) Lew's SAC alleges two claims: (1) violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Count I) against all Defendants; and (2) violations of Section 20(a) of the Exchange Act (Count II) against El-Khoury and Trent (the "Individual Defendants"). (*Id.* ¶¶ 172– 90.) Defendants proceeded to file the pending Motion to Dismiss. (*See generally* Doc. 43.) Defendants also seek judicial notice and incorporation by reference of various documents either referenced in the SAC or that they contend are relevant to the dispute. (*See generally* Doc. 44.)

## II. LEGAL STANDARDS

### A. Motion to Dismiss

To survive a motion under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, a complaint must meet Rule 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," providing defendant

1    with "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl.*

2    *Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47

3    (1957)).    The pleader must assert "factual content that allows the court to draw the

4    reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

5    *Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action,

6    supported by mere conclusory statements, do not suffice.").    Movants often base Rule

7    12(b)(6) motions on a lack of a cognizable legal theory or the absence of sufficient factual

8    allegations under a cognizable theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696,

9    699 (9th Cir. 1988).

10    A complaint that asserts a cognizable legal theory will survive if it contains

11    sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible

12    on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).    Plausibility does

13    not equal "probability," but requires "more than a sheer possibility that a defendant has

14    acted unlawfully." *Id.*  Pleading facts that are merely consistent with a defendant's liability

15    falls short of plausibility.    *Id.*  Courts take well-pleaded facts as true and construe them in

16    the non-movants favor.    *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  Legal

17    conclusions couched as fact, however, do not receive a presumption of truthfulness. *Pareto*

18    *v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998) ("[C]onclusory allegations of law and

19    unwarranted inferences are not sufficient to defeat a motion to dismiss.").    Courts ordinarily

20    may not consider evidence outside the pleadings.  *See United States v. Ritchie*, 342 F.3d

21    903, 907–08 (9th Cir. 2003).

22    Complaints alleging securities fraud are also subject to heightened pleading

23    requirements under the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b).

24    *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir. 2023).  The PSLRA requires

25    that complaints alleging falsity "specify each statement alleged to have been misleading,

26    the reason or reasons why the statement is misleading, and, if an allegation regarding the

27    statement or omission is made on information and belief, the complaint shall state with

28    particularity all facts on which that belief is formed." *Glazer Cap. Mgmt., L.P. v. Forescout*

1    *Techs., Inc. (Glazer II)*, 63 F.4th 747, 765 (9th Cir. 2023) (quoting 15 U.S.C.

2    § 78u-4(b)(1)).  Rule 9(b) similarly requires plaintiffs to "state with particularity the

3    circumstances constituting fraud."  *In re Facebook*, 87 F.4th at 947 (citation omitted).  The

4    allegations "must be 'specific enough to give defendants notice of the particular

5    misconduct which is alleged to constitute the fraud charged so that they can defend against

6    the charge and not just deny that they have done anything wrong.'"  *Id.* (citation omitted).

7    **B.  Judicial Notice & Incorporation by Reference**

8          District courts generally do not consider materials outside of the pleadings when

9    assessing the sufficiency of a compliant under Rule 12(b)(6).  *Khoja v. Orexigen*

10   *Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  When parties present matters outside

11   the pleadings that is not excluded, the 12(b)(6) motion converts into a motion for summary

12   judgement.  *Id.*; Fed. R. Civ. P. 12(d).  But there are two exceptions: "the incorporation by

13   reference doctrine, and judicial notice under Federal Rule of Evidence 201.  *Khoja*, 899

14   F.3d at 998.  Neither exception is an appropriate vehicle to undermine the typical pleading

15   burdens and the heightened pleading standard applicable to fraud matters.  *Id.* at 998–99

16   ("[T]he unscrupulous use of extrinsic documents to resolve competing theories against the

17   complaint risks premature dismissals of plausible claims that may turn out to be valid after

18   discovery.  This risk is especially significant in SEC fraud matters, where there is already

19   a heightened pleading standard, and the defendants possess materials to which the plaintiffs

20   do not yet have access.").

21         Judicial notice under Rule 201 permits courts to notice an adjudicative fact that is

22   "not subject to reasonable dispute" because it (1) "is generally known"; or (2) "can be

23   accurately and readily determined from sources whose accuracy cannot reasonably be

24   question."  Fed. R. Evid. 201(b)(1)–(2).  Courts may take judicial notice of matters in the

25   public record without converting a motion to dismissing into one for summary judgement.

26   *Khoja*, 899 F.3d at 999.  Courts, however, may not take judicial notice of disputed facts

27   contained in such records.  *Id.*  Unlike judicial notice, the incorporation-by-reference

28   doctrine is a judicially created doctrine that "treats certain documents as though they are

1   part of the complaint itself . . . [to] preven[t] plaintiffs from selecting only portions of
2   documents that support their claims, while omitting portions of those very documents that
3   weaken—or doom—their claims." *Id.* at 1002.  A defendant may seek to incorporate a
4   document where the plaintiff "extensively" refers to the document or the document "forms
5   the basis of the plaintiff's claim." *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903,
6   907–09 (9th Cir. 2003)).  Mere existence of a document is insufficient for incorporation.
7   *Id.*  A document may be incorporated where a claim necessarily depends on it but not where
8   it merely creates a defense to the well-pleaded allegations in the complaint.  *Id.*  Courts
9   may assume incorporated documents' contents are true but not if the assumption of truth
10  only services to dispute well-pleaded facts.  *Id.* at 1003.

## III.    DISCUSSION

### A. Judicial Notice & Incorporation by Reference

Defendants request that the Court take judicial notice and incorporation by reference
of various exhibits (Exhibits 1 through 12) to the Declaration of Mark R.S. Foster in
connection with their pending Motion to Dismiss.  (*See* Doc. 44; *see also* Doc. 43-2
(Foster's Declaration).)  Specifically, Defendants seek judicial notice of Exhibits 1 through
12 and ask the Court to find that Exhibits 1 through 8 are incorporated by reference.  (Doc.
44 at 2.) Defendants further argue that Exhibits 1 through 8 are independently subject to
judicial notice because they are publicly available financial documents, including SEC
filings, earning call transcripts and stock price history.  (*Id.* at 4.)

Courts routinely take judicial notice of the existence and contents of SEC filings but
not the truth of the facts contained in the filings.  *Hutton v. McDaniel*, 264 F. Supp. 3d 996,
1008 (D. Ariz. 2017); *Hadian v. Fate Therapeutics, Inc.*, No. 3:23-CV-00111-RBM-AHG,
2024 WL 4246083, at *11 (S.D. Cal. Sept. 19, 2024).  "Court have declined to consider
facts regarding stock sales in the absence of allegations regarding financial motives."  *See*
*Pirani v. Netflix, Inc.*, 710 F. Supp. 3d 756, 767 (N.D. Cal. 2024).

Defendants advance that the amounts Onsemi reported it spent to repurchase
common shares during the Class Period is relevant to negate scienter.  (Doc. 44 at 5–6

(citing *In re Cisco Sys. Inc. Sec. Litig.*, No. C 11-1568 SBA, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013) (noting stock repurchasing programs are relevant to negate a finding of scienter)).)  Lew's SAC did not assert financial motives in the scienter allegations.  The purported use of these documents is to create a dispute about scienter, which is improper.  *See Khoja*, 899 F.3d at 1003.  Additionally, for many documents Defendants fail to point to any specific facts contained in the document to justify judicial notice.  *In re Green Dot Corp. Sec. Litig.*, No. CV 19-10701 DDP (EX), 2024 WL 1356253, at *3 (C.D. Cal. Mar. 29, 2024) (rejecting a request for judicial notice where the movant failed to identify the particular facts contained in the document).  Finally, some of the exhibits are improperly being used to introduce an alternate theory of the case.  Therefore, the Court declines to take judicial notice of these documents.

Defendants ask the Court to find that Exhibits 1 through 8 are incorporated by reference.  As an initial matter, "a single brief quotation is likely not extensive enough" to invoke incorporation by reference.  *Khoja*, 899 F.3d at 1005.  Lew only mentions Exhibits 1, 6, and 7 using single references and brief quotations.  Therefore, the Court finds that these exhibits are not incorporated by reference.

Lew does extensively rely on Exhibit 3.  (*See* Doc. 39 ¶¶ 79, 82, 85, 88–91, 93, 94, 98, 111, 141, 147–49, 152–53.)  But Defendant aims to use the incorporated document to create a factual dispute.  To find the discussions in Exhibit 3 about "recent reductions" and growth reported during the call is somehow consistent with a "win-win" to the effect that it represents the effectiveness of the LTSAs, goes beyond the reach of the incorporation by reference doctrine.  *See Khoja*, 899 F.3d at 1003.  This would require viewing the term "recent" in Defendants' favor.  This would also require Court to assume there is truth in an inference drawn from the revenue growth that it in fact represents a "win-win," which the Court disregards as an attempt to inject an improper dispute about Lew's allegations.  *See id.* at 1003, 1015 ("The incorporation-by-reference doctrine does not override the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage.").  Therefore, the Court declines to find Exhibit 3

incorporated by reference.

Next, regarding Exhibits 2, 4, and 5, the Court finds they are properly incorporated by reference. Lew extensively relies on Onsemi's 2022 Form 10-K (Exhibit 2) by comparing its disclosures to previous years' forms and arguing Onsemi removed warnings about unilateral cancellation of orders and changes in demand. (*See* Doc. 39 ¶¶ 30, 47–50, 102, 122–25, 131.) Lew, however, omits or ignores context that tends to weaken his claims. *See Khoja*, 899 F.3d at 1002. Lew's allegations do not address any other risk factors disclosed in the 2022 Form 10-K, which span over a dozen pages. (*See* Doc. 43-2 at 122–35.) Among those factors, Onsemi warns about market volatility and changes in economic conditions that can affect the company's operations. (*See id.* at 125.) Elsewhere, the 2022 Form 10-K also describes that in 2022, Onsemi entered into various LTSAs that include "minimum purchase commitments," and then provides:

> [Onsemi's] sales are made primarily pursuant to orders that are booked as far as 52 weeks in advance of delivery. Generally, prices and quantities are fixed at the time of booking. Backlog as of a given date consists of existing orders and forecasted demand from our customers, in each case scheduled to be shipped in the current or future period. Backlog is influenced by several factors, including market demand, pricing and customer order patterns in reaction to product lead times.
>
> In the semiconductor industry, backlog quantities and shipment schedules under outstanding purchase orders are frequently revised to reflect changes in customer needs. Historically, a significant portion of [Onsemi's] backlog was cancellable, however, [its[ current agreements, including orders subject to minimum purchase commitments under [its] longer-term supply arrangements, are not subject to cancellation, unless otherwise mutually agreed.

(*Id.* at 113, 116.) Additionally, the 2022 Form 10-K discloses:

> Total sales estimates are based on negotiated contract prices and demand quantities, and could be influenced by manufacturing issues, supply chain constraints, and modifications to customer agreements, among other things. Accordingly, the amount represented by remaining performance obligations may not be indicative of the actual revenue recognized for future periods.

(*Id.* at 169.)

Accordingly, Lew's SAC omits portions of the 2022 Form 10-K that tend to weaken his claims that Defendants removed all relevant risk warnings and provides context for cancellations or modifications to LTSAs. *See Khoja*, 899 F.3d at 1002; *see also id.* at 1003,

1015 ("The incorporation-by-reference doctrine does not override the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage.").  Therefore, the Court finds Exhibit 2 incorporated by reference.

Next, Exhibit 4 is a copy of an UBS analyst's report (the "UBS Report") in which UBS cut its stock price target for Onsemi by 20%.  (*See* Doc. 44 at 4–5; Doc. 43-2 at 2 ¶ 5, 228–52.)  Lew's SAC frequently references the UBS Report's statement that "the bloom is off the rose with respect to Onsemi's [LTSAs]," relating to Onsemi's reveal of the automotive customer's demand reduction.  (Doc. 39 ¶¶ 79, 85, 88, 96, 152; *see also* Doc. 243-2 at 222, 228.)  In their Motion to Dismiss, Onsemi highlights that the UBS Report indicates that Onsemi suggested that it had "extracted value in other aspects of its relationship with the customer."  (Doc. 43 at 11; Doc. 43-2 at 228.)  Lew argues that Defendants seek to introduce the UBS Report to create contesting inferences from the SAC's allegations.  (Doc. 46 at 17.)  Defendants posit that Lew misrepresents the UBS Report and context establishes that Onsemi "was still able to extract value from the customer that is the focus of the fraud allegations."  (Doc. 48 at 6.)

Lew does not dispute that he extensively relies on the UBS Report in the SAC for his claims, nor that the surrounding context of his quotes is relevant to the allegations. Thus, the Court finds that Lew's SAC incorporates by reference the UBS Report (Exhibit 4).  But the Court will not take as true that, because the UBS Report indicates that Onsemi suggested that it extracted value in other aspects of its relationship with the customer, Onsemi achieved a "win-win."

Next, Exhibit 5 is the transcript from JPMorgan's 21st Annual Tech-Auto Forum (the "JPMorgan Forum").  (*See* Doc. 243-2 at 254–66.)  Lew's SAC references El-Khoury and Trent's statements that Onsemi would not be "left holding the bag" and assured investors that renegotiation of a LTSA where a customer sought to lower its demand would require a "win-win," and advance notice of the reductions would further aid in revenue predictability.  (Doc. 39 ¶¶ 65, 80–81, 103, 116, 140.)  Lew also relied on El-Khoury's statements at the JPMorgan Forum to assert that officers and board members, including

El-Khoury and Trent, signed off on the LTSAs and that the LTSAs were "legally binding" and "take or pay" to support scienter.  (*Id.* ¶ 103.)  In their Motion to Dismiss, Defendants assert that El-Khoury's other statements at the JPMorgan Forum highlight that a "win-win" could take different forms, like reducing manufacturing production to account for an anticipating reduction in demand to avoid sitting on inventory or, even better, move the extra capacity elsewhere.  (Doc. 43 at 14.)  Lew does not dispute that he extensively relies on this transcript or its relevance.  (*See* Doc. 46 at 18–19.)  In fact, he further relies on it to argue Defendants omit and misquote the discussion in an attempt refute his allegations that there was no "win-win" under the automotive customer's LTSA.  (*Id.*; *see also* Doc. 39 ¶¶ 92, 98.)  As Lew extensively relies on these statements to allege scienter and what "win-win" may have meant at the time, the surrounding context of the statements is certainly relevant.  The Court finds that Exhibit 5 is incorporated by reference.

Finally, Exhibit 8 is the transcript from the September 7, 2023 Citi Global Technology Conference (the "Citi Conference").  (*See* Doc. 43-2 at 318–334.)  Lew alleges that during the Citi Conference, El-Khoury responded to a question about how "ironclad" the LTSAs were and how renegotiations would work, e.g., whether the customer takes the product or pays a cancellation fee, in which he indicated the LTSAs enabled Onsemi to predict demands based on notice months in advance and could have the conversation but that "it has to be a win-win."  (Doc. 39 ¶ 87.)  El-Khoury also stated "if the customer is not interested in a win-win, but a win/lose, that's where it's ironclad.  It's a legally binding agreement that both parties in a win-win will renegotiate an amendment.  But net of that, we're not going to be left holding the bag."  (*Id.* (emphasis removed).)  Overall, Lew uses these statements to support his allegations that Defendants misled investors about the security LTSAs afforded.  (*See* Doc. 39 ¶¶ 86–87, 140.)

Lew omits relevant and necessary context in this exhibit.  The SAC indicates El-Khoury said the renegotiations have "to be a win-win," proceeds to omit a portion of El-Khoury's statement, and then in the next sentence, he states "So all of these are a win-win."  (*See* Doc. 39 ¶ 87.)  Lew, through the omission, excludes the referents of "[s]o

all of these," so it is unclear what "these" refers to and what El-Khoury considered a "win-win." Nestled in those omitted paragraphs are El-Khoury's statements that the renegotiations could take varying forms, including extending the term or adding on additional products.[1] This context tends to undermine Lew's allegations that the Defendants mislead investors that the LTSAs were ironclad when they retained the ability to permit customers to push out orders. The Court finds Lew's SAC incorporated the transcript (Exhibit 8) by reference but the Court remains guided by the motion to dismiss standard and construes well-pleaded facts in the nonmovant's favor. *See Khoja*, 899 F.3d at 1002, 1003, 1015.

**B. Defendants' Motion to Dismiss**

The parties generally disagree about what standards apply and how they apply to the statements at issue. Lew alleges and Defendants challenge statements the Individual Defendants made at four events (the "challenged statements"): (1) the Q1 2023 Earnings Call; (2) the May 23, 2023 JPMorgan Chase Conference (the "JPMorgan Conference); (3) the August 30, 2023 Deutsche Bank Conference (the "Deutsch Bank Conference"); and (4) the September 7, 2023 Citi Conference (the "Citi Conference"). (Doc. 43 at 6 (citing Doc. 39 ¶¶ 78, 81, 83, 84, 87); *see also* Doc. 39 at 2, 24–35.) The parties deploy overlapping and varying legal standard in part due to Lew's allegations lacking precision on whether he premises his claims on the challenged statements based on a misstatement of material

---

[1] The omission in full reads:

> What does that look like? Look, if demand is down, it doesn't really help us maybe in the short term, but it doesn't help the company in saying, "Well, you got to take, I don't care, put the inventory on your shelf" it doesn't help anybody to have inventory at the customer if demand is not there. So we'll have the conversation about, okay, well, we know we have 50% share on this product, and we increase the share, offset the gap and so on and so forth. So we have those conversations. From a company perspective, we would rather ship product any day than have fees because those are onetime benefits. I really don't care for them, right? I like the sustainability of it, which is, okay, let's talk about revenue. Let's talk about share gains. Hey, maybe we extend the LTSA and you bolt on more, let's put more products that you maybe are not buying from us, but we can qualify because we have a new product.

(Doc. 43-2 at 330–31.)

fact or omission of material fact.  (*See, e.g.*, Doc. 39 ¶¶ 75–76.)  Lew's allegations appear to be both.  (*See id.* ¶¶ 79, 82, 85, 88.)  The Court seeks to clarify the applicable law for the challenged statements below.

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), prohibits "manipulative or deceptive" practices in connection with the purchase or sale of a security.  *See In re Alphabet Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021).  Rule 10b-5 of the implementing regulations is "coextensive" with Section 10(b).  *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024) (citation omitted).  The Rule prohibits making "any untrue statement of a material fact" or omitting material facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Glazer II*, 63 F.4th at 764 (quoting 17 C.F.R. § 240.10b-5(b)).  To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege: (1) a material misrepresentation or omission ("falsity"), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation.  *In re Genius Brands*, 97 F.4th at 1180.  Controlling individuals' liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 77*o*, is derivative of a primary violation of securities laws, like Section 10(b).  *Id.*

As a general matter, "securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021).  Under Rule 10b-5, an affirmative misrepresentation is an "untrue statement of a material fact," and a fraudulent omission is a failure to "state a material fact necessary in order to make the statements made, in the light of the circumstances under which were made, not misleading." *Id.*; *see also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.   Both theories require falsity with respect to a "material *fact*."  *Id.* (citing 17 C.F.R. § 240.10-b5(b)).

Material misrepresentations are capable of objective verification. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). To that end, however, there is a distinction between statements of fact and those of opinion. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 182–83 (2015); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (applying *Omnicare* to Section 10(b) claims). A "fact" is a "thing done or existing" or "an actual happening." *Omnicare*, 575 U.S. at 183 (explaining "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not.") (citation modified). Conversely, an "opinion" is a "belief, a view, or a sentiment which the mind forms of persons or things." *Id.* (noting an opinion in ordinary usage does not imply definiteness or certainty and may rest on grounds that are insufficient for complete demonstration) (citation modified).

A sincere statement of pure opinion is not actionable because it is "not an 'untrue statement of material,' regardless of whether an investor can ultimately prove the belief wrong." *Id.* at 186. An opinion, however, may become actionable where it involves a representation of material fact. *See Wochos*, 985 F.3d at 1188–9; *see also Omnicare*, 575 U.S. at 185 (explaining "that a statement can sometimes be 'most fairly read as affirming separately both the fact of the [speaker's] opinion and the accuracy of the facts' given to support or explain it" (citation omitted)). As the Ninth Circuit has explained:

> First, every statement of opinion "explicitly affirms one fact: that the speaker actually holds the stated belief." Second, "some sentences that begin with opinion words like 'I believe' contain embedded statements of fact." As the [Supreme] Court explained, a statement that "I believe our TVs have the highest resolution available because we use a patented technology" could give rise to misrepresentation liability if the speaker's technology was not patented. Third, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." For example, if a company declares that "We believe our conduct is lawful," a reasonable investor "likely expects such an assertion to rest on some meaningful legal inquiry." Accordingly, if in fact that company made "that statement without having consulted a lawyer," the statement "could be misleadingly incomplete," potentially giving rise to liability under an omission theory.

*Id.* (quoting *Omnicare* 575 U.S. at 184, 185, 188) (citation modified).

Additionally, statements of opinion may involve inactionable "puffery," i.e., the statement involves "expressing an opinion" that is not "capable of objective verification." *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098–99 (9th Cir. 2022) (quoting *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)). Puffery also involves "vague statements of optimism like 'good,' 'well-regarded,' or other feel-good monikers," which "are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Id.* (citation omitted); *see also Hewlett-Packard*, 845 F.3d at 1276 (explaining puffery may involve statements that are "inherently aspirational" and "expresses opinions as to what actions are preferable" (citation omitted)). General statements of optimism may be actionable, however, where, taken in context, the statement addresses "specific aspects of a company's operation that the speaker knows to be performing poorly." *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143–44 (9th Cir. 2017) (citation omitted).

Pleading scienter requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Glazer II*, 63 F.4th at 766 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). To determine if the "strong inference" standard is met, courts first determine "whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter." *Id.* "If no individual allegation is sufficient, the court conducts a holistic review to determine whether the allegations combine to give rise to a strong inference of scienter." *In re Facebook*, 87 F.4th at 947 (citation modified). The alleged facts are sufficient to satisfy the "strong inference" standard where they demonstrate an "intent to deceive, manipulate, or defraud" or "deliberate recklessness." *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (citation omitted); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007) (noting a complaint survives a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" (citation modified)). "Deliberate recklessness is an

extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Webb*, 844 F.3d at 851 (citation modified).

Finally, the PLSRA provides a shield protecting against liability for false or misleading forward-looking statements. *In re Quality Systems*, 865 F.3d at 1141; *see also* 15 U.S.C. § 78u-5(c)(1)(B)(i), (i)(1)(A)–(F) (providing that a "forward-looking statement" includes statements involving projections of revenues, plans and objectives of management for future operations, future economic performance, and statements of the assumptions underlying or relating to such statements). Relevant here, the allegations must establish a strong inference that defendants made the forward-looking statements with "actual knowledge that the statement was false or misleading." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (quoting § 78u-5(c)(1)(B)(i)) (citation modified). Mixed statements, i.e., those combining both non-forward-looking and forward-looking statements, by virtue of including forward-looking statements do not provide safe harbor protections for non-forward-looking statements. *In re Quality Systems*, 865 F. 3d at 1142.

Guided by this framework, the Court will now turn to the challenged statements.

### 1. The Q1 2023 Earnings Call Statement

During the Q1 2023 Earnings Call, in responding to an analyst's question about whether Onsemi had any changes to their automotive outlook for the following three quarters, El-Khoury stated: "Absolutely, no changes. **It's actually very, very predictable, and that's really the benefit that we've been talking about with the LTSAs that have us really, with our customers, align on** pricing and **volume through the duration of the LTSAs.**" (Doc. 39 ¶ 78; *see also id.* ¶ 76 (indicating that the portions of the allegations bolded or underlined by Lew are the statements alleged to be false or misleading).)

### i. Falsity

Lew alleges that this statement was "false and misleading, or omitted material facts necessary to make it not misleading" because the "LTSAs did not align customers on purchase volumes, nor did the LTSAs provide the benefit of strong

predictability . . . . [C]ustomers under LTSAs were allowed to indefinitely misalign their purchasing with the amounts in the agreements, including unilaterally cancelling volume without Onsemi's mutual agreement or amending the LTSA without providing Onsemi with any benefit." (*Id.* ¶ 79.)

Lew's theory for this statement becomes difficult to pinpoint and does not appreciate that whether a statement provides an untrue material fact and one that omits a material fact are distinct theories. *See Wochos*, 985 F.3d at 1188. To support an affirmative misrepresentation theory, Lew seems to assert that El-Khoury's statement that the LTSAs provided for "very, very predictable" revenues and that pricing and volumes aligned are both untrue as a matter of fact, i.e., objectively the LTSAs did not provide predictability or enable alignment on pricing and volumes throughout their durations. Whether something is *very, very* predictable fits squarely within the classic feel-good monikers and is inactionable puffery and incapable of objective verification. *See Align Tech.*, 39 F.4th at 1098–99. Whether the LTSAs provide predictability based on aligned pricing and volumes appears inherently aspirational and used to provide an optimistic view of the quarterly outlooks. That is, El-Khoury provided how he perceived the benefits of the LTSAs and was to, in Lew's words, "boast" about the reliability of Onsemi's outlooks. (*See* Doc. 39 ¶ 77.) This is classic puffery, and thus not misleading. *Hewlett-Packard*, 845 F.3d at 1275 (noting "puffing . . . is not misleading").

Lew reliance on *Glazer II* is misplaced and does not overcome a finding of puffery. (*See* Doc. 45 at 15 (citing *Glazer II*, 63 F.4th at 770–71).) Lew posits that because El-Khoury made the statement in response to a question from an analyst during an earnings call, it is not puffery. (*Id.*) But Lew omits the Ninth Circuit's additional reasoning in *Glazer II* that the defendant's puffery "contravened the unflattering facts in [the defendant's] possession" and were during conference calls "*after* [the defendant] accounted disappointing financial predictions or results." *See* 63 F.4th at 770–71 (emphasis added) (noting "[t]he statements went beyond mere optimism by "provid[ing] a concrete description of the past and present"). Further, the analyst's question in *Glazer II*

specifically related to the company's anticipated poor performance and how that squared with an increase in revenue guidance for the year overall.  *See id.* at 758–60.  Based on Lew's allegations, the analyst asked broadly as if there were "*any* changes one way or another" for Onsemi's automotive outlook for Q2 through Q4 of 2023.  (Doc. 39 ¶ 78.) These are not the same circumstances as in *Glazer II* and the case is distinguishable.

Assuming the statement does not fall under the umbrella of puffery, the statement is also not capable of objective verification.  *See Weston Fam. P'ship LLLP v. Twitter*, Inc., 29 F.4th 611, 621 (9th Cir. 2022).  Lew does not articulate any specific facts to show how this statement is objectively false beyond bare assertions that customers were allowed to indefinitely misalign purchasing volumes and unilaterally cancel volume without conferring a benefit.  First, the challenge statement here makes no reference to the legally binding nature of the LTSAs or that they compel a "win-win" scenario.  In context, the benefit that El-Khoury referred to was generally to being able to predict revenues based on the LTSAs, not that those LTSAs ensured Onsemi would receive a benefit if a customer renegotiates an LTSA.  Second, the only relevant allegations in which to infer that customers were allowed to indefinitely misalign their orders pertains to the CW Employee reporting that a military customer had not placed orders to meet its obligations under its LTSA in Q1 2023, carrying forward indefinitely, and that Onsemi failed the enforce the obligation or penalize the customer.  (*See* Doc. 39 ¶¶ 67–74, 79(a)–(b).)  Lew's allegations require assuming that any lost revenue attributable to the military customer—and further assuming the military customer's orders falls within the automotive outlook—was not accounted for in that outlook to make the statement about predictability objectively false.

Additionally, the CW Employee was not part of any renegotiations and left the company in the summer of 2023, rendering his characterization of the misalignment as indefinite wholly speculative and unsupported.  *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (noting confidential witness statements may only be relied upon where the confidential witnesses are described "with sufficient particularity to support the probability that a person in the position

occupied by the source would possess the information alleged").  El-Khoury's statements concerned alignment through the duration of the LTSAs, not alignment tied to quarterly revenue projections.

Notably, at oral argument, Lew clarified that the LTSAs were presented as having "an inherent degree of risk protection against order loss."   Lew's issue ultimately lies in the general degree of certainty underlying predictability and alignment, i.e., how predictable or how aligned things actually were, not whether there was predictability or alignment as a matter of fact.  And he has not shown facts that support inferring this statement was objectively false.

Despite his blanket falsity allegations, Lew primarily appears to rely on an omission theory.  Again, this theory would require inferring that El-Khoury omitted the fact that customers were allowed to indefinitely misalign their purchasing amounts without a corresponding benefit to Onsemi.  (*Id.* ¶ 79.)  In general, there is no affirmative duty to disclose any and all material information.  *Hewlett-Packard*, 845 F.3d at 1278.  "[A] duty to provide information exists only where statements were made which were misleading in light of the context surrounding the statements."  *Id.*  "[O]nce defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information."  *Khoja*, 899 F.3d at 1009.  Lew has not alleged sufficient facts that show adverse information or some alternative and contrary reality exists.  He assumes that because El-Khoury and Trent were involved in negotiating and executing LTSAs, they were keenly aware of the specifics of how they operate.  Without more, the Court would have to assume they were not operating according to how El-Khoury understood them and any potential misalignment with the military customer carried beyond the summer of 2023 and through duration of that LTSA.  But El-Khoury made these statements before that could became a reality.  In the end, Lew's allegations do not support his claim.

### ii.   *Scienter*

Setting aside that the statements are not objectively false or misleading, Lew fails

to adequately allege a strong inference of scienter.   The only basis that Lew offers to infer that Defendants knew or recklessly disregarded that the LTSAs did not afford the predictability that El-Khoury represented lies in El-Khoury and Trent's involvement in negotiation and executing the LTSAs, removal of a risk warning from the 2022 Form 10-K and their involvement in approving that form, and that the military customer not placing orders in early 2023.  (*See* Doc. 39 ¶¶ 119–126.)

Those allegations are insufficient.  The CW Employee did not remain with Onsemi to find out if the military customer never placed any relevant orders, was not part of any negotiations, and does not purport to know whether Onsemi's predictions accounted for any reductions based on the military customer.  Involvement in negotiating the LTSAs and removing risk warnings related to short-term cancellations in Form 10-Ks does not provide a basis to infer that El-Khoury intentionally or was deliberately reckless in touting the predictability that the LTSAs provided Onsemi.  Therefore, Lew's scienter allegations fail.

## 2.  JPMorgan Conference

During the JPMorgan Conference, in responding to an analyst's question about market conditions, customers rescheduling orders, and if pushouts began stabilizing, Trent stated:

> Yes.  So let's back up and talk about our business.  Our LTSAs [are] what we're managing, right?  And when customers are coming in, they need help with LTSAs.  We're getting the call quarters in advance of something is going to get solved.  **If we can create a win-win with that customer, we'll try and help that customer.  And there's got to be a win for both companies.**  We saw a lot of that happening late last year.  We've actually seen in the first quarter and even so far in the second quarter is that's actually stabilized and actually coming down a little bit, which gives you some confidence in the second half as well.  Again, think about the visibility we have with the LTSAs and the fact that we're getting less of those requests.  There's pockets of them.  But late last year, we saw a lot more uncertainty, and I think people remain cautious.  So that allows us to really have a dialogue with our customers versus historically, they place a PO, and that PO would disappear 30 days before it shifted.   Now we're getting that call in advance, and we're able to help those customers.  But it is kind of slowing in terms of the rescheduled request.

(Doc. 39 ¶ 81.)

### i.    Falsity

Lew alleges that this statement was false or misleading because Onsemi

misrepresented that if a customer called to reschedule orders, Onsemi would renegotiate only if it could generate a "win-win," and to the contrary, Onsemi retained discretion to allow customers to push out or cancel orders without achieve said "win." (*Id.* ¶ 82.)

Lew does not pinpoint facts showing this statement is objectively false. On its face, what constitutes a "win-win" is subjective and so broad and ambiguous that it is incapable of objective verification. Trent's statement does not provide a concrete definition of "win-win" and seemingly encompasses many preferrable forms. *See, e.g.*, *Hewlett-Packard*, 845 F.3d at 1276 (explaining puffery may involve statements that "expresses opinions as to what actions are preferable" (citation omitted)). Additionally, Lew has not alleged that Onsemi did not receive calls from its customers prior to changes in demand or that Onsemi would not "try and help" the customers to find "win-win." As Onsemi points out, nowhere does Lew articulate what the term "win-win" means. (*See* Doc. 47 at 8–9.)

At oral argument, when asked to define "win-win," Lew indicated that it means to "land in a much better spot that [Onsemi] would have otherwise been." (*See also* Doc. 39 ¶ 84.) Somehow Lew envisions a world where his definition alleviates subjectivity and ambiguity, but in reality, it does not. Lew provides no guidance on how to define what constitutes a "much better spot." Because Lew has not advanced a contemporaneous definition that allows the Court to evaluate the objective falsity of the statement, he has failed to plead with the particularity Rule 9(b) and the PSLRA require. *See, e.g.*, *In re Cloudera, Inc. Sec. Litig.*, 121 F.4th 1180, 1188–89 (9th Cir. 2024) (affirming the district court where it found the plaintiff failed to plead facts sufficient to support a special or nuanced meaning for a phrase that differs from what the literal words suggested). The literal words here convey a multi-form, subjective, and circumstantial result that is incapable of objective verification.

Lew also does not pinpoint what is misleading or omitted from the statement. Once again, the only relevant factual allegations that substantiate any potential omission relate to the CW Employee's concerns about the military customer. (*See* Doc. 39 ¶ 82(a)–(b).)

- 21 -

The allegations themselves appear to confirm that Onsemi would generally receive notice in advance from its customers that the orders would not be placed or reduced allowing for a potential renegotiation.  (Doc. 45 at 10 ("[T]he bulk of the military customer's orders were scheduled to be ordered in February and March of 2023, but that 'a quarter before' (i.e., Q4 2022), Onsemi received notice the orders would not be placed." (citing Doc. 39 ¶¶ 68–71)).)  And this is consistent with Trent indicating that Onsemi "saw a lot" of customers needing help with their LTSAs "late last year," referring to late 2022, and that pushouts had stabilized and "coming down a bit" and "slowing in terms of rescheduled request[s]."

Lew further alleges that the CW Employee indicated that he informed his supervisor of the failure to place the orders but heard "crickets" and described management as "shrugging their shoulders."  (Doc. 39 ¶ 72.)  And that by the time he left Onsemi in July 2023, the orders had not been placed, inferring that Onsemi did nothing nor penalized the customer.  (*Id.* ¶¶ 72–73.)  Trent's statements did not address the particular circumstances of this customer, nor does Lew explain how the customer "indefinitely push[ing] out" orders is somehow inconsistent with Trent acknowledging that there are pushouts but they that they are slowing down to render his statement misleading overall.  Lew faults Onsemi for not achieving a corresponding "wins," but his facts do not provide a reasonable inference supporting that assertion.  Lew merely assumes that because the orders were not placed before the CW Employee left, which he had yet to do at the time Trent made this statement, that the orders were "indefinitely" delayed and no "win" resulted.  Further, as noted, the CW Employee was not part of any negotiations and left shortly after the company was made, eviscerating any basis to support his characterization of the pushout as indefinite.  Therefore, Lew has not provided a sufficient basis to support an inference that Trent affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.  *See Brody*, 280 F.3d at 1006.

Once again, both of Lew's theories fail to support his claims here.

*ii.    Scienter*

Assuming Lew adequately alleged falsity, his scienter allegations fail.  Defendants argue that the PSLRA safe harbor applies because the statement is forward-looking and not made with actual knowledge of its falsity.  (*See* Doc. 43 at 18–23.)  Lew disagrees, arguing the PSLRA safe harbor does not apply because his allegations pertain to current affairs at the time of the alleged misstatements and are not forward-looking predictions.  (Doc. 45 at 19.)

Lew is incorrect that Trent described the then-current state of affairs.  Trent responded to a question about market uncertainty, customers wanting to reschedule orders, and whether pushouts started to stabilize.  (Doc. 39 ¶ 81.)  Trent described the LTSAs as enabling Onsemi to receive calls in advance of a customer's change in demand, that "if [Onsemi could] create a win-win with that customer, [it] would try and help that customer [, and] there's got to be a win for both companies."  (*Id.*)  He then explained that Onsemi saw stabilization in the previous quarter and in the start of the second quarter, which would give investors "some confidence" in the second half of the second quarter.  (*Id.*)  In context, the statement is best understood to address Trent's understanding how the LTSAs are functioning to provide more confidence that pushouts are stabilizing into the future.  Though his statement does contain some non-forward-looking statements about stabilization trends in the past and present, his discussion of the LTSAs ensuring "win-wins" underlined his conclusion that pushouts and rescheduled orders were stabilizing into the future and is thus a forward-looking statement.

As a forward-looking statement, the inquiry becomes whether Trent had actual knowledge of its falsity.  Lew's allegations are not the Trent's knew that characterizing the trend for pushouts and rescheduled orders as slowing was false but rather that he seemingly knew that Onsemi would renegotiate LTSAs without achieving a "win."  (Doc. 39 ¶¶ 82, 171.)

Lew's factual allegations supporting Trent's actual knowledge are weak.  From what the Court can piece together, Lew alleges that Trent had personal knowledge of the agreements and participated in their negotiations and execution, was involved in removing

the risk warnings from the 2021 and 2022 Form 10-Ks, and was aware of customers under LTSAs refusing to place orders based on demand changes. (*Id.* ¶¶ 102, 128.) The only substantive allegations that support actual knowledge relate to the CW Employee issue the Court has already addressed and rejected. The allegations regarding the CW Employee do not support an inference that Onsemi failed to obtain "win" after a customer's change in demand to impute knowledge to Trent. *See, e.g.*, *Zucco Partners*, 552 F.3d at 995. And additionally, there are no allegations that Trent supervised or managed the CW Employee to infer that his report ever reached Trent. (*See id.* ¶ 72 (noting the CW Employee alerted his manager, who directly reported to El-Khoury, of the issue).) At bottom, Lew's allegations rely on speculation and unsupported conclusions and thus fail to establish Trent acted with the requisite scienter.

### 3. Deutsche Bank Conference

During the Deutsche Bank Conference, El-Khoury made the following to statements. In response to an analyst's question about where automotive demand for non-silicon carbide products were plateauing, he said:

> We have engagements with customers. If they have a weak -- softness in their market and they have an LTSA, we're going to get the call 6 months in advance. And that call basically goes along, hey, our run rate is not where we thought it would be in this certain area. We're going to have potentially some inventory. What are the options? If I can ship that to somebody else that I've been under shipping to, we're going to redirect it. So somebody gets more supply to meet their demand, and somebody is not going to get oversupply that's going to sit in inventory.
>
> **So that LTSA and the conversations we're having with the customer to have a win-win, although we may take some down and amend it, saying, yes, no problem, net-net, it's a win-win. And that's exactly what the LTSAs have provided us. And the structure we put in, given that it's a legally binding agreement, have forced that conversations for us to have a -- to land in a much better spot than we would have otherwise been.**

(Doc. 39 ¶ 83.) And in response to a question from the host-analyst asking, "what do you do if you've seen customers not want as much" and "to the extent demand weakens, how concrete are those enforced because you have a longer-term partnership with these companies?" El-Khoury said:

> **Because the customer is legally liable like you said, they're going to place**

**the call at the first sign of softness they have because they have a small bag to carry also, not just ON Semi.  And that makes the partnership a win-win as far as trying to find a solution.**

. . . .

Now if I don't have another customer to give that capacity to, then we have to talk about is it a different cost structure now because lower volume, different impact.  So all of these are -- every customer has different constraints. And we are going to sit down and work with the customer -- because all these customers, like you said, are strategic. That's why we have an LTSA with them to begin with.  **So we're going to sit with the customer, and we're going to find a win-win.**

(*Id.* ¶ 84; *see also* Doc. 43-2 at 330–31.)

### i.  Falsity

Lew alleges that these statements misrepresented the customers were "legally liable" under the LTSAs, the structure of the LTSAs put Onsemi "in a much better spot than [it] otherwise [would have] been," and that Onsemi would only renegotiate LTSAs if it could generate a corresponding "win."  (*Id.* ¶ 85.)  Lew further contends that contrary to these statements, Onsemi retained discretion to permit customers to indefinitely push out orders without a corresponding "win."  (*Id.*)

First, whether the LTSAs assisted in putting Onsemi in a "much better spot" is incapable of objective verification and classic use of feel-good monikers, i.e., puffery and not a misleading statement.  *See Align Tech.*, 39 F.4th at 1098–99; *Hewlett-Packard*, 845 F.3d at 1275.  Second, as the Court has discussed, Lew has failed to articulate a contemporaneous definition or explanation of what "win" meant when El-Khoury said it to demonstrate its objective falsity, and thus he has failed to plead with the particularity Rule 9(b) and the PSLRA require.  *See, e.g.*, *In re Cloudera*, 121 F.4th at 1188–89.  Similarly, Lew provides no explanation for what "legally liable" means or conveys to demonstrate that this broad and vague statement is objectively false.  Lew relies on the same unavailing allegations relating to the CW Employee, which do not provide a basis to find these statements are false statements of fact.  (*See* Doc. 39 ¶ 85(a)–(b).)

As for actionable omissions, Lew appears to allege that there is a scenario where the customer can reduce its demand without paying for the orders or buying an alternative

product and Onsemi does not achieve a "win" because it could not shift the supply to another customer, leaving Onsemi with the ultimate loss.  For the reasons previously stated, the allegations related to the CW Employee do not support this scenario and he was no longer with the company when these statements were made.  Consequently, there are no facts that support Onsemi had not achieved a "win" under an LTSA to support an inference that the challenged statement omitted the fact the LTSAs permitted renegotiations that did not confer a "win" to Onsemi.

Lew also contends that the CW Employee reviewed the LTSAs, although it is unclear whether he reviewed the military customer's specific LTSA, and observed that there was no penalty for indefinitely delaying purchase orders.  (*See* Doc. 45 at 20.)  As El-Khoury stated, however, Onsemi could ship the outstanding product to another customer and the military customer would not receive products it did not need.  And in his view, "net-net, it's a win-win."  In that regard, whether there was a penalty to the military customer for not placing all of its orders is not dispositive and Onsemi achieved a "net-net," "win-win" by selling the products to another customer.  Lew fails to allege facts to infer whether this occurred one way or the other.

Again, both of Lew's theories fail and this statement does not support the claim.

### ii.    Scienter

The parties disagree about whether El-Khoury's statement is forward looking and whether it is protected by the PSLRA safe harbor.  (Doc. 43 at 19; (Doc. 45 at 19.)  Both parties fail to appreciate the nuance of mixed statements.  El-Khoury made a mixed-statement, including forward-looking statements that the LTSAs forced customers to have a conversation with Onsemi to renegotiate the agreement, the result of which would create a "win-win."  (Doc. 39 ¶¶ 84–85.)  The only portion of his statement that is possibly non-forward looking is that that the customers were "legally liable" under the LTSAs.  (*See id.* ¶ 84.)  But it remains unclear how this statement is objectively false or misleading.  It begs the question—legally liable how or for what?  To place the call at the first sight of reduced demand?  To order a total dollar amount over the term of the LTSA?  To come to

the table to negotiate in good faith?  Lew does not clarify.[2]

To demonstrate the falsity that El-Khoury was purportedly knowledgeable of, Lew alleges that the CW Employee's concerns corroborate that Onsemi would receive notice months in advance and failed to achieve a "win-win" after the military customer failed to place the required orders.  (*See id.* ¶¶ 142–43.)  First, as noted, the CW Employee allegations do not support any reasonable inference here.  Second, whether there was no penalty built into the LTSA for not placing orders is beside the point.  There is no need for a "penalty" for not placing expected orders if the parties are obligated to and can renegotiate an LTSA to cover different products.  Finally, El-Khoury being involved in negotiating LTSAs and possibly receiving word of the military customer's circumstances provides no basis to infer he knew his statements were false or misleading.  There are far too many analytical gaps between the CW Employee's concerns, the terms of the military customer's LTSA, and El-Khoury general statements that the LTSAs are "legally binding" to reasonably infer scienter is met.

El-Khoury's statements Onsemi would "sit with the customer" and that the negotiations would lead to a "win-win" is forward-looking.  Lew contends that Onsemi must have received notice of the automotive customer's reduced demand before the Class Period.  (*Id.* ¶¶ 138–39, 143.)  Lew then relies on inferring that, because Onsemi later revealed the $200 million revenue projection reduction months after receiving notice, El-Khoury somehow knew that some renegotiations would not result in a "win-win."  Even viewing the facts in Lew's favor, the fact of the reduced revenue projection merely demonstrates the possibility that Onsemi had yet to achieve the "win" and negotiations were ongoing to secure that "win" in whatever form it may ultimately take.  In short, Lew

---

[2] The year before, at the same or similar conference, El-Khoury consistently represented that that the LTSA guaranteed a phone call because they are "legally binding agreements with take-or-pay for volume and price.  So as soon as the customer sees the demand [drop], they're going to pick up the [phone], and they're going to call El-Khoury."  (*Id.* ¶ 57.)  El-Khoury further explained, Onsemi was willing to renegotiate the legally binding, take-or-pay LTSAs if there were changes in end-user demand and there was a net benefit to Onsemi, e.g., a 10% reduction to the purchase orders for one product could be offset by Onsemi capturing a greater share of that customer's business elsewhere.  (*Id.* ¶ 58.)

has failed to establish El-Khoury had the requisite scienter in making these statements.

### 4. Citi Conference

During the Citi Conference, in response to a question about "how ironclad" the LTSAs were and how renegotiations would work, El-Khoury stated (as incorporated):

> Historically, backlog disappeared 30 days before I ship it, and you're left holding the bag. So the LTSAs, somebody is going to get the bat phone and call and say, we got a problem, 6 months, 9 months from now, let's have a conversation. **So we'll have the conversation, but it has to be a win-win.**
>
> [What does that look like?  Look, if demand is down, it doesn't really help us maybe in the short term, but it doesn't help the company in saying, "Well, you got to take, I don't care, put the inventory on your shelf" it doesn't help anybody to have inventory at the customer if demand is not there.  So we'll have the conversation about, okay, well, we know we have 50% share on this product, and we increase the share, offset the gap and so on and so forth.   So we have those conversations.  From a company perspective, we would rather ship product any day than have fees because those are onetime benefits.  I really don't care for them, right?   I like the sustainability of it, which is, okay, let's talk about revenue.  Let's talk about share gains.  Hey, maybe we extend the LTSA and you bolt on more, let's put more products that you maybe are not buying from us, but we can qualify because we have a new product.]
>
> **So all of these are win-win. Now, if the customer is not interested in a win-win, but a win/lose, that's where it's ironclad. It's a legally binding agreement that both parties in a win-win will renegotiate an amendment. But net of that, we're not going to be left holding the bag.**

(Doc. 39 ¶ 87; *see also* Doc. 43-2 at 330–31.)

#### i.    *Falsity*

Lew alleges that this statement was false or misleading because he misrepresented that if a customer called in advance of reduced demand, the LTSAs were "ironclad" and required a corresponding "win."  (*Id.* ¶ 88.)  Lew further reiterates that the LTSAs were not "ironclad" because Onsemi had discretion to permit to customer to indefinitely push out orders, thus allowing a "win/lose."  (*Id.*)

In using the term "ironclad" El-Khoury discusses the multiple avenues a renegotiation of an LTSA could undertake.  He does not present that the "ironclad" LTSAs ensure that that renegotiation forges a "win" into a definitive form, but that at bottom, Onsemi would "not be left holding the bag."  In context, like many of the other statements at issue, the phrase is inherently vague and highlighting general corporate optimism, and

thus inactionable puffery.

Lew attempts to contrast this statement with the statements El-Khoury made during the Q3 2023 Earnings Call over a month later in which he revealed the automotive customer's reduced demand lowered Onsemi's projected revenue forecast for silicon carbide products by 20% or $200 million for 2023.  (*See* Doc. 39 ¶¶ 88–97.)  Lew alleges that El-Khoury admitted that the LTSA was not enforced against the automotive customer.  El-Khoury made no such admission.  He expressly stated during the call that he was not commenting on specific customer details and the timeline for a "win" under the LTSAs generally depends on the customer's circumstances.  (*See id.* ¶¶ 91–92; Doc. 43-2 at 222.)  Lew seemingly conflates breach or cancellation of an LTSA with a permissible modification and has not established a coherent theory on falsity for this statement.

As to any omission, the statement acknowledges the multiple variables at play during the renegotiation of an LTSAs.  The negotiation could result in the customer taking the product, capturing the customer's demand for another product if demand for the unordered product is down, or extend the term of the LTSAs to achieve a net benefit.  In context, El-Khoury's statement acknowledges that the renegotiations are evaluated on a case-by-case basis and dependent on the circumstances of the customer and the variables in the market.  At best, it reflects a statement of opinion on preferred outcomes but the ultimate form of a "win-win" remains amorphous.  *See, e.g.*, *Hewlett-Packard*, 845 F.3d at 1276.

The timeline that the Onsemi would realize this "win-win" was never concrete.  Lew claims that neither El-Khoury or Trent announced that Onsemi would receive an offsetting benefit from the automotive customer for its reduced demand, therefore Onsemi had not received a "win-win," and refused to commit to an offsetting "win" by 2025.  (Doc. 39 ¶¶ 90–92.)   As noted, El-Khoury declined to speak about the specific automotive customer's LTSA.  El-Khoury and Trent addressed general market demands and indicated that they expected continued growth through Q4 of 2023 and through 2024, that the reduction in demand related only to the single customer for that quarter, and there were no

changes for Onsemi's 2024 outlook overall.  (*See id.*; Doc. 43-2 at 216, 222.)  Lew has failed to point to any specific omission that would render this statement misleading nor to any fact that does not square with El-Khoury's ambiguous statement.  *See, e.g.*, *Omnicare*, 575 U.S. at 191 (explaining investors understand statements of opinion in its full context and liability for an omission may arise where the omission of a material fact cannot be squared with a fair reading).  Therefore, Lew's theories fail to support his claims.[3]

### ii.    Scienter

The parties disagree about whether El-Khoury's statement is forward looking and whether it is protected by the PSLRA safe harbor.  (Doc. 43 at 19; (Doc. 45 at 19.)  El-Khoury's statements at the Citi Conference are substantively similar to his statements at the Deutsche Bank Conference.  (*See* Doc. 43-2 at 330–31.)  He touted that the LTSAs ensured customers would notify Onsemi of anticipated reductions in demand and that renegotiations would generate a "win-win" but that if the customer is interested in a "win/lose, that's where [the LTSAs are] ironclad."  (*Id.*)  His statement is non-forward looking in that he represents the then-current "ironclad" nature of the LTSAs.  Similar to whether the LTSAs were "legally binding," Lew has not established a basis to infer scienter.  At best, the renegotiations with the automotive customer likely remained ongoing and do not provide a basis to infer, let alone a strong inference, that El-Khoury was aware the LTSAs permitted a "win/lose."  Therefore, Lew has failed to adequately allege the requisite scienter for El-Khoury's statements at the Citi Conference to support his claim.

### 5.    Core Operations Theory

Assuming falsity exists for all challenged statements, Lew alleges that the LTSAs

---

[3] Lew argues that Defendants attempt to assert a "truth-on-the-market" defense that is generally improper to decide on a motion to dismiss.  (Doc. 45 at 17–18.)  In the typical fraud on the market case, the defense operates to excuse a defendant's failure to disclose material information where the information was already made credibly available to the market by other sources.  *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991).  Defendants concede that they do not assert this defense but rather provide statements that predate the challenged statements to put the alleged misrepresentations in context.  (Doc. 47 at 9.)  Defendants are not offering other sources' disclosures of any purported misrepresentations.  They offer their own statements.  (*See id.* (citing Doc. 39 ¶¶ 58, 83).)  Therefore, the Court need not reach this issue.

are integral to Onsemi's core operations and it would be absurd to suggest that El-Khoury and Trent were not aware that the LTSAs were subject to the risk of amendment or cancellation to the detriment of Onsemi, which he contends supports a strong inference of scienter.  (Doc. 39 ¶¶ 127–37.)  This theory relies on the principle that "corporate officers have knowledge of critical core operations of their companies."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (citation omitted).  Core operations may support scienter in "rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.  *Id.* (citation omitted); *see, e.g.*, *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984, 988–89 (9th Cir. 2008) (finding it absurd that corporate executives were not aware that including certain government contracts that were subject to stop orders and had a high likelihood of unilateral cancellation as part of the company's backlog, which represented work that the company was likely to perform, was misleading and caused a substantial drop in revenue).

Defendants argue that this case is not one of those "rare circumstances" and there are no alleged facts that support an inference that El-Khoury's and Trent knew material facts about the LTSAs that contradicted their public statements.  (Doc. 43 at 21; Doc. 47 at 16.)  Lew disagrees, arguing that El-Khoury were intimately involved in the negotiation and execution of the LTSAs so that it would be absurd to infer that they did not understand whether the LTSAs could guarantee a "win-win."  (Doc. 45 at 23–24.)

The problem with Lew's allegations is that he conflates obtaining certain projected revenues for a product with obtaining a "win" in renegotiating an LTSA and the timeline for recognizing any revenue derivative of that renegotiation.  Additionally, Lew's allegations assume that the renegotiation with the automotive customer was not fruitful based on the revenue adjustment and assumes no benefit was or will be obtained in the future.  El-Khoury and Trent repeatedly represented that the LTSAs provided for a "win-win" if customers experienced changes in demand.  And notably, Defendants disclosed before the Class Period that minimum purchase commitments under the LTSAs

1    were not cancellable unless otherwise mutually agreed.  (Doc. 39 ¶ 49.)

2          In effect, Lew appears to premise his theory on the fact El-Khoury and Trent were

3    aware that renegotiations could take longer than six to nine months and by virtue of the

4    projected revenue reduction and refusal to comment on the automotive customer's plans to

5    place orders in 2024, Onsemi did not obtain a "win."  But the core operations theory based

6    on absurdity requires the falsity of a fact to be patently obvious, i.e., the facts are prominent

7    enough that it is absurd to suggest top management is unaware of them.  *See Zucco*, 552

8    F.3d at 1001.  By conflating projected revenues and whether renegotiations achieve a

9    "win-win," Lew bases his theory on a subjective belief of what constitutes a "win," and not

10   on any patently obvious fact.  It would not be obvious to corporate management that the

11   possibility of failing to recognize projected revenues for a product during a quarter or fiscal

12   year would render a statement that renegotiations of LTSAs ensure a "win-win" objectively

13   false.  *See id.*  In context overall, the Onsemi conveyed that they would renegotiate to a

14   "win-win" under the duration of an LTSA and not necessarily quarterly revenue

15   projections.  Thus, Lew's core operations theory fails.

16                          6.  <u>Holistic Scienter</u>

17         Finally, the Court is required to review the scienter allegations "holistically" to

18   determine if, in accepting them as true and collectively, a reason person would deem the

19   inference of scienter at least as strong as any opposing inference.  *Tellabs*, 551 U.S. at 326.

20   The parties dispute whether Lew has alleged sufficient facts to create such an inference.

21   (Doc. 43 at 22–23; Doc. 45 at 24; Doc. 47 at 16.)

22         Lew's allegations create a narrative that El-Khoury and Trent knew or recklessly

23   disregarded that the LTSAs were not "ironclad" or that they did not ensure an offsetting

24   "win-win" based on their participation in executing LTSAs, the core operations inference,

25   notice regarding the military customer's cancelled or delayed orders, removal of risk

26   warnings in the Form 10-Ks, and  notice from the automotive customers reduced demand

27   months in advance of their announcement of reduced revenue projections.  (*See generally*

28   Doc. 39 ¶¶ 103–44.)  These allegations, however, do not give rise to an inference of scienter

that is at least as compelling as an inference that El-Khoury and Trent's statements—if false in the first place—were made as an honest mistake and based on general corporate optimism. The Court has rejected Lew's core operations theory. Even in considering El-Khoury and Trent's involvement in negotiating and executing LTSAs, including any renegotiations before or during the Class Period, an inference in Lew's favor is entirely based on speculation about what a "win" constitutes and if the automotive customer was permitted to cancel its orders without Onsemi recognizing some benefit.

At bottom, any inference from Lew's fraud narrative falls short of meeting an inference of a nonfraudulent intent. *See, e.g.*, *Webb*, 844 F.3d at 858 (affirming dismissal of § 10(b) claims where the plaintiff's narrative was "simply not as plausible as a nonfraudulent alternative"). Lew has thus failed to sufficiently plead scienter.

In the end, Lew has failed to adequately plead his § 10(b) claim based on any of the challenged statements.

### 7. Section 20(a) Claim

"Controlling persons liability under Section 20(a) of the Exchange Act is derivative, such that there is no individual liability where there is no primary violation of securities law." *In re Genius Brands*, 97 F.4th at 1180. Seeing no primary violation, Lew's § 20(a) claim against the Individual Defendants also necessarily fails and is dismissed.

### C. Leave to Amend

Federal Rule of Civil Procedure 15(a) requires that leave to amend be "freely give[n] when justice so requires." Leave to amend should not be denied unless "the proposed amendment either lacks merit or would not serve any purpose because to grant it would be futile in saving the plaintiff's suit." *Universal Mortg. Co. v. Prudential Ins. Co.*, 799 F.2d 458, 459 (9th Cir. 1986). Therefore, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citation modified).

At oral argument, Lew's counsel noted that while the instant Motion to Dismiss was

pending, Lew has since filed a motion to intervene and unseal a complaint filed in this Court for another securities fraud case involving the Individual Defendants. *See Balsam-Respler v. El-Khoury*, No. 2:25-CV-01672-SMB (D. Ariz. May 16, 2025), Dkt. Nos. 1, 12, 17. There, Lew's counsel noted that there are unsealed allegations that are directly relevant to the deficiencies in his Complaint. While it is not abundantly clear to the Court how Lew will amend his allegations to address the deficiencies outlined above, the Court will grant leave to amend. As a general matter, should Lew choose to file an amended complaint, he should add clarity to his falsity allegations to discern between an affirmative misstatement of fact and a material omission and the reasons supporting each theory separately. The Court cautions that the Court will not be left putting together the pieces of Lew's puzzle as he hides under a cloud of vagueness and imprecision. *See, e.g.*, *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 949 (D. Ariz. 2024) ("Courts may dismiss cases for 'puzzle pleading,' where the complaint recites lengthy statements attributed to the defendants, followed by a generalized list of reasons that the statements may have been false or misleading or a generalized list of omissions that were required to make the statements not misleading." (citation modified)), *reconsideration denied*, No. CV-22-02126-PHX-MTL, 2025 WL 371717 (D. Ariz. Feb. 3, 2025).

## IV.    CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED granting** Defendants' Motion to Dismiss Second Amended Complaint (Doc. 43), dismissing the claims without prejudice.

**IT IS FURTHER ORDERED** that Plaintiff shall file a Third Amended Complaint, if he so chooses, **no later than thirty (30) days after this Order is filed**.

…

…

…

…

…

**IT IS FURTHER ORDERED** that, if Plaintiffs fail to file an amended complaint within 30 days of the date of this Order, the Clerk of the Court shall enter judgment dismissing this entire case without prejudice.

Dated this 11th day of July, 2025.

Honorable Susan M. Brnovich
United States District Judge