LEVI & KORSINSKY, LLP
Shannon L. Hopkins (admitted *pro hac vice*)
(State of Connecticut Juris No. 435545)
Gregory M. Potrepka (admitted *pro hac vice*)
(State of Connecticut Juris No. 437326)
David C. Jaynes (to be admitted *pro hac vice*)
(State of California Juris No. 338917)
P. Cole von Richthofen (to be admitted *pro hac vice*)
(State of Connecticut Juris No. 444159)

1111 Summer Street, Suite 403
Stamford, CT 06905
shopkins@zlk.com
gpotrepka@zlk.com
djaynes@zlk.com
cvrichthofen@zlk.com
Telephone: 203-992-4523
*Lead Counsel for Lead Plaintiff Jeffery S. Lew*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffery S. Lew, Individually and on Behalf of All Others Similarly Situated <br><br> Plaintiff, <br><br> v. <br><br> ON Semiconductor Corporation, Hassane El-Khoury, and Thad Trent <br><br> Defendants. | No. CV-24-00594-PHX-SMB <br><br> CLASS ACTION <br><br> JURY TRIAL DEMANDED <br><br> THIRD AMENDED COMPLAINT |

DATED this 11th day of August, 2025.

*/s/ Gary A. Gotto*

Gary A. Gotto
Liaison Counsel for Plaintiff Lew

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ......................................................................... 1

II.    JURISDICTION AND VENUE ..................................................................... 8

III.   PARTIES ...................................................................................................... 8

       A.     Plaintiff ............................................................................................. 8

       B.     Defendants ........................................................................................ 9

       C.     Relevant Non-Party ......................................................................... 9

IV.    SUBSTANTIVE ALLEGATIONS ............................................................. 10

       A.     Onsemi Manufactures and Sells Semiconductors ......................... 10

       B.     In 2020, the COVID-19 Pandemic Disrupts Supply Chain Reliability in the Semiconductor Market, Motivating Customers to Place Redundant Orders with Multiple Suppliers and Artificially Inflating Demand Market-Wide 12

       C.     In 2021, Defendants Introduce LTSAs that Purportedly Provide "Better Visibility" and a "Committed Long-Term Demand Outlook," to Make Losses from Customer Cancellations "A Thing of the Past" ..................... 14

       D.     LTSAs Purportedly Helped Ensure that Onsemi's Limited Manufacturing Capacity for SiC Products Remained Fully Utilized ................................ 21

       E.     Onsemi Operated a Robust Enterprise Risk Management System to Report, Discuss, and Attempt to Mitigate Known Risks ........................... 23

       F.     Prior to and During the Class Period, Defendants Represented That the "Win-Win" Parameters to Amend an LTSA Obligated the Amending Customer to Offset Any Revenue Impact to Onsemi, Ensure Continuity of Manufacturing Capacity, and Prevent Inventory Build Up at Onsemi ...... 27

       G.     Defendants' Unqualified Representations That Onsemi Would Enforce "Take-or-Pay" Provisions in an LTSA, or Renegotiate to Obtain an Offsetting Benefit, Were Materially Misleading ....................................... 32

       H.     Defendants Knew, From Their Attendance at Meetings and Internal Reports That LTSAs Were Not "Iron-Clad" and That Onsemi Increasingly Failed to Achieve "Wins" During LTSA Renegotiations That Offset the Unfavorable Financial Impact Caused by Customers' LTSA Noncompliance ............................................................................................. 35

V.     DEFENDANTS' MISLEADING STATEMENTS AND OMISSIONS THROUGHOUT THE CLASS PERIOD ........................................................ 39

       A.     May 1, 2023 Q1 Press Release ....................................................... 40

       B.     May 1, 2023 Q1 Earnings Call ....................................................... 43

C.    May 1, 2023 Quarterly Report on Form 10-Q for Fiscal Q1 2023 ............ 46

D.    May 23, 2023 JPMorgan Chase Conference ............................................. 49

E.    July 31, 2023 Q2 Press Release ............................................................... 53

F.    July 31, 2023 Quarterly Report on Form 10-Q for Fiscal Q2 2023 .......... 57

G.    August 30, 2023 Deutsche Bank Conference ........................................... 61

H.    September 7, 2023 Citi Conference .......................................................... 66

VI.    DEFENDANTS REVEAL THE TRUTH ................................................................ 71

VII.    POST CLASS PERIOD EVENTS ........................................................................ 75

A.    Board Materials Confirm That the Impression Held By Investors During the Class Period Concerning the LTSAs' Durability Conflicted With Reality .................................................................................................... 75

B.    Defendants Admit the $200 Million Onsemi Lost in 2023 When It Failed to Achieve a "Win-Win" with the SiC OEM Was "De-Risked" and Was Not "Push[ed] Out" or Assumed to "Recover" in Onsemi's 2024 Forecast .................................................................................................... 75

C.    Onsemi's Shrinking 2024 Sales Volumes and Revenue Belie Any Notion that LTSAs Could Ensure "Win-Wins" During LTSA Renegotiations, and Confirm that the Fundamental Weakness in the SiC OEM's LTSA Inhered in All Other LTSAs .................................................................................. 77

VIII.    ADDITIONAL SCIENTER ALLEGATIONS ....................................................... 78

A.    Board Documents Reveal That, Unbeknownst to Investors, Defendants Were Aware Onsemi Faced Significant Challenges With LSTA Amendments That Had Not Provided an Offsetting Benefit ..................... 79

B.    The Individual Defendants' Primary Roles in Negotiating, Signing, Executing, and Monitoring the LTSAs Raise a Strong Inference of Scienter .................................................................................................... 83

C.    Defendants' Extensive, Detailed Commentary on the LTSAs Raises a Strong Inference of Scienter ................................................................... 87

D.    Defendants' Prior Notice of Large, "Significant" Customers Violating LTSAs Without Penalty Raises a Strong Inference that Defendants Made the Misrepresentations with Scienter ....................................................... 90

E.    That Onsemi's Robust Risk Management Function Communicated ERM Risk Reports to the Individual Defendants on a Monthly Basis During Executive Risk Committee Meetings Raises a Strong Inference that the Misleading Statements Were Made with Scienter ................................... 91

F.      LTSAs Are Integral to Onsemi's Core Operations ...................................... 92

G.      Defendants Received Notice Before the Class Period that a Large Automotive Customer Would Not Take Delivery of $200 Million in Minimum Purchase Commitments in 2023, But Continued Representing LTSAs Were "Ironclad" ............................................................................ 95

IX.    LOSS CAUSATION ................................................................................................. 96

X.     CLASS ALLEGATIONS ....................................................................................... 101

XI.    PRESUMPTION OF RELIANCE ......................................................................... 102

XII.   NO STATUTORY SAFE HARBOR ...................................................................... 104

XIII.  COUNTS ................................................................................................................. 106

XIV.  PRAYER FOR RELIEF .......................................................................................... 109

XV.   DEMAND FOR A JURY TRIAL .......................................................................... 109

1. Lead Plaintiff Jeffery S. Lew ("Lead Plaintiff") brings this class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), individually and on behalf of himself and all persons and entities similarly situated, other than Defendants (defined at Section III.B., *infra*), who purchased or otherwise acquired ON Semiconductor Corporation ("Onsemi" or "Company") common stock between May 1, 2023 and October 27, 2023, inclusive (the "Class Period"), and were damaged thereby.

2. Lead Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the investigation of his undersigned attorneys ("Lead Counsel"), which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding Onsemi; (ii) Defendants' other public statements, including transcripts of interviews and calls Defendants participated in; (iii) interviews with an individual who is a former employee of Onsemi ("Confidential Witness" or "CW1"); (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Onsemi and the industry in which the Company operates; and (v) pertinent court filings, including, but not limited to, the Verified Stockholder Derivative Complaint (the "*Balsam-Respler* Complaint") filed in the shareholder derivative action captioned *Balsam-Respler v. El-Khoury, et al.*, Case No. 2:25-cv-01672-SMB (D. Ariz.) (the "*Balsam-Respler* Action").

## I. NATURE OF THE ACTION[1]

3. This is a securities class action concerning misstatements that Onsemi, its CEO Hassane El-Khoury ("El-Khoury"), and its CFO Thad Trent ("Trent"), knowingly or severely recklessly made to investors throughout the Class Period regarding the Company's

---

[1] Emphasis is added throughout the complaint unless otherwise specified.

long-term supply agreements' ("LTSAs") ability to offset negative financial impact to Onsemi during LTSA amendment negotiations. Defendants' statements fostered a misimpression that the LTSAs acted as a bulwark against shrinking and unpredictable customer orders in a period of softening market demand, and concealed the gravity of the risk that LTSA renegotiations posed to Onsemi's financial forecasts. Such risks incubated throughout the Class Period as LTSA amendments proliferated exponentially until the truth regarding the LTSAs' fallibility became known, when Defendants disclosed that a single automotive client had unilaterally backed out of a massive commitment, vaporizing $200 million of projected 2023 revenue and causing Onsemi's stock price to fall nearly 22% in a single trading session. Defendants' Class Period misrepresentations artificially and fraudulently inflated the price for Onsemi stock, causing massive damages to Lead Plaintiff and the Class (defined at Section X, *infra*).

4.     Onsemi manufactures and sells semiconductors and other products, including from materials such as silicon carbide ("SiC") that saw burgeoning growth before the Class Period (particularly for electric vehicles ("EVs") and the automotive industry). Following the COVID pandemic, the semiconductor industry saw a surge in demand that exceeded manufacturers' capacity. Customers often placed redundant orders with multiple manufacturers to ensure supply. When such orders were filled by one supplier, end customers would cancel the remaining orders with alternate suppliers on short notice. This phenomenon impeded the predictability of Onsemi's financial modeling and manufacturing capacity planning. Accordingly, in 2021, Defendants introduced LTSAs to purportedly eliminate short term order cancellations.

5.     For over two years and on at least twenty-seven occasions, Defendants aggressively and relentlessly promoted Onsemi's LTSAs as "take-or-pay" and "legally binding agreements" that ensured predictable revenues, locked-in volumes and pricing, always generated "win-win" outcomes in the event of LTSA amendments. Defendants defined "win-wins" repeatedly to investors, explaining that such a result meant that:

2

Onsemi would maintain utilization of its manufacturing capacity committed to LTSAs; Onsemi was not "left holding the bag" of unsold inventory; and that Defendants' "**guiding principle**" was that "**any flexibility offered cannot be dilutive to** [the Company's] **financials**" including its revenue forecasts.

6.    Entering 2023, Defendants' touting of LTSAs intensified as Onsemi targeted $1 billion in SiC revenue for the year, all purportedly committed to by customers under LTSAs. However, end customer demand in all markets fell and, unbeknownst to investors, trouble enforcing Onsemi's LTSAs began surfacing in early 2023, as evidenced by materials presented at a meeting of the Company's board of Directors (the "Board") on February 20, 2023. During this meeting Defendants El-Khoury and Trent gave a "CEO/CFO Business Update" focused on the Company's revenue outlook and flagging Onsemi's "Strategic Initiatives Goals," which called out the Company's emerging need to "ensure compliance" with LTSAs. Furthermore, the Board presentation stated that Onsemi reached a position of requiring an "LTSA Amendment true-up" to account for the number of customers seeking and obtaining relief from their LTSA commitments. This issue was underscored by the eyewitness account of a 30-year Onsemi Project Manager who confirmed, based on a personal review, that Onsemi's LTSA lacked enforcement provisions, and further reported that a "significant" LTSA customer indefinitely delayed placing orders required under its LTSA from Q1 2023 until at least July 2023, when the witness left Onsemi.

7.    By May 2023, Defendants were in crisis mode. Board meeting minutes reveal that in Q1 2023, Onsemi amended 15 LTSAs and had another 38 amendments in process. In Q2 2023, LTSA amendment numbers exploded further: with Onsemi amending 90 LTSAs and having another 110 amendments in process, increases of 500% and 189%, respectively. Additionally, May 18-19, 2023 presentations to the Board (including El-Khoury) included a sales update of items that "**keeps us awake at night**" including "customer retention" and other concerns such as "[m]anaging the LTSAs," which included

successfully "negotiating [LTSA] amendments which preserve [O]nsemi revenue/margin/inventory goals[.]" In reality, a concurrently held meeting of the Board's Audit Committee attended by Defendants El-Khoury and Trent evidenced that preserving such goals were increasingly difficult. Indeed, the Audit Committee documents highlight that LTSA amendment offsets were elevated as "Key Action[s]" to "Close the Gap" and help the Company's "*2023 Recovery Plan*" but these offsets were far from guaranteed, with the presentation giving only a *50% probability* of Onsemi obtaining one.

8. Additional nonpublic documents from Board and Audit Committee meetings in July and August 2023 confirm that LTSA compliance continued deteriorating, presenting revenue "non-linearity" as a key risk for 2023. In fact, an Enterprise Risk Management ("ERM") Update to the Audit Committee on August 17, 2023 (attended by El-Khoury and Trent) highlighted the dramatic escalation in risk to LTSAs: "LTSA Customer Compliance" jumped from being the Company's 26th priority in 2021 to 11th in 2022, signaling widespread customer reneging and financial threats like lost revenue and excess inventory during demand downturns. The ERM team's involvement and escalation of the LTSA risk was telling—that group was specifically designed and created to identify risks to Onsemi's operational and financial performance and elevate the most serious to the Individual Defendants and Onsemi's Board.

9. Furthermore, a September 9, 2023 Board presentation contained a memorandum from Defendant El-Khoury announcing the commissioning of a strategic initiative to investigate how to "extend the viability of our LTSAs" which had been plagued by customers' decommitted orders. The memo further admitted that LTSA amendments caused significant lost "revenue" and stuck Onsemi with $2 billion in inventory meant to fill orders for LTSA customers "who are no longer in need of it[.]"

10. Importantly, Defendants knew that investors were unaware of these facts concerning the rapidly deteriorating performance of LTSAs throughout the Class Period. In fact, nonpublic materials from a February 2023 Board meeting note that pushback from

4

investors "regarding our ability to sustain margin (and pricing) has moderated significantly" in light of Defendants' reassurances regarding LTSAs. And during the May 18, 2023 Audit Committee meeting—against the true facts known internally (including that current LTSA performance contained a "Gap" that placed Onsemi in "Recovery" mode), the Board highlighted that investors were "very pleased with SiC performance" with analysts on "[Wall] Street increasingly confident of our ability to hit" the Company's $1 billion revenue target.

11.     Nonetheless, as customers frequently sought financially "dilutive" LTSA amendments and as investors held a misperception of the LTSAs durability born out of years of Defendants' promotion, Defendants made materially misleading statement during the Class Period touting the LTSAs purported benefits while omitting any negative information relating to the customer agreements.

12.     For example, on May 1, 2023, Defendant El-Khoury claimed LTSAs made automotive revenue outlooks "**very, very predictable**," aligning customers on "pricing and **volume through the duration**" and that Onsemi was experiencing "**no pressure**" on orders to be supplied. On May 23, 2023, August 30, 2023, and September 7, 2023, Defendants El-Khoury and Trent stated Onsemi's LTSAs always generated "**win-win**[s]" during LTSA renegotiations, and that they would only agree to amendments in the event a customer agreed to "**offset the gap**" with a "**win**" for Onsemi. These guarantees were purportedly possible because, as Defendant El-Khoury assured investors on August 30, 2023, LTSAs made customers "**legally liable**" for order volumes which liability "**forced**" the Company "**to land in a much better spot**" whenever customers sought to amend LTSAs. On September 7, 2023, just two days before his memorandum calling for an investigation of "the viability of our LTSAs" was shared with the Audit Committee, Defendant El-Khoury claimed "**if the customer is not interested in a win-win, but a win/lose, that's where it's ironclad. It's a legally binding agreement that both parties in a win-win will renegotiate an amendment. But net of that, we're not going to be left**

**holding the bag**" of unwanted inventory. Moreover, throughout the Class Period, Defendants issued speculative risk warnings that misleadingly warned revenues "**could be influenced by [] modifications to customer agreements**," while omitting the ongoing, dramatic rise in such modifications.

13.     Defendants El-Khoury and Trent knew their statements were misleading when made because, *inter alia*, they: were directly involved in presentations to Onsemi's Board wherein the infirmity of LTSAs, frequency of amendments, and inability to achieve offsetting "wins" for the Company in the event of such amendments were discussed; were primarily involved in negotiating, signing, and monitoring LTSAs, including personally signing the LTSAs and reviewing 30+ pages of relevant Key Performance Indicators ("KPIs") weekly; extensively commented publicly on Onsemi's LTSAs, demonstrating their intimate knowledge; had notice prior to the Class Period of a "significant" customer violating LTSAs without a beneficial offset to Onsemi; participated in monthly ERM meetings tracking the rising risk of customer LTSA noncompliance; and managed Onsemi, for which LTSAs were integral in purportedly securing future revenue.

14.     The truth emerged on October 30, 2023, during Onsemi's earnings call for the third fiscal quarter of 2023 ended September 29, 2023 (the "2023 Q3 Earnings Call"), when the Defendants revealed a massive $200M shortfall in 2023 SiC revenue from an automotive client—representing a whopping 20% of the Company's $1B target for 2023. This news contradicted what investors had been led to believe regarding the durability of Onsemi's LTSAs and their ability to always generate win-wins during amendment negotiations. When investors inquired about what "win" had been achieved to offset the massive loss in SiC revenue, Defendant El-Khoury quietly conceded that Onsemi was only achieving wins "outside of silicon carbide in Q4[.]" Later, Defendants disclosed that the $200 million in 2023 SiC revenue was "de-risked" from Onsemi's financial projections and that the Company was "not assuming" it could be pushed out to the future and be recovered.

15. Analysts understood that the $200 million in lost 2023 SiC revenue highlighted the minimal value of the LTSAs and was a harbinger of what was to come as end market demand weakness continued. Indeed, financial analysts reacted swiftly and negatively to the news on October 30, 2023. For example: UBS issued a report titled "Big Step Back In Confidence/Credibility on SiC Story," noting LTSAs had been revealed to have only "very limited value"; William Blair noted—using Defendant El-Khoury's "ironclad" language against him in quotations—that "We have seen 'iron-clad' LTSAs fall apart in cyclical downturns," with other companies it covered, and postulated that Onsemi's LTSAs were similarly "fallible"; Truist declared that LTSAs were "not bulletproof" and stated that "the [revenue] miss contrasts mgmt's confident messaging" during the Class Period; Bank of America stated that the $200 million SiC guidance reduction "created doubts about the durability of [Onsemi's SiC LTSAs], a key part of the bull thesis"; and Goldman Sachs concluded that Defendants' disclosure "brings into question … the viability of LTSAs."

16. In other words, investors, who believed LTSAs ensured stability and had no knowledge of the rapid deterioration of customer compliance with LTSAs, were blindsided. On this news, Onsemi's stock plummeted from a price of $83.52 per share at market close on October 27, 2023 to $65.34 per share at close on October 30, 2023—a $18.18 (nearly 22%) per share drop on heavy volume, erasing $7.9 billion in market capitalization.

17. Moreover, analysts' and investors' reactions were well-founded—the $200 million in lost SiC revenue in 2023 was just the tip of the spear. In 2024, Onsemi's revenue shrunk year-over-year by almost $1.2 billion (or 14.2%), attributable to lower sales volumes across *all* segments and a decrease in demand in the automotive and industrial end-markets. Likewise, Onsemi's 2024 gross profit shrunk year-over-year by almost $670 million, or approximately 17.2%, "primarily due" to the decline in sales volume in both existing products and new products. Put simply, Onsemi's vaunted LTSAs (which comprised 77% of the Company's revenue coverage before the Class Period) lacked the

ability to ensure "wins" during renegotiations and avoid financially "dilutive" amendments.

18.     Defendants' fraudulent and misleading statements served to artificially inflate the price of Onsemi's common stock throughout the Class Period, causing massive investor losses when the price of the stock precipitously declined as the truth about Onsemi's LTSAs was revealed. Lead Plaintiff hereby seeks damages individually and on behalf of the Class.

## II.  JURISDICTION AND VENUE

19.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Onsemi's principal place of business and principal executive offices are located in this District, in Scottsdale, Arizona. Moreover, Defendants entered a stipulation with Lead Plaintiff on March 15, 2024 agreeing on the propriety of this Court as venue for this litigation. *See* ECF Nos. 19, 20.

21.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A.  Plaintiff

22.     Lead Plaintiff Jeffery S. Lew purchased Onsemi common stock during the Class Period, as set forth in his Certification of Plaintiff Pursuant to Federal Securities Laws (ECF No. 9-1) which Lead Plaintiff incorporates by reference herein, at prices

artificially inflated by Defendants' materially misleading public statements and omissions, and was damaged thereby.

**B. Defendants**

23.    At all times relevant to this action, Defendant ON Semiconductor Corporation was a public corporation, organized and existing under the laws of the State of Delaware with its principal place of business and principal executive offices located in Scottsdale, Arizona. At all relevant times, the Company's common stock was traded on the Nasdaq Global Select Market ("NASDAQ"), a national exchange, under the ticker symbol "ON."

24.    Defendant Hassane El-Khoury was, at all times during the Class Period, the President, Chief Executive Officer, and a director of Onsemi. Defendant El-Khoury began his tenure as CEO in December 2020 and remains CEO as of the date of this filing.

25.    Defendant Thad Trent was, at all times during the Class Period, the Executive Vice President ("EVP"), Chief Financial Officer, and Treasurer of Onsemi's Board. Defendant Trent began his tenure as CFO and Treasurer of Onsemi in February 2021.

26.    Defendants El-Khoury and Trent are collectively referred to hereinafter as the "Individual Defendants" and, together with Onsemi, comprise the "Defendants." The Individual Defendants, because of their positions with Onsemi, possessed the power and authority to control the contents of the Company's filings with the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and investors. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially misleading.

**C. Relevant Non-Party**

27.    CW1 was employed at Onsemi for 30 years before leaving the Company in July 2023. CW1 worked most recently as a Project Manager in the Advanced Solutions

9

Group business unit at Onsemi and was responsible for a team that developed products for military and aerospace customers, including defense firms and the U.S. government. CW1 reported to Cale Entzel, who reported to Terry Danzer, who reported to Michel De Mey, the Military and Aerospace Business Unit Manager, who reported directly to CEO Hassane El-Khoury. De Mey is currently the Vice President and General Manager of the Industrial Solutions Division at Onsemi.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Onsemi Manufactures and Sells Semiconductors

28.    Onsemi manufactures and sells semiconductor components for various electronic devices worldwide and serves original equipment manufacturers ("OEMs"), distributors, and electronic manufacturing service providers. Onsemi's semiconductors are used by customers in a variety of industries such as industrial, medical, aerospace/defense, communications, networking, computing, and automotive, including both traditional combustion vehicles and electric vehicles.

29.    Historically, most of Onsemi's products were silicon ("Si") semiconductors that were sold into and widely used in the computing, consumer, and communications industries.

30.    More recently, developments in the markets for EVs, 5G wireless, and industrial power storage solutions have made new chips made with SiC an important part of Onsemi's portfolio of products. SiC semiconductors can operate at much higher voltages, temperatures, and frequencies than traditional Si chips, meaning SiC products are a more popular choice than Si for applications in burgeoning industries such as EVs, solar power conversion, 5G wireless, and aerospace.

31.    Accordingly, Onsemi's revenues have shifted over time, away from the computing, consumer, and communications industries and towards automotive and industrial. Moreover, Onsemi has experienced a significant ramp in the production and

10

sales of SiC products as the Company has focused on serving customers in the growing EV and power storage markets.

32.     While automotive accounted for 32% of total revenues in 2020, by the end of 3Q 2023, automotive accounted for 53% of total revenues. *See* Figure 1.

**Figure 1.**



Source: Jefferies, company data; ON has reported 3 segments starting 3Q21.

33.     Onsemi operates both a direct sales model, in which the Company sells semiconductor products directly to OEMs or the OEMs' suppliers, and an indirect sales model, in which the Company sells semiconductors to distributors who then sell them to end-users. Onsemi's sales are made primarily pursuant to orders that are booked as far as 52 weeks in advance of delivery. Onsemi often refers to customer orders as "bookings," because they represent orders for products to be manufactured and delivered at a future date, and the Company's manufacturing capacity (*i.e.*, the capital, resources, and facilities needed to produce such products) needs to be allocated to accommodate such orders.

11

34. Onsemi, like most of its competitors in the semiconductor industry, relies upon a "backlog" to monitor purchase orders and bookings (planned or expected future purchase orders) and to forecast demand from customers. The Company's "backlog" on a given date consists of (1) existing purchase orders and (2) forecasted demand from customers (*i.e.*, bookings), in each case scheduled to be shipped in the current or future period. Onsemi describes its backlog as influenced by "several factors, including market demand, pricing and customer order patterns in reaction to product lead times."

35. Onsemi uses its backlog to prepare quarterly "Outlooks" that are communicated to investors in press releases contemporaneously with the Company's earnings announcements for the fiscal quarter most recently ended. Onsemi's Outlooks describe, *inter alia*, the Company's expected revenue and gross margin for the coming quarter.

36. In addition to Company-wide quarterly revenue and gross margin Outlooks, Onsemi also disclosed full-year revenue targets for its SiC products. Indeed, as Defendants stated on Onsemi's Q4 2022 Earnings Call on February 6, 2023, the Company sought to achieve "$1 billion in [SiC revenue] in 2023 based on committed revenue from LTSAs[,]" a figure Defendants frequently repeated starting in late 2022 and through the Class Period. In a presentation given to Onsemi's Board and the Individual Defendants on February 20, 2023, the group president of one of Onsemi's business segments described the SiC business as a "race" with competitors to reach $1 billion in SiC revenue.

**B. In 2020, the COVID-19 Pandemic Disrupts Supply Chain Reliability in the Semiconductor Market, Motivating Customers to Place Redundant Orders with Multiple Suppliers and Artificially Inflating Demand Market-Wide**

37. The COVID-19 pandemic constrained production capacity and disrupted supply chains around the globe. This disruption was acute for semiconductor manufacturers and their customers.

38.     For years leading up to the pandemic, demand for semiconductors had been rising, but in the first months of 2020, as the pandemic spread rapidly across the globe, demand for semiconductors plummeted and semiconductor manufacturers correspondingly curtailed operations at certain of their manufacturing facilities and canceled plans to invest in additional manufacturing capacity. Shortly thereafter, an industry recovery began and demand rapidly increased for semiconductors, in part because of the huge increase in computer hardware needed to support remote work and school.

39.     Demand for semiconductors in late 2020 quickly rose above pre-pandemic levels, causing bottlenecks in the supply chain resulting in industry-wide semiconductor shortages, commonly known as the "chip shortage." This shortage, which began in late 2020 and slowly eased through the end of 2023, was particularly felt by automotive companies who had canceled orders for semiconductors at the beginning of the pandemic, only to find themselves competing for semiconductor capacity when chip foundries reopened in the second calendar quarter of 2020 when pandemic-related government mandates began lifting.

40.     During the chip shortage, many customers who were unable to obtain the components they needed from semiconductor suppliers placed purchase orders with multiple suppliers in hopes of obtaining the components as quickly as possible. After a customer received the semiconductor components it needed from one supplier, that customer would then cancel its pending orders with other suppliers, to the detriment of the other suppliers. Thus, customer behavior during the pandemic resulted in an artificially-inflated demand signal, causing further financial and operational harm to semiconductor suppliers when customers inevitably canceled their redundant orders.

41.     Some semiconductor manufacturers, including Onsemi and Cypress Semiconductor (a semiconductor manufacturer at which Defendant El-Khoury was president and CEO before he joined Onsemi in December 2020), responded to these supply chain issues and artificial demand signals by requiring customers to sign long-term supply

13

agreements that specified minimum purchase commitments and product pricing. Locking in a minimum amount of purchase orders and product pricing would, in theory, permit semiconductor manufacturers to have a guarantee that if they invested in building additional manufacturing capacity, those capital expenditures ("CapEx") would have a positive return for the company because manufacturers like Onsemi could then reliably anticipate that such capacity (*e.g.*, a new fabrication facility) would generate new revenue and be operated at (or near) full utilization, thereby minimizing the Company's costs of goods sold.

**C. In 2021, Defendants Introduce LTSAs that Purportedly Provide "Better Visibility" and a "Committed Long-Term Demand Outlook," to Make Losses from Customer Cancellations "A Thing of the Past"**

42.     During Onsemi's earnings conference call for the first fiscal quarter of 2021 held on May 3, 2021 (the "Q1 2021 Earnings Call"), Defendant El-Khoury stated that the Company was "working with our strategic customers to secure long-term agreements to provide better supply and price visibility over the next few years." Defendant El-Khoury elaborated: "My goal is to have an organization that is able to react quickly to changing business condition and is able to make decisions efficiently and objectively in the best interest of shareholders."

43.     When speaking to investors, leading up to and throughout the Class Period, Defendant El-Khoury frequently referred to Onsemi's LTSAs in the singular (*i.e.*, "our LTSA") to broadly describe that Onsemi had a uniform policy for the agreements. Moreover, Defendants did not caveat or carve out exceptions for particular customers when describing the LTSAs' terms to investors. For example on December 6, 2022, during the NASDAQ Investor Conference, when asked about what differentiated Onsemi's LTSA from competitors, Defendant El-Khoury highlighted Onsemi's singular, take-or-pay LTSA "framework[,]" "infrastructure[,]" and "structure" stating, in pertinent part:

> Look, so ***the LTSA***, as broad as it is today, our long-term supply agreements are new, call it, to a first order. But for us, both Thad and I, in our prior lives,

we implemented and executed very, very well for -- on LTSA with the *same framework* that we are in executing to at Onsemi. It worked very well. So that learning, we carried over to Onsemi in order to have that *same infrastructure*.

\* \* \*

All of our silicon carbide 23 and beyond is under LTSA. So our strategy as a go-to-market strategy, we're not going to put silicon carbide capacity unless it's under LTSA. That protects our return of capital, which is very solidly tied to volume and pricing. So we maintain our financial model and the return on that capital. So that's one. So it's all under LTSA. Overall, over the next 3 years, we talked about a $4 billion of committed revenue. ***Committed revenue under the structure of the take-or-pay with our LTSA***.

44.    Again, during Onsemi's May 16, 2023 Investor Day conference, Defendant El-Khoury described LTSAs in the singular, stating "Look, we look at pricing as stable because just look at it from the LTSA perspective, ***our LTSA is a multiyear in duration, where both volume and pricing is locked in***. So that anchors on the value."

45.    Long-term supply agreements between Onsemi and its customers were important to investors, who peppered Defendants with questions about the LTSAs in the years leading up to, and throughout, the Class Period. For example, during the Q1 2021 Earnings Call, securities analysts asked the Company for more information about Onsemi's ability to obtain long-term agreements with customers and the impact such long-term agreements would have on the Company's business.

46.    In response to analyst questions during the Q1 2021 Earnings Call, Defendant El-Khoury explained that the long-term supply agreements were intended to increase confidence in the Company's outlook, create better visibility into customer demand, and enable Onsemi to invest in building production capacity only if that additional capacity would be supported by customer demand:

As far as the long-term agreements, I look at them as more outlook confidence. If you look out over the next few years, we want to be able to spare capacity. We want to be able to potentially build or shift capacity into the strategic products we want. And we are engaged with customers to make sure that their demands over the next few years are met. And that comes with a 2-way where we make sure the investments are made in the areas where we see the growth. And from the customer side, the investment is made in order

15

to give us the visibility and the long-term agreement for us to make sure that we are building for the right demand.

So it's a win-win for our strategic customers. We've been working with a lot of them in order to make sure that [the inventory shortage, production capacity constraint, and inflated demand signal] we experienced in 2021 does not occur again. And that only comes with a steady and outward-looking demand signal that they will commit to.

47.     During the same call, in response to a question from Jefferies analyst Mark John Lipacis about trends in customers' inventory purchases, Defendant El-Khoury explained that the purpose of the long-term supply agreements was to make customer demand predictable and mitigate the risk of order cancellations on short notice:

For me, the focus is a productive engagement with the customer, where they are confident in their demand signal, and I'm confident in my investment in order to meet that [demand]. The short-term cancellation, all of that, I think, is going to be a thing of the past.

And that's going to be the difference between a strategic customer and a nonstrategic customer, it's the ones that we are able to run a healthy and profitable, but more importantly, a predictable business with.

48.     On August 2, 2021, during Onsemi's earnings call for the second quarter of 2021, Defendant El-Khoury told investors that when Onsemi entered into LTSAs, the Company benefitted through "committed" long-term demand and that the "better visibility" of demand allowed better planning for the Company's CapEx (*i.e.,* capital expenditures for manufacturing capacity expansion):

Long-term supply agreements, or LTSAs, are a win-win for both customers and us by guaranteeing supply to the customer and at the same time, providing better visibility and allowing us to better plan our capital allocation towards capacity expansion with a committed long-term demand outlook.

49.     Defendant Trent also extolled the purported benefits of LTSAs. For instance, on August 5, 2021, at the Company's first annual Analyst Day, Defendant Trent touted the Company's "better visibility" into demand, which "allows us to plan better and plan our capital allocation and our investments in capacity."

16

50.    Defendant Trent also asserted that the long-term supply agreements gave the Company assurance of its "capacity needs multiple years out[,]" stating:

> And with our engagement with our customers and our long-term agreements that we're putting in place, we can plan much better on the capacity needs multiple years out. And we'll build the capacity based on the demand that we see based on commitments from our customers rather than build it and they will come. So this will give us an advantage as well, and again, as I've said, be much more capital efficient for the company.
>
> * * *
>
> We've got long-term service agreements that give us better visibility with our customers to plan our capacity and our capital allocation.
>
> * * *
>
> It's definitely flexible. I mean we'll flex it with the revenue growth, right? And because we have the long-term agreements with many customers, we're seeing -- we've got better visibility of what that revenue growth looks like. And obviously, we're taking kind of a risk-based approach to this. We'll evaluate that. But if we're not seeing that revenue growth come through, we can definitely throttle back our CapEx investments as well.

51.    El-Khoury added, based on "firsthand" knowledge, that the strategic benefits of the long-term supply agreements would begin ramping up in 2021 and 2022 and explained that the "milestones" investors would see included eliminating cancellations, greater visibility into demand, and "committed volume[s]" under contract for at least two years in advance:

> It's a long-term agreement to share a much deeper level of road mapping and a much tighter coupling of design between products and end product -- our products and end products. And it goes back on the efficiency. When you have been engaged with a customer, it's not off the shelf. When you have engagement with the customer where their design makes or breaks based on the delivery of your technology versus anything else, that will start the design in much ahead of time. And then the milestones are from cancellation to visibility to committed volume 2 years from now because we have to build the capacity, back to John's point, where when you start seeing that as you approach, then you start making the throttle investment versus let's build all the capacity on hope, and then you can't anymore.

17

52.    Defendants would reiterate their view of the durability of the Company's LTSAs again and again. For example, on August 8, 2022 during the KeyBanc Capital Markets' 23rd Annual Technology Leadership Forum ("2022 KeyBanc Forum"), KeyBanc's John Nguyen Vinh questioned whether the value of LTSAs would endure "when things truly do soften"—*i.e.,* during a market correction wherein customer demand softens—because "there's a lot of skepticism from investors that … these [long-term supply agreements] hold," and pointed out that over the last week or so "a few of [Onsemi's] peers announced that they're trying to decimate and renegotiate some of their long-term wafer purchase commitments[.]"

53.    In response, Defendant El-Khoury explained that Onsemi's LTSAs were "legally binding" agreements and that customers were "liab[le]" for the price and volumes agreed upon in the LTSAs:

> [The] LTSA is a legally binding document between us and the customer that discloses on a part number basis, multiple years that extend into [20]24, [20]25 and sometimes [20]29, that has volume and price in it over that period of time. And it's legally binding.

* * *

> [T]he LTSA guarantees somebody is going to pick up the bat phone and call me because there's a liability in there.

54.    A few days later, during the August 31, 2022 Deutsche Bank Technology Conference, Defendant El-Khoury reiterated that the LTSA's "guaranteed" notice of changes in demand up to 6 months in advance and explained that the LTSAs include "take-or-pay" provisions and are legally binding, and Defendant El-Khoury further explained that Onsemi was willing to renegotiate the legally binding, take-or-pay LTSAs in circumstances of changes in end-user demand, but only as long as the amended agreement was a net benefit to the Company. For example, Defendant El-Khoury suggested that the Company might be willing to take 10% fewer purchase orders of one product if, in

18

exchange, the customer was willing to give Onsemi a greater share of the customers total business:

> So what does the LTSA do? The LTSA gets me a phone call, guaranteed, because these are legal binding agreements with take-or-pay for volume and price.
>
> So as soon as the customer sees the demand saying, oh, in 6 months, we're going to have that softness or 10% down, they're going to pick up the ba[t] phone, and they're going to call me and go, "Hey, we see this 10%. We'll take the parts obviously, because of the LTSA. But is there something we can do?" And there are a lot of things we can do.
>
> Because one*, if I didn't build the wafers, that's fine because I'm not stuck with inventory that I have to write off* and then that is bad for margin P&L and all the subsequent problems that comes with it. So okay, now you stopped wafers. *But how do you make me [whole] because that's capacity, right?*
>
> Then you say, okay, take that 10%, either give me different share. If there's something where we're dual source on some other product that I can use those same wafers at the same capacity, no problem. Or take that and [let's] extend the LTSA for 2 years. So I get 2 more years of visibility for a 10% fluctuation. If we're that accurate, I'll take it because it's the visibility to manage the uncertainty in the outer years. That's what the LTSAs do.
>
> *What they will not do and won't allow,* that's why I said it's up to the conversation, *is where you say, "Now I can get that part for now 10% less somewhere else. So I'm just going to move the share."* The answer is that's not a market demand driven, that is a choice.
>
> And *that is not a choice that I'm going to support* because it's not – that's why it's volume and price. So it depends on the scenario, but the LTSA gives that engagement on both scenarios.

55.     Whether Onsemi would actually enforce the LTSAs would continue to be of great interest to investors leading up to the Class Period. For example, on December 6, 2022, during the NASDAQ Investor Conference, analyst Joseph Lawrence Moore of Morgan Stanley asked the Defendants about the Company's LTSAs, inquiring: "How long do the commitments go out? How much do you hold people to those commitments in different types of economic environments?"

56.     In response, Defendant El-Khoury explained that although the LTSAs were a recent development at Onsemi, both El-Khoury and Trent had a lot of experience

19

implementing and executing LTSAs at other companies prior to joining Onsemi. Defendant Trent added that the LTSAs built a relationship with customers "at a C level" (*i.e.*, Onsemi's and its customers' highest-ranking executive officers, including El-Khoury and Trent). Defendant El-Khoury also represented that LTSAs guaranteed that during renegotiations, inventory would not be "reserved" (*i.e.*, suffer a reduction in value), or "scrapped" (*i.e.*, written off). Specifically, Defendants stated during the NASDAQ Investor Conference that:

**Joseph Lawrence Moore**
Yes. I appreciate that. Maybe if you can talk a little bit about the longer-term supply agreements. And I feel like we're learning that every company has a slightly different philosophy about this, as we move into this elevated lead time environment, how do you view it? How long do the commitments go out? How much do you hold people to those commitments in different types of economic environments?

**Hassane S. El-Khoury**
Sure. Look, so the LTSA, as broad as it is today, our long-term supply agreements are new, call it, to a first order. But for us, both Thad and I, in our prior lives, we implemented and executed very, very well for -- on LTSA with the same framework that we are in executing to at onsemi. It worked very well. So that learning, we carried over to onsemi in order to have that same infrastructure.

So what does it mean? And what do those commitments look like? They're essentially take-or-pay agreements where the customer commits to taking products, except volume and pricing. So both of those are contractually -- call it, contractual obligation for volume and price. And what we will do is we will invest in order to support those volumes at these price. So that's at the high level structure. They extend anywhere. On average, it's 4 to 5 years. To some extent, 7 or 8 years depending on the automotive and the new products that we're putting in. And on average, they have almost 200 parts in them. We identify it by part number. So it's not this high level of are you going to pull this much revenue and this much margin. It's a part number level list, volume and pricing.

***Now the following question is, well, how enforceable are they, which is really the question that comes up now given some of the outlook in these markets****. Let me just say it at a high level, they are legally binding agreements. So we'll start with that. Now what happens when a customer

20

says, "Hey, we have a -- we see softness coming in, in 6-month or 9-month, and we're not going to be able to pull." Well, benefit #1 is I did get the call where before, backlog will disappear 30 days before you ship, you're stuck with inventory, then what? The LTSA, if they do one thing, they will guarantee a phone call. The bad phone is going to ring way in advance where the customer is going to be proactive and so will we.

So what does that mean? ***It means we can manage inventory. I can move capacity somewhere else. So it's not dead inventory that ends up being reserved or scrapped***. And the customer gets -- we get a much longer signal of demand -- of end demand than you do just by looking at the backlog, which is almost backwards-looking signal. Now what -- and we'll negotiate because, look, it's not our benefit either nor is it the customers to shove inventory. You just push the problem down the road. So we want to manage inventory. We want to be proactive in managing inventory. What is nonnegotiable is the pricing. So we can discuss demand. We can discuss demand signal. But what is nonnegotiable and it's extremely enforceable is the pricing conversation that we're not going to have. So that's how we look at LTSA and the engagement we have with our end customers.

**Thad Trent**
And Joe, I would add that we've got a lot of cases where customers are co-investing with us. So they're actually putting capital upfront. So it tends to make that relationship very much like a long-term partnership, which is what our industry hasn't had in the past and very sticky. ***So in a downturn, we expect to pick up market share well through that, right? So I think it's an engagement that is totally different than what we've seen. It's much deeper, and it's at a C level.***

57.   As nonpublic documents given to Onsemi's Board confirm, Defendants' public commentary around LTSAs "helped increase confidence" in the Company's "long-term revenue and margin outlook[,]" and, as a result, investor concerns "regarding [Onsemi's] ability to sustain margin (and pricing) [had] moderated significantly" by February 20, 2023.

**D. LTSAs Purportedly Helped Ensure that Onsemi's Limited Manufacturing Capacity for SiC Products Remained Fully Utilized**

58.   Before and during the Class Period, Defendants also disclosed that LTSAs affected Onsemi's manufacturing capacity and, in particular, the Company's capacity to

21

produce increasingly important SiC products—which Defendant El-Khoury described during the Q1 2023 Earnings Call (defined in Section V.B, *infra*) as experiencing "megatrend growth[.]"

59. Producing large volumes of in-demand SiC products required the Company to both build new SiC manufacturing capacity and convert existing facilities to handle SiC products. To ensure new manufacturing capacity would be utilized, and thereby provide Onsemi with return on its investments in expanding capacity, Onsemi required its customers to actually place orders that were committed to. Defendants explained to investors that LTSAs were the solution to this issue.

60. For example, on March 7, 2023, Defendant El-Khoury explained that Onsemi "deploy[ed] CapEx [capital expense] for LTSAs" such that, as LTSAs gave the Company "more visibility" into customers' demand for SiC products, Onsemi would build or reallocate "capacity and scale it accordingly[.]" This strategy was in response to what El-Khoury described, during the Q1 2023 Earnings Call, as the "supply-to-demand gap" in the SiC market, wherein customer demand for SiC products was so high that Onsemi was still "catching up" in having enough capacity to produce enough. Onsemi therefore employed LTSAs to help assign its limited SiC capacity to fulfill customer orders, resulting in the Company being "sold out on silicon carbide" capacity through the start of the Class Period. Indeed, as Defendant El-Khoury had put it on December 6, 2022, Onsemi would not build or allocate "silicon carbide capacity unless it's under LTSA."

61. Leading up to and throughout the Class Period, Defendants repeatedly confirmed that Onsemi's SiC capacity was fully allocated based on LTSA commitments. Indeed, Defendant El-Khoury asserted as early as November 2022 that Onsemi's "100%" LTSA SiC capacity was fully "sold out" for FY23. At J.P. Morgan's Tech/Auto Forum in January 2023, El-Khoury confirmed that Onsemi was "pretty much sold out" of capacity. El-Khoury echoed this at the 2023 JPMorgan Conference in May 2023, stating that "[o]bviously, in 2023, we've said we've sold out" of capacity, and explaining during the

22

Q1 2023 Earnings Call that "demand is much higher than even our increased capacity" because SiC was "of course, a [supply-]constrained technology[.]" Just one month later in June 2023, El-Khoury told investors at a Bank of America conference again that "we've been sold out" of capacity.

62.    Given that Onsemi in FY2023 was purportedly fully sold out of SiC manufacturing capacity, and that SiC orders were 100% pursuant to LTSAs, if a SiC customer then cancelled orders without giving Onsemi sufficient time to adjust manufacturing capacity, Onsemi would be left holding work-in-progress inventory that could not be sold and would also lose out on the opportunity to shift that capacity to service another customer with existing SiC demand. Thus, if SiC customers in FY2023 sought to amend their LTSAs, one of Onsemi's key focuses in amendment negotiations was to ensure that capacity, and in particular highly valuable and constrained SiC capacity, remained utilized.

**E. Onsemi Operated a Robust Enterprise Risk Management System to Report, Discuss, and Attempt to Mitigate Known Risks**

63.    According to a case study titled "ON Semiconductor Evolving Practices in Enterprise Risk Management" published January 8, 2021 on the American Productivity & Quality Center ("APQC") website (the "APQC Case Study"), Onsemi's approach to risk management prior to 2015 was "ad hoc and done in functional silos." To improve the Company's risk management, beginning around 2015, Onsemi developed an Enterprise Risk Management program that was designed to "embed[] a risk-aware decision-making culture across all functions within the company and thereby increasing decision quality and the probability of achieving strategic goals." The scope and primary focus for Onsemi's ERM is "supporting the board's oversight of risk for the organization."

64.    Thus, prior to and throughout the Class Period, Onsemi maintained and utilized an ERM methodology to identify and mitigate risks to the Company's business, which has been led by the Senior Director of Global Enterprise Risk Management, Michael

23

Zuraw, at least since 2022. This continual business process regularly apprised the Individual Defendants and Onsemi's Board (of which Defendant El-Khoury was also a member) of risks to Onsemi's operational and financial performance, including risks resulting from LTSAs such as the risks of customer noncompliance and amendments, and how such LTSA-related risks rose significantly in prominence during the Class Period.

65.    Throughout the Class Period, Onsemi's ERM process was overseen by an Executive Risk Committee ("Risk Committee") comprised of Zuraw, Defendant El-Khoury, Defendant Trent, and Onsemi's Chief Legal Officer, Chief Sustainability Officer, and EVP of Operations and Manufacturing. According to Onsemi's 2023 sustainability report published on the Company's website, titled "Innovating for a Better Future," "***ERM findings are communicated to the Risk Committee monthly***" to ensure that relevant information concerning risks is regularly communicated to Onsemi's executives and Board of Directors.

66.    Indeed, Zuraw was quoted in a January 17, 2020 article published by RIMS (a professional organization that describes itself as "the risk management society[,]" with which Zuraw is involved as a contributor), titled "Truly Long-Term Strategic Risk Management in Focus[,]" as stating that "top risks" to Onsemi's business are documented in reports "for the board[.]"

67.    In the APQC Case Study, Zuraw provided more insight into Onsemi's internal risk management practices. According to the case study, the Company:

> [L]everages 27 risk champions who cover each functional area of the business and coordinate quarterly updates. Risk champions are identified and nominated by leadership in each area and are trained to act as ERM resources and [subject matter expert]s for their part of the business. Zuraw's team coordinates regular virtual risk champion meetings to keep the engagement levels of these important resources high.

24

68.     The APQC Case Study further explained:

***Assessments of near-term risks are rolled up to the CEO through quarterly reporting***. For this type of risk assessment, each functional group (e.g., marketing strategy, sales, R&D, finance and investor relations, HR, legal and governmental affairs, etc.) in the business identifies the top five risks that may impact their ability to meet their goals and objectives in support of the company's objectives at the enterprise level. As they assess risks for their respective areas, each group scores and prioritizes risks based on their probability and impact in terms of cost, strategy, reputation, and other factors.

69.     Thus, Zuraw explained in the APQC Case Study that Onsemi's ERM approach was a robust process that was wide-reaching into every function within the Company's business and contributed to by a diverse, trained professionals, ensuring that all risks to Onsemi were methodically identified and considered.

70.     Later, during an interview published on February 25, 2025 on news outlet The Morning Brew's finance-focused online publication, *CFO Brew*, Zuraw confirmed the frequency and purpose of Onsemi's Executive Risk Committee (whose membership included both Individual Defendants):

**How do you work with the CFO and the finance team in general on risk management?**

We have an executive risk committee that my team and I meet with monthly, and ***that team includes Thad [Trent] the CFO, as well as the CEO***, head of strategy, general counsel, [and] head of operations and manufacturing…to go through tracking the actual progress of those mitigation actions across our top tier risks. It's not directly interacting with finance, but the CFO is part of that committee. Within that set of risks, there are some tier one risks in that discussion that are specifically around things within the finance group, to where Thad may be actually a sponsor and someone in finance may actually be an owner. And with those tier one risk owners and sponsors, we work with them continually on tracking their actions.

71.     Documents filed by Onsemi with the SEC also demonstrate that Company management and the Board were regularly involved with ERM, which the Board considered to be important to the Company. On April 6, 2023, Onsemi issued and filed with the SEC a proxy statement on Schedule 14A (the "2023 Proxy Statement"), which was designed by the Company to, *inter alia*, induce shareholders to re-elect Defendant El-

Khoury to the Company's Board. The 2023 Proxy Statement indicated within El-Khoury's biographical snapshot that his "[r]elevant [s]kills and [q]ualifications" included ERM, and that Onsemi's Board "believes that it is important" that such an ERM skill and qualification "are represented on [Onsemi's] Board" because it is of "particular relevance to [Onsemi's] business."

72. The 2023 Proxy Statement also stated that the Board (including El-Khoury as a director) either in full and through committees was responsible for "providing oversight for [Onsemi's] ERM Program, including the establishment of corporate risk appetite parameters and management's implementation of processes for assessing and managing risks[.]" Therefore, Defendants El-Khoury and Trent were responsible as members of Onsemi management (and for El-Khoury, doubly so as a member of the Board) for continually assessing and managing risks to Onsemi's financial performance in liaison with the Board.

73. The 2023 Proxy Statement also stated that the Board's Audit Committee was tasked with "[d]iscuss[ing] with management" (*i.e.,* including El-Khoury and Trent) "the Company's major financial risk exposures and processes in place to monitor and control such exposures[.]" The 2023 Proxy Statement additionally noted that "management is responsible for the day-to-day management of [Onsemi's] risk," and the Board plays an "ongoing and active role … by regularly reviewing and discussing with management areas of material risk and mitigation measures being taken to address such risks." "Specifically," the 2023 Proxy Statement provided, the Board's Audit Committee was required by its own charter to "discuss with management [Onsemi's] major financial … risk exposures" and to have "primary oversight over [Onsemi's] ERM Program and provide[] guidance to the Board regarding … risk oversight[.]"

26

**F. Prior to and During the Class Period, Defendants Represented That the "Win-Win" Parameters to Amend an LTSA Obligated the Amending Customer to Offset Any Revenue Impact to Onsemi, Ensure Continuity of Manufacturing Capacity, and Prevent Inventory Build Up at Onsemi**

74.    Leading up to and during the Class Period, Defendants disclosed to investors certain criteria governing when they would allow an amendment to an LTSA that constituted a "win-win" for Onsemi. Specifically, Defendants conditioned investors to understand that LTSA amendments would only be agreed to if the amendments: "offset" any reduction in revenue for Onsemi, such that it was not financially "dilutive"; maintained utilization of Onsemi's manufacturing capacity committed to LTSAs; and ensured Onsemi was not "left holding the bag" of unsold inventory.

75.    For example, during the 2022 KeyBanc Forum, Defendant El-Khoury explained that the Company would amend LTSAs to permit a customer to reduce volume for one product if the customer agreed to "offset" that reduction by increasing its purchases of another product:

> While the LTSA guarantees somebody is going to pick up the bat phone and call me because there's a liability in there. So first, I'm going to get a call, and I'm going to get a call ahead of everybody else to figure out what are we going to do about it. Now if it's a demand issue, where they say, I thought it's 1 million, now it's 800. There's that 200-unit gap. If I get it ahead of time, I can manage my business differently. But it's not an impact on pricing because pricing is in there also. So yes, ***there's maybe some change in volume and so on that I would offset with that customer*** where I say, okay, if this is not ramping as fast as you think, well, how about the other one that's ramping, I'll take that share. But that gives us that visibility and the dialogue way ahead of just backlog disappearing.

76.    Defendant Trent echoed Defendant El-Khoury's assurances, stating:

> We're going to get these notifications from our customers early, [which] allows us to adjust our manufacturing strategy. ***We're not holding a bunch of inventory.*** We're not pushing inventory into the distribution channel. So we can manage proactively once we have those discussions with customers versus reacting, which is what our industry has done in the past.

77. The comments by Defendants El-Khoury and Trent at the 2022 KeyBanc Forum assured investors that LTSAs were legally binding agreements that protected the Company's expected revenue and inventory positions, because if a customer had softening demand for one product, Onsemi would not be left "holding a bunch of inventory." Rather, any amendment to the volumes agreed upon in the LTSAs would include the Company taking a "share" of another product that the customer was ramping up that would "offset" the impact of any agreement to reduce volumes.

78. At Credit Suisse's Technology Conference on November 29, 2022, Defendant Trent and El-Khoury again explained that although Onsemi did not have a policy of mechanically "shov[ing]" inventory committed under LTSAs onto customers—the Company would *only* allow LTSA amendments, if such amended terms ensured an offsetting revenue impact and maintained utilization rates of the Company's manufacturing capacity. As Defendant El-Khoury succinctly stated, "any flexibility offered cannot be dilutive to [Onsemi's] financials."

79. Specifically, Defendants responded to a question by Credit Suisse analyst Christopher Caso as follows:

**Christopher Caso**
And what sort of levers do you have to pull if industrial, for example, should weaken if some of the customers ask give us a little bit of time, what sort of levers do you pull to stabilize those gross margins if that were to in fact occur?

**Thad Trent**
Well, I think it's back to the discussion earlier, what's fungible, right? So if we can move this. Now a lot of that business is on LTSAs, right? So we've got good visibility. We're going to have our customers coming to us well in advance if there is an issue in softness of demand, which might be below their LTSA revenue. ***If that's the case, and we can move that capacity somewhere else***. We'll do that, right? ***There's got to be a win-win for us*** and the customer through that process. But that's ***the main thing is being able to reallocate those -- that capacity somewhere else***.

**Hassane S. El-Khoury**
Yes. ***Bottom line, from the LTSA, at a high level, the guiding principle is any flexibility offered cannot be dilutive to our financials***. Meaning if we have underloading because of it, then customers are going to have to ***offset*** that if they don't want to take the product.

So our goal is not to blindly shove inventory into the customer. Because you just pushed the problem down the road. So we're not focused on short-term kind of benefit, had [sic] a long-term impact. We want the long-term stability of our go-to-market and our revenue and our margin. ***But it can't be margin dilutive*** because historically, we're left holding the backlog and disappear in 30 days before. Back to that point, we're going to get a call 6 months in advance when there's a problem, which gives us a lot more time to manage it as a win-win with the customer.

80.     At J.P. Morgan's Annual Tech/Auto Forum held January 5, 2023 (the "2023 J.P. Morgan Tech Forum"), the host analyst, Harlan L. Sur, referenced Defendants' remarks on the Q3 2022 Earnings Call that LTSAs had contributed to Onsemi's 2023 manufacturing capacity becoming "sold out" in both its automotive and industrial segments. The analyst then asked El-Khoury to explain how LTSAs would be an "advantage" should customers begin showing "weaker demand[.]"

81.     Again echoing prior remarks, El-Khoury responded that if a "customer has a concern on demand" such that they want to amend their commitment under an LTSA, "we can manage our manufacturing" capacity in a way that Onsemi would not be left with "[work-in-progress] … inventory": either "the customer will have to take it" because LTSAs held customers "liab[le]" to "take or pay[,]" or Onsemi would "move that capacity elsewhere"—*i.e.*, to another product the customer could buy, or to another paying customer. Defendant El-Khoury stated, in pertinent part:

As far as the LTSAs, look, I'll start by saying LTSAs for us, our long-term supply agreements are legally binding agreement between us and the customer. And what is included in those agreements is both pricing and volume. People ask about -- ask a lot of questions about what are we doing on backlog? How does the backlog? We're not really -- at this point, we're not building to backlog. We're building to LTSAs because that's where the customer signed.

29

And when I say by the customer signed, it's not -- not minimizing the title, but it's not a director of procurement that's going to sign the -- in Europe, it's a member of the Board. In North America, it has to be an officer of the company. For ourselves, it's me, Thad or our Head of Sales that sign. So they are legally binding agreement, because they're liability for the customer because they're take or pay.

Now that's -- like you said, that's all great when everybody makes the parts. Now what happens in moving forward? Okay, look, we're not here to "shove inventory". **If the customer has a concern on demand or they say, okay, 6 months from now, it's not going to be where I thought it was going to be. That allows us a few things**.

**One is we can manage our manufacturing. So you don't have WIP that's going to end up in inventory. If we do, the customer will have to take it because we're not going to be left holding the bag. It has to be a win-win**. If I can move that capacity elsewhere because we're oversubscribed, that's even better for us and the customer. It's a win-win, again. What we're not going to have a conversation about is pricing. Because that's usually where everything falls apart in a softer environment. People say, "Oh, well, I can find it 10% cheaper somewhere else." That's not negotiable. That's where we will execute the extent of the agreement. So that's the -- call it, the framework of the LTSA and then our view on how we're approaching it.

* * *

**Thad Trent**
Yes. And just let me add. Hassane talked about the duration of these. I think the perception sometimes is the short-term duration. These are not just for '23. Normally, they're 3 to 4 years plus. We're not doing something short term to solve the short term. And that's what makes it very strategic. And **if we look at the softness that we saw in consumer and compute, the LTSA -- LTSAs held up in that process as well. So that's kind of our proof point that says we can enforce these with win-win situations** with our customers.

**Harlan L. Sur**
And does the LTSA[] in periods of weakness actually motivate your customers to give you more heads up? Not -- 3, 4 years ago, you guys would get 30 days notice, right? "Yes, I'm not going to need these products. I'm canceling my orders." And so does the LT[S]A program actually motivate your customers to say, "Look, we're looking at the macro environment 6 months out, like things are looking squishy. Let's let the ON team know about this."

30

**Hassane S. El-Khoury**

Yes. That's exactly -- no, I joke with my team, like if the LTSA do one thing, it's somebody is going to pick up the bat phone and call me. I remember, in end of 2018 when kind of the backlog like got a 30% haircut, right, if you recall, I didn't even get a phone call. ***I just woke up in the morning, I thought it was a computer glitch where a backlog kind of somebody didn't add it up. Well, I don't want that. We were not going to be left holding the bag*** because, look, we made a lot of investments in order to support that outlook from our customers. And therefore, it's a win-win. And the way they see it, they have to take the part, so it's a take or pay.

***But if they let us know 6, 9 months in advance that, "Hey, we -- this new model is not working out." Look,*** that's fine. The conversation is great. We'll take share on another model that works ***as long as we utilize the capacity***. And the fact that customers -- some customers have co-invested with us, they're more likely to give a share because of their investment from others in a -- call it, in an environment where they don't have the full volume materialize. So all of those are win-win for us.

82.     During the Class Period on August 30, 2023, Defendants again described "win-win" LTSA amendments when speaking at Deutsche Bank's 2023 Technology Conference (the "2023 Deutsche Bank Conference"). Repeating similar parameters regarding inventory management and an offsetting revenue impact, Defendant El-Khoury described that if an LTSA customer saw "softness in their market" meaning the customer would have less demand for a product, Onsemi would "get [a] call 6 months in advance" and would then see if it could "ship that [inventory] to somebody else" and thereby derive revenue from a different customer. El-Khoury further stated that a "win-win" could occur if an amendment resulted in a customer extending its LTSA ("add[ing] 2 years on top of [its] LTSA"). However, if Onsemi in the meantime didn't "have another customer to give that capacity to[,]" then the Company and LTSA customer would "have to talk about … a different cost structure" (meaning a higher price to the customer) to make up for the "lower volume[.]" In other words, El-Khoury stated that a "win-win" amendment would have to ensure the same level of revenue coming in to Onsemi.

31

83. Defendants also described "win-win" parameters at the Citi 2023 Global Technology Conference (the "2023 Citi Conference") held September 7, 2023. Defendant El-Khoury again explained that LTSAs ensured revenue generation and capacity usage for Onsemi in the event of an amendment, stating that any such solution would need to "offset the gap" for Onsemi's revenue and capacity. El-Khoury illustrated that examples of win-win amendments could be for Onsemi to "increase the share" with the customer (*i.e.*, produce more of a different part) or to "bolt on more" products into the LTSA that the customer was not already "buying from [the Company]." Either one of these examples, in which that the customer was "talk[ing] about revenue" for Onsemi, were considered by Defendants to be "win-win" where Onsemi would not be left "holding the bag" of excess inventory.

84. In sum, beginning in 2022 and throughout the Class Period, Defendants consistently and clearly defined their vision of a "win-win" to investors—articulating that any renegotiation of committed LTSA order volumes would need to: (i) "offset" the anticipated revenue impact (meaning, either revenue neutral or accretive); (ii) maintain utilization of Onsemi's manufacturing capacity committed to LTSAs; and (iii) ensure that Onsemi was not stuck holding already-manufactured inventory.

85. Defendants' publicly disclosed definition of a "win-win" matched the Company's internal definition. Indeed, during a Board meeting on May 18-19, 2023, attended by Defendant El-Khoury, a sales presentation stated that Onsemi's goal in "negotiating amendments" was to "preserve [O]nsemi revenue/margin/inventory goals while simultaneously ensuring no inventory build in the channel or end customer."

### G. Defendants' Unqualified Representations That Onsemi Would Enforce "Take-or-Pay" Provisions in an LTSA, or Renegotiate to Obtain an Offsetting Benefit, Were Materially Misleading

86. While Defendants represented Onsemi's LTSAs as "legally binding" contracts that included "take-or-pay" provisions, Defendants omitted that the LTSAs were

being frequently amended throughout the Class Period and were frequently not enforced against customers who cancelled orders or refused to place orders required under the LTSA.

87.    CW1, who was employed at Onsemi for 30 years, worked as a Project Manager in the Advanced Solutions Group division in 2022 and 2023 supporting aerospace and defense customers.

88.    CW1 stated that, as a Project Manager working on the development and qualification of new products for customers, CW1 attended weekly meetings with customers to develop and qualify new products and to establish a forecast for production. CW1 stated that the forecast developed with the customer was input into a planning tool and was used to inform the production team about how many semiconductor wafers per week or month they would need to produce for the customer.

89.    CW1 recalled developing a product with a military customer (who CW1 was not at liberty to identify by name) in late 2022 that was scheduled to ramp up production in 2023 pursuant to the terms of an LTSA. CW1 recalled that the value of the contract was considered "significant" to Onsemi and stated that the customer was required to order 50,000 semiconductor wafers worth about $6 or $7 million. CW1's description of $6 or $7 million of revenue as significant is corroborated, for example, by Onsemi's Senior VP Sudhir Gopalswamy who, during Onsemi's May 16, 2023 Investor Day conference, confirmed that a data center expansion opportunity that would generate $5 million of revenue per data center was "a very significant growth opportunity for [Onsemi]."

90.    CW1 recalled that the military customer placed a few small orders after production began, but that the bulk of the orders required under the LTSA were scheduled to be ordered in February and March of 2023.

91.    However, CW1 explained, despite Onsemi's customer service team telling the production team to "get ready" for the largest purchase orders, the customer's purchase orders never came and instead were pushed out indefinitely by the customer. CW1 explained that when a customer wasn't going to place an order as contemplated by the

33

LTSA, "I knew well in advance, a quarter before, that it wasn't going to occur" because the customer would inform Onsemi of softening demand in advance of their forecasts and production schedule.

92. CW1 stated that in "early" 2023, after CW1 learned that the customer failed to place the purchase orders as required under the LTSA, CW1 alerted management to the situation, including Michel De Mey who reported directly to Defendant El-Khoury at that time. CW1 recalled that the response "was crickets" and described management as "shrugging their shoulders" at the situation in hopes that the order would come in 2024. When CW1 left the Company in July 2023, the military customer had still not placed the purchase orders required under the LTSA. As CW1 explained, "there was no penalty" for the customer to not place its expected purchase orders, "nothing tied to the LTSA to make them place the order," a fact CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

93. In addition to Onsemi failing to enforce the LTSA with the military customer, CW1 also explained that CW1 had reviewed one of Onsemi's LTSAs in Q1 2023 for a commercial customer, and CW1 did not see any provisions in the LTSA that would penalize the customer for not placing the purchase orders specified in the LTSA. Nor did CW1 see any provisions in the LTSA that guaranteed Onsemi would receive advance notice of softening demand. Thus, CW1 believed that Onsemi's description of the LTSAs as "watertight" was inaccurate because "if you really read one, it doesn't hold water." CW1 added that an LTSA "was only good" to Onsemi "if customers were buying things. And then if a customer were to go away, there was no penalty to that customer for not ordering things."

94. CW1's experience with the military customer not placing orders required by an LTSA, and CW1's reading of an LTSA, contradicted what the Individual Defendants had been representing to the market. Despite the lack of penalties or other enforcement mechanisms in the LTSAs for customers who delayed or canceled purchase orders, despite

Onsemi's non-enforcement of its LTSAs after at least one major customer indefinitely delayed placing the purchase orders required by an LTSA, and despite the Company's undisclosed interest in making unilateral concessions on LTSAs to large customers, Defendants continued asserting that Onsemi would never renegotiate an LTSA unless it was a win for the Company.

**H. Defendants Knew, From Their Attendance at Meetings and Internal Reports That LTSAs Were Not "Iron-Clad" and That Onsemi Increasingly Failed to Achieve "Wins" During LTSA Renegotiations That Offset the Unfavorable Financial Impact Caused by Customers' LTSA Noncompliance**

95.    On June 16, 2025, the plaintiff in the *Balsam-Respler* Action filed the unredacted *Balsam-Respler* Complaint. The *Balsam-Respler* Complaint alleges causes of action on behalf of Onsemi as the nominal defendant against certain of Onsemi's current and former officers and directors, including Defendants El-Khoury and Trent. The allegations in the *Balsam-Respler* Complaint are made, in part, upon the plaintiff's counsel's "review of internal documents produced by the Company [Onsemi] to [the plaintiff in the *Balsam-Respler* Action] in response to a books and records demand made pursuant to 8 *Del. C.* §220 . . . ."

96.    As detailed herein, the allegations in the *Balsam-Respler* Complaint corroborate (and are corroborated by) allegations from CW1 and Defendants' own admissions after the Class Period that Onsemi's LTSAs lacked the ability to always generate "win-wins" and, in fact, could not stem a significant loss of committed orders prior to and throughout the Class Period. The *Balsam-Respler* Complaint also confirms that at all relevant times Defendants were aware of the LTSAs' infirmities, and the rise in customers seeking to amend LTSAs, through periodic attendance at meetings and through review of reports confirming the same, and that the Company understood this reality conflicted with the impression held by analysts and investors.

97.    On February 20, 2023, Onsemi's Board convened a meeting. During the meeting, Defendants El-Khoury and Trent provided a "CEO/CFO Business Update" where

35

they discussed the Company's LTSAs and 2023 revenue outlook. Defendants El-Khoury and Trent highlighted that 77% of Onsemi's "2023 revenue coverage" came from LTSAs and remarked that investor pushback "regarding our ability to sustain margin (and pricing) has moderated significantly." However, conflicting with the impression held by such investors, Defendants El-Khoury and Trent also discussed, or were informed of, disappointing LTSA performance and execution. For example, Defendants El-Khoury and Trent announced certain "Strategic Initiatives Goals" during the CEO/CFO Business Update that included to "ensure compliance" with the LTSAs and to manage "revenue long-term in a stable supply/demand with LTSAs[.]" Indeed, later during the meeting, Defendants El-Khoury and Trent were updated regarding SiC market losses, which included $480 million in Power Solutions Group revenue, only partially offset by $200 million growth in the Automotive & Industrial segments.  Thus, by February 20, 2023, Defendants El-Khoury and Trent knew that LTSA "compliance" issues were problematic enough to require Board escalation.

98.    Defendants' discussion of compliance issues during the February 2023 Board meeting demonstrates that the issue CW1 observed with a military customer not complying with LTSA minimum order commitments was more widespread than a single customer and was pervasive enough at Onsemi to warrant discussion with the chief executives and the Board.

99.    Further, during the February 20, 2023 meeting, the Board was informed that a list of actions needed to achieve Onsemi's gross margin included "LTSA Amendment true-up" and "LTSA Take-or-pay or short-term pricing increase in amendment requests[.]"

100.    On May 18, 2023, the Board's Audit Committee convened a meeting with Defendants El-Khoury and Trent in attendance. The presentation focused on LTSA amendment offsets as "Key Action[s]" to "Close the Gap" and help the Company's "2023 Recovery Plan" but these offsets were far from guaranteed, with the presentation giving only a *50% probability* of Onsemi obtaining at least one of these offsets. Against the true

36

facts known internally (including that current LTSA performance contained a "Gap" and the need for a "Recovery Plan" for 2023), the Board presentation highlighted that investors were "very pleased with SiC performance" with analysts on "[Wall] Street increasingly confident of our ability to hit" the Company's $1 billion revenue target.

101. On May 18-19, 2023, the Board convened a meeting attended by Defendant El-Khoury. A sales update to the Board by management highlighted weaknesses in the LTSAs with fifteen amendments signed in the first quarter and "38 in process." The update also noted that demand was "softening in most markets including automotive[.]" Another slide listed items that "keeps us awake at night," including "customer retention" based on extended "lead time" and a 180-day cancellations window. Another area of concern listed was "[m]anaging the LTSAs," which included successfully "negotiating amendments which preserve [O]nsemi revenue/margin/inventory goals while simultaneously ensuring no inventory build in the channel or end customer."

102. On July 27, 2023, the Board's Audit Committee convened with Defendants El-Khoury and Trent in attendance. The meeting materials listed focus items for "Q'3 23 and Beyond" including "LTSA Compliance."

103. On August 17, 2023, the Board's Audit Committee convened again with Defendants El-Khoury and Trent in attendance. An ERM Update emphasized shifts in risk trends with "LTSA Customer Compliance" being one of the "largest increases in risk priority rank position" going from a rank of 26th in 2021 to a rank of 11th in 2022, driving home the fragility of the LTSAs.

104. On August 17–18, 2023, the Board convened a meeting attended by Defendant El-Khoury. Materials distributed in connection with the meeting noted key risks for 2023 and beyond, including revenue "non-linearity" due to "customer LTSA/[i]nventory control" requiring the Company to leverage "LTSA amendments" to ensure "quarterly commit[ments]." According to an article published by Oracle NetSuite regarding forecasting methods titled "Revenue Forecasting Explained," the straight-line

37

method of forecasting assumes that past growth rates will continue and roughly projects future revenue based on those past growth rates.[2] The straight line method is appropriate when a company's financial metrics are expected to continue to grow at a steady rate, as Onsemi's revenues might have performed if LTSAs had proven to be effective. But a 2023 Power Solution Group LTSA summary stated that an LTSA with Kodiak had "lower volumes" and concluded that there was an "increasing risk of [LTSA] amendments **as compliance drops**." In other words, Onsemi's risk of "non-linearity" in revenues dramatically increased as LTSA amendment frequency increased. A legal department update highlights that in Q2 2023 the Company signed "90 [LTSA] amendments" with "another 110-in process."

105.   Thus, although Q1 already involved such a high number of amendments completed and in-process that the figures were escalated to the Board in May 2023, just one quarter later, Onsemi's number of LTSA amendments in process increased by over 189% and the number of LTSA amendments Onsemi actually signed increased by 500%. *See* Figure 2, below.

**Figure 2.**

|  | Q1 2023 | Q2 2023 | % Increase |
|---|---|---|---|
| **LTSA Amendments Signed** | 15 | 90 | 500% |
| **LTSA Amendmnents In Process** | 38 | 110 | 189% |
| *Source: Board Meeting Dated* | 5/18/2023 | 8/17/2023 | |

106.   Furthermore, the Board held a meeting on September 9, 2023, just two days after Defendant El-Khoury would claim that if customers are "not interested in a win-win, but a win/lose," that LTSAs were "ironclad" and that net of a "win-win," Onsemi would not be "left holding the bag." In stark contrast to these statements, El-Khoury provided a memo to the Board during the September 9, 2023 meeting highlighting Onsemi's weak

---

[2] Rami Ali, *The 4 Financial Forecasting Methods Explained,* Oracle NetSuite, (April 6, 2025), https://www.netsuite.com/portal/resource/articles/financial-management/financial-forecasting-methods.shtml (last visited Aug. 11, 2025).

position regarding the enforcement of LTSAs and amendments, while discussing a new initiative in the sales group to counter customers' "decommits" from LSTAs:

> This initiative is focused on the renewal of the LTSA as we have multiple set to expire in 2024, with customers working on amendments. I strongly believe that some customers are using the macro environment as a cover to move share to our competitors, and we are letting them do it because we do not have data to understand the dynamic. Whether because of pricing or because of availability of qualified materials, or for other reasons, ***we are losing more revenue than the markets have caused and we need to put that back under control with a tighter amendment analysis.*** The market is not getting softer, therefore there needs to be a much larger justification for an amendment than prior. ***We have [more than $2 billion] of inventory that we built for customers who are no longer in need of it***, yet everyone assures me that we don't do amendments with stranded inventory. The outcome of this initiative is to set a renewal [percentage] to extend the viability of our LTSAs and pricing performance and minimize the short term impact of the decommits.

## V. DEFENDANTS' MISLEADING STATEMENTS AND OMISSIONS THROUGHOUT THE CLASS PERIOD

107.    Throughout the Class Period, Defendants made materially misleading statements and omissions relating to the Company's LTSAs, including risks of unfavorable LTSA amendments that had transpired with increasing frequency, and the supposed "ironclad" nature of the LTSAs in protecting Onsemi against financially dilutive LTSA renegotiations. Defendants moreover represented that, in the event that demand softened for customers under LTSAs, Defendants would only allow a renegotiation if it would result in a "win-win" for Onsemi and the customer. Specifically, Defendants during the Class Period made the statements enumerated below, which fostered a material misimpression to investors regarding Onsemi's LTSAs and artificially inflated the price of the Company's common stock.

108.    Lead Plaintiff asserts that the portions of the statements set forth in this Section V., *infra*, that are bolded and underlined (**<u>example</u>**) are alleged to be misleading when made; all other portions of statements are included for context.

## A. May 1, 2023 Q1 Press Release

109.    The Class Period begins on May 1, 2023, when Onsemi issued a press release before the market opened in order to report its financial and operating results for the Company's first fiscal quarter of 2023, ended March 31, 2023 (the "Q1 2023 Press Release"). The Q1 2023 Press Release was attached to an 8-K that Onsemi filed with the SEC that same morning, which was signed by Defendant Trent.

110.    The Q1 2023 Press Release instructed investors to "carefully consider the trends, risks and uncertainties described in … our 2022 Form 10-K[,]" thus incorporating such language from the 2022 Form 10-K by reference.

111.    The 2022 Form 10-K stated, in relevant part:

A significant portion of the Company's orders are firm commitments that are non-cancellable, including certain orders or contracts with a duration of less than one year. Certain of the Company's customer contracts are multi-year agreements **that include firmly committed amounts** ("Long-term Supply Agreements" or "LTSA's") for which the remaining performance obligations as of December 31, 2022 were approximately $16.6 billion (excluding the remaining performance obligations for contracts having a duration of one year or less). The Company expects to recognize approximately 31% of this amount as revenue during the next twelve months upon shipment of products under these contracts. **Total sales estimates** are based on negotiated contract prices and demand quantities, and **could be influenced by** manufacturing issues, supply chain constraints, and **modifications to customer agreements**, among other things. Accordingly, the amount represented by remaining performance obligations may not be indicative of the actual revenue recognized for future periods.

112.    Defendants' statements, that the LTSAs include "**firmly committed amounts**" and the purely hypothetical warnings that total sales estimates "**could**" be influenced by LTSA amendments, were materially misleading when made because Defendants omitted material facts necessary to make the statements not misleading. In particular, Defendants omitted presently-known facts undermining the "firmness" of commitments under the LTSAs and demonstrating that Onsemi's sales estimates were already being negatively "influenced" by LTSA amendments. When the Defendants chose

40

to speak about the durability of committed LTSA orders and factors that could influence the Company's sales estimates, Defendants had a duty to disclose the full truth. Instead, the Defendants disclosed a half-truth, omitting that such amendments were occurring frequently and harming Onsemi's operational and financial performance, which misled investors as to the true state of affairs regarding the strength, durability, and benefits of Onsemi's LTSAs.

113.    The materially misleading nature of Defendants' statements is supported by many alleged facts, including:

(a)    Statements made in connection with Onsemi's February 20, 2023 quarterly Board meeting. During the meeting, Defendants El-Khoury and Trent provided a "CEO/CFO Business Update" acknowledging that concerns of how to "ensure compliance" with LTSAs and that managing "revenue long-term in a stable supply/demand with LTSAs" had risen to the station of "Strategic Initiatives Goals" that needed to be shared with the Board. Further, the update informed the Board that LTSAs were amended frequently, requiring the Company to perform an "LTSA Amendment true-up" and that Onsemi needed to enforce "LTSA Take-or-pay" provisions or obtain a "short-term pricing increase in amendment requests" to achieve its gross margin expectations.

(b)    Analyst misimpressions. During Onsemi's February 20, 2023 quarterly Board meeting, Defendants El-Khoury and Trent advised the Board that pushback from investors "regarding our ability to sustain margin (and pricing) has moderated significantly" in light of Defendants' reassurances regarding LTSAs. These known facts stood in stark contrast to prominent investment banks' post-Class Period reactions, including, but not limited to William Blair who asked "**What Happened to LTSAs?** The management team has been very confident in its LTSA strategy[,]" Truist who stated that the corrective disclosures "contrasts mgmt's confident messaging[,]" and UBS who reported a "Big Step Back in

41

Confidence/Credibility on SiC story" because, as their analyst noted during the 2023 Q3 Earnings Call, Defendants "had always talked about LTSAs being legally binding and it didn't seem like they would be subject to any changes" in market fluctuations.

(c)     Proliferation of LTSA amendments. During Q1 2023, Onsemi signed 15 LTSA amendments and had another 38 amendments in process, figures that were so high they required Board escalation. Topping this already high amount, Onsemi signed 90 LTSA amendments in Q2 2023, and had another 110 in process, an increase over the prior quarter of 500% and 189%, respectively.

(d)     CW allegations. Indeed, CW1 reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things." Further, CW1 stated that "nothing tied to the LTSA to make" customers place orders that were required under the LTSAs, which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(e)     Post-Class Period admissions. For example, during the 2023 Q3 Earnings Call, Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted for the first time that Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes in such a way that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit. Defendant El-Khoury also admitted that a SiC OEM customer was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded there was no offsetting "win" for Onsemi, because while Onsemi generally sought win-wins during renegotiations, El-Khoury allowed that such policy was "outside of silicon carbide in Q4[.]"

42

**B. May 1, 2023 Q1 Earnings Call**

114.    On May 1, 2023, Onsemi held an earnings call at 9:00 a.m. Eastern Time to report its financial and operating results for the Company's first fiscal quarter of 2023, ended March 31, 2023 (the "Q1 2023 Earnings Call"). On the call, Defendants reassured investors about the reliability of Onsemi's revenue projections based on the supposed certainty that LTSAs provided to the Company.

115.    The Q1 2023 Earnings Call began with Onsemi's Vice President of Investor Relations instructing investors to interpret financial projections in context of "[i]mportant factors that can affect [Onsemi's] business" as described in the Company's "earnings release for the first quarter of 2023"—*i.e.*, the Q1 2023 Press Release. Thus, the Q1 2023 Earnings Call incorporated by reference the Q1 2023 Press Release and, consequently, the misleading statements in the 2022 Form 10-K, listed in Section V.A, *supra*. These statements were materially misleading for the same reasons listed in Section V.A.

116.    During the Q1 2023 Earnings Call, analyst Vivek Arya of BofA Securities asked whether there were "*any* changes one way or another" in the Company's "automotive outlook Q2 through Q4[.]" In response, Defendant El-Khoury boldly asserted that, "not just in automotive[,]" but writ-large, the LTSAs ensured "very, very predictable" revenues and that Onsemi was seeing "very, very stable" order volumes to supply for customers:

> Absolutely, no changes. **It's actually very, very predictable, and that's really the benefit that we've been talking about with the LTSAs that have us really, with our customers, align on** pricing and **volume through the duration of the LTSAs.** So no conversations about pricing. **The focus has always remained on supply and that's holding up not just through the year, but through the extent of the LTSAs we have with the customers. So very, very stable and no pressure on that.** And by the way, it's not just in automotive.

117.    Defendant El-Khoury's statements were materially misleading when made because El-Khoury omitted material facts in his possession that contravened the claim that LTSAs provided an observable "benefit" in the form of "very, very predictable" revenue

outlooks, that LTSAs inherently "align[ed]" Onsemi with customers on order volumes, and that Onsemi saw "no pressure" on its purportedly "very, very stable" order "supply[.]" When the Defendants chose to speak about the predictability and stability of LTSA orders, or any pressure on such orders, Defendants had a duty to disclose the full truth. Instead, the Defendants disclosed a half-truth, omitting that LTSA amendments were occurring frequently and harming Onsemi's operational and financial performance, which misled investors as to the true state of affairs regarding the strength, durability, and benefits of Onsemi's LTSAs.

118. The materially misleading nature of Defendants' statements is supported by many alleged facts, including:

(a)     Statements made in connection with Onsemi's February 20, 2023 quarterly Board meeting. During the meeting, Defendants El-Khoury and Trent provided a "CEO/CFO Business Update" acknowledging that concerns of how to "ensure compliance" with LTSAs and that managing "revenue long-term in a stable supply/demand with LTSAs" had risen to the station of "Strategic Initiatives Goals" that needed to be shared with the Board. Further, the update also informed the Board that LTSAs were amended frequently, requiring the Company to perform an "LTSA Amendment true-up" and that Onsemi needed to enforce "LTSA Take-or-pay" provisions or obtain a "short-term pricing increase in amendment requests" to achieve its gross margin expectations.

(b)     Analyst misimpressions. During Onsemi's February 20, 2023 quarterly Board meeting, Defendants El-Khoury and Trent advised the Board that pushback from investors "regarding our ability to sustain margin (and pricing) has moderated significantly" in light of Defendants' reassurances regarding LTSAs. These known facts stood in stark contrast to prominent investment banks' post-Class Period reactions, including, but not limited to William Blair who asked "**What Happened to LTSAs?** The management team has been very confident in its LTSA

44

strategy[,]" Truist who stated that the corrective disclosures "contrasts mgmt's confident messaging[,]" and UBS who reported a "Big Step Back in Confidence/Credibility on SiC story" because, as their analyst noted during the 2023 Q3 Earnings Call, Defendants "had always talked about LTSAs being legally binding and it didn't seem like they would be subject to any changes" in market fluctuations.

(c)    Proliferation of LTSA amendments. During Q1 2023, Onsemi signed 15 LTSA amendments and had another 38 amendments in process, figures that were so high they required Board escalation. Topping this already high amount, Onsemi signed 90 LTSA amendments in Q2 2023, and had another 110 in process, an increase over the prior quarter of 500% and 189%, respectively.

(d)    CW allegations. Indeed, CW1 reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things." Further, CW1 stated that "nothing tied to the LTSA to make" customers place orders that were required under the LTSAs, which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(e)    Post-Class Period admissions. For example, during the 2023 Q3 Earnings Call, Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted for the first time that Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes in such a way that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit. Defendant El-Khoury also admitted that a SiC OEM customer was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded there was no offsetting "win" for

45

Onsemi, because while Onsemi generally sought win-wins during renegotiations, El-Khoury allowed that such policy was "outside of silicon carbide in Q4[.]"

## C. May 1, 2023 Quarterly Report on Form 10-Q for Fiscal Q1 2023

119.    On May 1, 2023, in the Company's quarterly report filed with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2023 (the "Q1 2023 Form 10-Q"), the Defendants published misleading statements regarding the Company's LTSAs. The Q1 2023 Form 10-Q was signed by Defendant Trent, among others.

120.    The Q1 2023 Form 10-Q instructed investors to read the financial results therein "in conjunction with" the notes to the Company's consolidated financial statements in its 2022 Form 10-K. As noted in Section V.A, *supra*, Note 3 of the 2022 Form 10-K stated, in relevant part:

> A significant portion of the Company's orders are firm commitments that are non-cancellable, including certain orders or contracts with a duration of less than one year. Certain of the Company's customer contracts are multi-year agreements **that include firmly committed amounts** ("Long-term Supply Agreements" or "LTSA's") for which the remaining performance obligations as of December 31, 2022 were approximately $16.6 billion (excluding the remaining performance obligations for contracts having a duration of one year or less). The Company expects to recognize approximately 31% of this amount as revenue during the next twelve months upon shipment of products under these contracts. **Total sales estimates** are based on negotiated contract prices and demand quantities, and **could be influenced by** manufacturing issues, supply chain constraints, and **modifications to customer agreements**, among other things. Accordingly, the amount represented by remaining performance obligations may not be indicative of the actual revenue recognized for future periods.

121.    Additionally in the Q1 2023 Form 10-Q, Defendants similarly stated:

> A significant portion of the Company's orders are firm commitments that are non-cancellable, including certain orders or contracts with a duration of less than one year. Certain of the Company's customer contracts are multi-year agreements **that include committed amounts** ("Long-term Supply Agreements" or "LTSA's").

46

The estimated remaining performance obligations as of March 31, 2023, are approximately $17.6 billion (excluding the remaining performance obligations for contracts having an original duration of one year or less). This amount is subject to contractual increases based on negotiated contract prices and volumes, defined product mix flexibility, and the timing of new part introductions, among other contractual provisions. The Company expects to recognize approximately 33% of the remaining purchase obligation as revenue during the next twelve months upon shipment of products under these contracts. **Total revenue estimates could be influenced by** risks and uncertainties including manufacturing or supply chain constraints, **modifications to customer agreements,** and regulatory changes, among other factors. Accordingly, our actual revenue recognized for the remaining performance obligation in future periods may fluctuate from estimates.

122.    Defendants' statements, that the LTSAs include "**firmly committed amounts**" and the purely hypothetical warnings that total sales estimates "**could**" be influenced by LTSA amendments, were materially misleading when made because Defendants omitted material facts necessary to make the statements not misleading. In particular, Defendants omitted presently-known facts undermining the "firm[ness]" of commitments under the LTSAs and demonstrating that Onsemi's sales estimates were already being negatively "influenced" by LTSA amendments. When the Defendants chose to speak about the durability of committed LTSA orders and factors that could influence the Company's sales estimates, Defendants had a duty to disclose the full truth. Instead, the Defendants disclosed a half-truth, omitting that such amendments were occurring frequently and harming Onsemi's operational and financial performance, which misled investors as to the true state of affairs regarding the strength, durability, and benefits of Onsemi's LTSAs.

123.    The materially misleading nature of Defendants' statements is supported by many alleged facts, including:

(a)    Statements made in connection with Onsemi's February 20, 2023 quarterly Board meeting. During the meeting, Defendants El-Khoury and Trent provided a "CEO/CFO Business Update" acknowledging that concerns of how to

47

"ensure compliance" with LTSAs and that managing "revenue long-term in a stable supply/demand with LTSAs" had risen to the station of "Strategic Initiatives Goals" that needed to be shared with the Board. Further, the update informed the Board that LTSAs were amended frequently, requiring the Company to perform an "LTSA Amendment true-up" and that Onsemi needed to enforce "LTSA Take-or-pay" provisions or obtain a "short-term pricing increase in amendment requests" to achieve its gross margin expectations.

(b)    Analyst misimpressions. During Onsemi's February 20, 2023 quarterly Board meeting, Defendants El-Khoury and Trent advised the Board that pushback from investors "regarding our ability to sustain margin (and pricing) has moderated significantly" in light of Defendants' reassurances regarding LTSAs. These known facts stood in stark contrast to prominent investment banks' post-Class Period reactions, including, but not limited to William Blair who asked "**What Happened to LTSAs?** The management team has been very confident in its LTSA strategy[,]" Truist who stated that the corrective disclosures "contrasts mgmt's confident messaging[,]" and UBS who reported a "Big Step Back in Confidence/Credibility on SiC story" because, as their analyst noted during the 2023 Q3 Earnings Call, Defendants "had always talked about LTSAs being legally binding and it didn't seem like they would be subject to any changes" in market fluctuations.

(c)    Proliferation of LTSA amendments. During Q1 2023, Onsemi signed 15 LTSA amendments and had another 38 amendments in process, figures that were so high they required Board escalation. Topping this already high amount, Onsemi signed 90 LTSA amendments in Q2 2023, and had another 110 in process, an increase over the prior quarter of 500% and 189%, respectively.

(d)    CW allegations. Indeed, CW1 reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water"

48

in that "there was no penalty to that customer for not ordering things." Further, CW1 stated that "nothing tied to the LTSA to make" customers place orders that were required under the LTSAs, which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(e)     Post-Class Period admissions. For example, during the 2023 Q3 Earnings Call, Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted for the first time that Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes in such a way that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit. Defendant El-Khoury also admitted that a SiC OEM customer was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded there was no offsetting "win" for Onsemi, because while Onsemi generally sought win-wins during renegotiations, El-Khoury allowed that such policy was "outside of silicon carbide in Q4[.]"

## D. May 23, 2023 JPMorgan Chase Conference

124.    On May 23, 2023, Defendants El-Khoury and Trent spoke in a panel discussion on behalf of Onsemi at the 51st Annual J.P. Morgan's Global Technology, Media and Communications Conference (the "2023 JPMorgan Conference"), which was attended by investors, analysts, and industry representatives.

125.    During the 2023 JPMorgan Conference, analyst Harlan Sur asked how Onsemi was handling "periods of macro uncertainty and end-market weakness" wherein "customers are wanting to reschedule" and "move backlogs," specifically querying whether customers' order placements being pushed out into the future had "started to stabilize[.]" In response, Defendant Trent assured investors that Onsemi was receiving calls from customers quarters in advance of any reduction in purchase orders, which allowed Onsemi to "solve[]" the issue and create "a win for both companies":

Yes. So let's back up and talk about our business. Our LTSAs [are] what we're managing, right? And when customers are coming in, they need help with LTSAs. We're getting the call quarters in advance of something is going to get solved. **If we can create a win-win with that customer, we'll try and help that customer. And there's got to be a win for both companies.** We saw a lot of that happening late last year. We've actually seen in the first quarter and even so far in the second quarter is that's actually stabilized and actually coming down a little bit, which gives you some confidence in the second half as well. Again, think about the visibility we have with the LTSAs and the fact that we're getting less of those requests. There's pockets of them. But late last year, we saw a lot more uncertainty, and I think people remain cautious. So that allows us to really have a dialogue with our customers versus historically, they place a PO, and that PO would disappear 30 days before it shifted. Now we're getting that call in advance, and we're able to help those customers. But it is kind of slowing in terms of the rescheduled request.

126.    Defendant Trent's statements were materially misleading because they gave the impression of a state of affairs where LTSA renegotiations always generated a "win" for Onsemi—meaning, as Defendants often reiterated, LTSA amendments always provided: an offset to any revenue reduction, such that the amendment was not financially dilutive; utilization of Onsemi's manufacturing capacity committed to LTSAs; and avoidance of inventory buildup. However, Defendant Trent omitted presently-known facts contravening the notion that Onsemi's LTSA amendments always resulted in "a win for both companies." When Defendant Trent chose to speak about the status of LTSA renegotiations, he had a duty to disclose the full truth. Instead, Defendant Trent disclosed a half-truth, omitting facts that Onsemi's ability to achieve a corresponding "win" during LTSA renegotiations was severely hampered, which misled investors as to the true state of affairs regarding the strength, durability, and benefits of Onsemi's LTSAs.

127.    The materially misleading nature of Defendants' statements is supported by many alleged facts, including:

(a)    Statements made in connection with Onsemi's Board's May 18, 2023 Audit Committee meeting. During the meeting, attended by Defendants El-Khoury

50

and Trent, presentation materials evidenced that LTSA amendment offsets were elevated as "Key Action[s]" to "Close the Gap" and help the Company's "2023 Recovery Plan" but these offsets were far from guaranteed, with the presentation giving only a *50% probability* of Onsemi obtaining at least one of these offsets.

(b)    Statements made in connection with the May 18-19, 2023 Board meeting. During the meeting, attended by El-Khoury, a sales update to the Board by management highlighted that demand was "softening in most markets including automotive[.]" Another slide listed items that "keeps us awake at night," including "customer retention" based on extended "lead time" for placing orders and a 180-day cancellations window. Another area of concern listed was "[m]anaging the LTSAs," which included successfully "negotiating amendments which preserve [O]nsemi revenue/margin/inventory goals while simultaneously ensuring no inventory build in the channel or end customer."

(c)    Statements made in connection with Onsemi's February 20, 2023 quarterly Board meeting. During the meeting, Defendants El-Khoury and Trent provided a "CEO/CFO Business Update" acknowledging that concerns of how to "ensure compliance" with LTSAs and that managing "revenue long-term in a stable supply/demand with LTSAs" had risen to the station of "Strategic Initiatives Goals" that needed to be shared with the Board. Further, the update also informed the Board that LTSAs were amended frequently, requiring the Company to perform an "LTSA Amendment true-up" and that Onsemi needed to enforce "LTSA Take-or-pay" provisions or obtain a "short-term pricing increase in amendment requests" to achieve its gross margin expectations.

(d)    Analyst misimpressions. During Onsemi's February 20, 2023 quarterly Board meeting, Defendants El-Khoury and Trent advised the Board that pushback from investors "regarding our ability to sustain margin (and pricing) has moderated significantly" in light of Defendants' reassurances regarding LTSAs.

51

Moreover, during the May 18, 2023 Audit Committee meeting—against the true facts known internally (including that current LTSA performance contained a "Gap" and the need for a "Recovery Plan" for 2023), the Board presentation highlighted that investors were "very pleased with SiC performance" with analysts on "[Wall] Street increasingly confident of our ability to hit" the Company's $1 billion revenue target. These known facts stood in stark contrast to prominent investment banks' post-Class Period reactions, including, but not limited to William Blair who asked "**What Happened to LTSAs?** The management team has been very confident in its LTSA strategy[,]" Truist who stated that the corrective disclosures "contrasts mgmt's confident messaging[,]" and UBS who reported a "Big Step Back in Confidence/Credibility on SiC story" because, as their analyst noted during the 2023 Q3 Earnings Call, Defendants "had always talked about LTSAs being legally binding and it didn't seem like they would be subject to any changes" in market fluctuations.

(e)     Proliferation of LTSA amendments. During Q1 2023, Onsemi signed 15 LTSA amendments and had another 38 amendments in process, figures that were so high they required Board escalation. Topping this already high amount, Onsemi signed 90 LTSA amendments in Q2 2023, and had another 110 in process, an increase over the prior quarter of 500% and 189%, respectively.

(f)     CW allegations. Indeed, CW1 reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things." Further, CW1 stated that "nothing tied to the LTSA to make" customers place orders that were required under the LTSAs, which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(g)     Post-Class Period admissions. For example, during the 2023 Q3 Earnings Call, Defendant El-Khoury blanketly described the process for when any

52

of "the LTSAs" were renegotiated and admitted for the first time that Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes in such a way that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit. Defendant El-Khoury also admitted that a SiC OEM customer was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded there was no offsetting "win" for Onsemi, because while Onsemi generally sought win-wins during renegotiations, El-Khoury allowed that such policy was "outside of silicon carbide in Q4[.]"

**E. July 31, 2023 Q2 Press Release**

128.    On July 31, 2023, Onsemi issued a press release before the market opened in order to report its financial and operating results for the Company's second fiscal quarter of 2023, ended June 30, 2023 (the "Q2 2023 Press Release"). The Q2 2023 Press Release was attached to an 8-K that Onsemi filed with the SEC that same morning, which was signed by Defendant Trent.

129.    As with the Q1 2023 Press Release, the Q2 2023 Press Release instructed investors to "carefully consider the trends, risks, and uncertainties described in … our 2022 Form 10-K[,]" thus incorporating such language from the 2022 Form 10-K by reference. As noted in Sections V.A and V.C, *supra*, the 2022 Form 10-K stated, in relevant part:

> A significant portion of the Company's orders are firm commitments that are non-cancellable, including certain orders or contracts with a duration of less than one year. Certain of the Company's customer contracts are multi-year agreements **that include firmly committed amounts** ("Long-term Supply Agreements" or "LTSA's") for which the remaining performance obligations as of December 31, 2022 were approximately $16.6 billion (excluding the remaining performance obligations for contracts having a duration of one year or less). The Company expects to recognize approximately 31% of this amount as revenue during the next twelve months upon shipment of products under these contracts. **Total sales estimates** are based on negotiated contract prices and demand quantities, and **could be influenced by** manufacturing issues, supply chain constraints, and **modifications to customer**

**agreements**, among other things. Accordingly, the amount represented by remaining performance obligations may not be indicative of the actual revenue recognized for future periods.

130. On Onsemi's Q2 2023 Earnings Call held the same morning that the Q2 2023 Press Release was published, Onsemi's Vice President of Investor Relations instructed investors to review the Release for "[i]mportant factors that can affect [Onsemi's] business[.]" Thus, the foregoing statements were also incorporated by reference into the Q2 2023 Earnings Call.

131. Defendants' statements, that the LTSAs include "**firmly committed amounts**" and the purely hypothetical and speculative warnings that total sales estimates "**could**" be influenced by LTSA amendments, were materially misleading when made because Defendants omitted material facts necessary to make the statements not misleading. In particular, Defendants omitted presently-known facts undermining the "firm[ness]" of commitments under the LTSAs and demonstrating that Onsemi's sales estimates were already being negatively "influenced" by LTSA amendments. When the Defendants chose to speak about the durability of committed LTSA orders and factors that could influence the Company's sales estimates, Defendants had a duty to disclose the full truth. Instead, the Defendants disclosed a half-truth, omitting that such amendments were occurring frequently and harming Onsemi's operational and financial performance, which misled investors as to the true state of affairs regarding the strength, durability, and benefits of Onsemi's LTSAs.

132. The materially misleading nature of Defendants' statements is supported by many alleged facts, including:

(a) Meeting materials for Onsemi's Board's July 27, 2023 Audit Committee meeting, attended by Defendants El-Khoury and Trent reflecting that focus items for "Q'3 23 and Beyond" included "LTSA Compliance."

(b)      Statements made in connection with Onsemi's Board's May 18, 2023 Audit Committee meeting. During the meeting, attended by Defendants El-Khoury and Trent, presentation materials evidenced that LTSA amendment offsets were elevated as "Key Action[s]" to "Close the Gap" and help the Company's "2023 Recovery Plan" but these offsets were far from guaranteed, with the presentation giving only a *50% probability* of Onsemi obtaining at least one of these offsets.

(c)      Statements made in connection with the May 18-19, 2023 Board meeting. During the meeting, attended by El-Khoury, a sales update to the Board by management highlighted that demand was "softening in most markets including automotive[.]" Another slide listed items that "keeps us awake at night," including "customer retention" based on extended "lead time" for placing orders and a 180-day cancellations window. Another area of concern listed was "[m]anaging the LTSAs," which included successfully "negotiating amendments which preserve [O]nsemi revenue/margin/inventory goals while simultaneously ensuring no inventory build in the channel or end customer."

(d)      Statements made in connection with Onsemi's February 20, 2023 quarterly Board meeting. During the meeting, Defendants El-Khoury and Trent provided a "CEO/CFO Business Update" acknowledging that concerns of how to "ensure compliance" with LTSAs and that managing "revenue long-term in a stable supply/demand with LTSAs" had risen to the station of "Strategic Initiatives Goals" that needed to be shared with the Board. Further, the update also informed the Board that LTSAs were amended frequently, requiring the Company to perform an "LTSA Amendment true-up" and that Onsemi needed to enforce "LTSA Take-or-pay" provisions or obtain a "short-term pricing increase in amendment requests" to achieve its gross margin expectations.

(e)      Analyst misimpressions. During Onsemi's February 20, 2023 quarterly Board meeting, Defendants El-Khoury and Trent advised the Board that

55

pushback from investors "regarding our ability to sustain margin (and pricing) has moderated significantly" in light of Defendants' reassurances regarding LTSAs. These known facts stood in stark contrast to prominent investment banks' post-Class Period reactions, including, but not limited to William Blair who asked "**What Happened to LTSAs?** The management team has been very confident in its LTSA strategy[,]" Truist who stated that the corrective disclosures "contrasts mgmt's confident messaging[,]" and UBS who reported a "Big Step Back in Confidence/Credibility on SiC story" because, as their analyst noted during the 2023 Q3 Earnings Call, Defendants "had always talked about LTSAs being legally binding and it didn't seem like they would be subject to any changes" in market fluctuations.

(f)     Proliferation of LTSA amendments. During Q1 2023, Onsemi signed 15 LTSA amendments and had another 38 amendments in process, figures that were so high they required Board escalation. Topping this already high amount, Onsemi signed 90 LTSA amendments in Q2 2023, and had another 110 in process, an increase over the prior quarter of 500% and 189%, respectively.

(g)     CW allegations. Indeed, CW1 reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things." Further, CW1 stated that "nothing tied to the LTSA to make" customers place orders that were required under the LTSAs, which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(h)     Post-Class Period admissions. For example, during the 2023 Q3 Earnings Call, Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted for the first time that Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes in such a way that any corresponding benefit to Onsemi could be realized over an indefinite

56

"longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit. Defendant El-Khoury also admitted that a SiC OEM customer was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded there was no offsetting "win" for Onsemi, because while Onsemi generally sought win-wins during renegotiations, El-Khoury allowed that such policy was "outside of silicon carbide in Q4[.]"

**F. July 31, 2023 Quarterly Report on Form 10-Q for Fiscal Q2 2023**

133. On July 31, 2023, in the Company's quarterly report filed with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2023 (the "Q2 2023 Form 10-Q"), the Defendants published misleading statements regarding the Company's LTSAs. The Q2 2023 Form 10-Q was signed by Defendant Trent, among others.

134. Just as with Onsemi's Q1 2023 Form 10-Q, the Q2 2023 Form 10-Q instructed investors to read the financial results therein "in conjunction with" the notes to the Company's consolidated financial statements in its 2022 Form 10-K. As noted in Sections V.A, V.C, and V.E, *supra*, Note 3 of the 2022 Form 10-K stated, in relevant part:

> A significant portion of the Company's orders are firm commitments that are non-cancellable, including certain orders or contracts with a duration of less than one year. Certain of the Company's customer contracts are multi-year agreements **that include firmly committed amounts** ("Long-term Supply Agreements" or "LTSA's") for which the remaining performance obligations as of December 31, 2022 were approximately $16.6 billion (excluding the remaining performance obligations for contracts having a duration of one year or less). The Company expects to recognize approximately 31% of this amount as revenue during the next twelve months upon shipment of products under these contracts. **Total sales estimates** are based on negotiated contract prices and demand quantities, and **could be influenced by** manufacturing issues, supply chain constraints, and **modifications to customer agreements**, among other things. Accordingly, the amount represented by remaining performance obligations may not be indicative of the actual revenue recognized for future periods.

135. Additionally, in the Q2 2023 Form 10-Q, the Defendants similarly stated:

57

A significant portion of the Company's revenue orders are firm commitments that are non-cancellable, including certain orders or contracts with a duration of one year or less. Certain customer contracts are multi-year agreements **that include committed amounts** ("Long-term Supply Agreements" or "LTSAs").

The estimated remaining performance obligations as of June 30, 2023 are approximately $20.0 billion (excluding the remaining performance obligations for contracts having an original duration of one year or less). This amount is subject to contractual increases based on negotiated contract prices and volumes, defined product mix flexibility, and the timing of new part introductions, among other contractual provisions. The Company expects to recognize approximately 32% of the remaining purchase obligation as revenue during the next 12 months upon shipment of products under these contracts. **Total revenue estimates could be influenced by** risks and uncertainties, including manufacturing or supply chain constraints, **modifications to customer agreements**, and regulatory changes, among other factors. Accordingly, the actual revenue recognized for the remaining performance obligation in future periods may significantly fluctuate from these estimates.

136. Defendants' statements, that the LTSAs include "**firmly committed amounts**" and the purely hypothetical warnings that total sales estimates "**could**" be influenced by LTSA amendments, were materially misleading when made because Defendants omitted material facts necessary to make the statements not misleading. In particular, Defendants omitted presently-known facts undermining the "firm[ness]" of commitments under the LTSAs and demonstrating that Onsemi's sales estimates were already being negatively "influenced" by LTSA amendments. When the Defendants chose to speak about the durability of committed LTSA orders and factors that could influence the Company's sales estimates, Defendants had a duty to disclose the full truth. Instead, the Defendants disclosed a half-truth, omitting that such amendments were occurring frequently and harming Onsemi's operational and financial performance, which misled investors as to the true state of affairs regarding the strength, durability, and benefits of Onsemi's LTSAs.

58

137.    The materially misleading nature of Defendants' statements is supported by many alleged facts, including:

(a)    Meeting materials for Onsemi's Board's July 27, 2023 Audit Committee meeting, attended by Defendants El-Khoury and Trent reflecting that focus items for "Q'3 23 and Beyond" included "LTSA Compliance."

(b)    Statements made in connection with Onsemi's Board's May 18, 2023 Audit Committee meeting. During the meeting, attended by Defendants El-Khoury and Trent, presentation materials evidenced that LTSA amendment offsets were elevated as "Key Action[s]" to "Close the Gap" and help the Company's "2023 Recovery Plan" but these offsets were far from guaranteed, with the presentation giving only a *50% probability* of Onsemi obtaining at least one of these offsets.

(c)    Statements made in connection with the May 18-19, 2023 Board meeting. During the meeting, attended by El-Khoury, a sales update to the Board by management highlighted that demand was "softening in most markets including automotive[.]" Another slide listed items that "keeps us awake at night," including "customer retention" based on extended "lead time" for placing orders and a 180-day cancellations window. Another area of concern listed was "[m]anaging the LTSAs," which included successfully "negotiating amendments which preserve [O]nsemi revenue/margin/inventory goals while simultaneously ensuring no inventory build in the channel or end customer."

(d)    Statements made in connection with Onsemi's February 20, 2023 quarterly Board meeting. During the meeting, Defendants El-Khoury and Trent provided a "CEO/CFO Business Update" acknowledging that concerns of how to "ensure compliance" with LTSAs and that managing "revenue long-term in a stable supply/demand with LTSAs" had risen to the station of "Strategic Initiatives Goals" that needed to be shared with the Board. Further, the update also informed the Board that LTSAs were amended frequently, requiring the Company to perform an "LTSA

59

Amendment true-up" and that Onsemi needed to enforce "LTSA Take-or-pay" provisions or obtain a "short-term pricing increase in amendment requests" to achieve its gross margin expectations.

(e)     Analyst misimpressions. During Onsemi's February 20, 2023 quarterly Board meeting, Defendants El-Khoury and Trent advised the Board that pushback from investors "regarding our ability to sustain margin (and pricing) has moderated significantly" in light of Defendants' reassurances regarding LTSAs. These known facts stood in stark contrast to prominent investment banks' post-Class Period reactions, including, but not limited to William Blair who asked "**What Happened to LTSAs?** The management team has been very confident in its LTSA strategy[,]" Truist who stated that the corrective disclosures "contrasts mgmt's confident messaging[,]" and UBS who reported a "Big Step Back in Confidence/Credibility on SiC story" because, as their analyst noted during the 2023 Q3 Earnings Call, Defendants "had always talked about LTSAs being legally binding and it didn't seem like they would be subject to any changes" in market fluctuations.

(f)     Proliferation of LTSA amendments. During Q1 2023, Onsemi signed 15 LTSA amendments and had another 38 amendments in process, figures that were so high they required Board escalation. Topping this already high amount, Onsemi signed 90 LTSA amendments in Q2 2023, and had another 110 in process, an increase over the prior quarter of 500% and 189%, respectively.

(g)     CW allegations. Indeed, CW1 reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water" in that "there was no penalty to that customer for not ordering things." Further, CW1 stated that "nothing tied to the LTSA to make" customers place orders that were required under the LTSAs, which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(h)     Post-Class Period admissions. For example, during the 2023 Q3 Earnings Call, Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted for the first time that Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes in such a way that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit. Defendant El-Khoury also admitted that a SiC OEM customer was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded there was no offsetting "win" for Onsemi, because while Onsemi generally sought win-wins during renegotiations, El-Khoury allowed that such policy was "outside of silicon carbide in Q4[.]"

## G. August 30, 2023 Deutsche Bank Conference

138.    On August 30, 2023, Defendants El-Khoury and Trent spoke in a panel discussion at the 2023 Deutsche Bank Conference. During the question-and-answer portion of the panel, an analyst asked El-Khoury whether demand for Onsemi's non-SiC automotive products was plateauing. In response, Defendant El-Khoury explained that Onsemi's LTSAs ensured that the Company would always get a "win-win" in the event an LTSA customer's demand dropped, stating in relevant part:

> And we will talk about the LTSAs. We have engagements with customers. If they have a weak -- softness in their market and they have an LTSA, we're going to get the call 6 months in advance. And that call basically goes along, hey, our run rate is not where we thought it would be in this certain area. We're going to have potentially some inventory. What are the options? If I can ship that to somebody else that I've been under shipping to, we're going to redirect it. So somebody gets more supply to meet their demand, and somebody is not going to get oversupply that's going to sit in inventory.
>
> **So that LTSA and the conversations we're having with the customer to have a win-win, although we may take some down and amend it, saying, yes, no problem, net-net, it's a win-win. And that's exactly what the LTSAs have provided us. And the structure we put in, given that it's a**

**legally binding agreement, have forced that conversations for us to have a -- to land in a much better spot than we would have otherwise been.**

139. During the 2023 Deutsche Bank Conference, El-Khoury and Trent were asked directly by host analyst Ross Clark Seymore "what do you do if you've seen customers not want as much" under LTSAs, and "to the extent demand weakens, how concrete are those enforced because you have a longer-term partnership with these companies?" In response, El-Khoury stated, in relevant part:

**Because the customer is legally liable like you said, they're going to place the call at the first sign of softness they have because they have a small bag to carry also, not just ON Semi. And that makes the partnership a win-win as far as trying to find a solution.** If we don't have a solution, at least I can stop the new wafers until I flush the inventory because I'd rather stop wafers -- and you saw that in the utilization in certain cases -- use the [ WIP ] I have to ship to them versus keep the wafers. And now there is over inventory in the market, and that doesn't help anyone. That's a win-win, for example, and the customer will say, and I will add 2 years on top of the LTSA because that's the run rate. That's a win-win I'll take any time.

Now if I don't have another customer to give that capacity to, then we have to talk about is it a different cost structure now because lower volume, different impact. So all of these are -- every customer has different constraints. And we are going to sit down and work with the customer -- because all these customers, like you said, are strategic. That's why we have an LTSA with them to begin with. **So we're going to sit with the customer, and we're going to find a win-win.**

140. Defendant El-Khoury's statements were materially misleading because they gave the impression of a state of affairs where customers were "legally liable" for order volumes under the LTSAs, that if a customer expected lower demand (*i.e.*, "softness") the "structure" of the LTSA "forced" customers to engage with Onsemi to put the Company "in a much better spot than [it] would have otherwise been," and that Company management would only permit a customer to amend the LTSA if it could generate a corresponding "win" for Onsemi—meaning, as Defendants often reiterated, LTSA amendments always provided: an offset to any revenue reduction, such that the amendment

62

was not financially dilutive; utilization of Onsemi's manufacturing capacity committed to LTSAs; and avoidance of inventory buildup.  However, Defendant El-Khoury omitted presently-known facts contravening the notion that Onsemi's LTSA amendments always resulted in "a win-win" or that Onsemi was holding customers "legally liable" in the absence of a win. When Defendant El-Khoury chose to speak about the status of LTSA renegotiations, he had a duty to disclose the full truth. Instead, Defendant El-Khoury disclosed a half-truth, omitting facts that Onsemi's ability to achieve a corresponding "win" during LTSA renegotiations was severely hampered, which misled investors as to the true state of affairs regarding the strength, durability, and benefits of Onsemi's LTSAs.

141.    The materially misleading nature of Defendants' statements is supported by many alleged facts, including:

(a)    Statements made in connection with Onsemi's Board's August 17, 2023 Audit Committee meeting. During the meeting, attended by Defendants El-Khoury and Trent, an ERM Update emphasized shifts in risk trends with "LTSA Customer Compliance" being one of the "largest increases in risk priority rank position" going from a rank of 26th in 2021 to a rank of 11th in 2022, driving home the fragility of the LTSAs.

(b)    Statements made in connection with the August 17-18, 2023 Board meeting. During the meeting, attended by Defendant El-Khoury, presentation materials noted key risks for 2023 and beyond, including revenue "non-linearity" (meaning revenue out of line with Onsemi's forecast) due to "customer LTSA/[i]nventory control" requiring the Company to leverage "LTSA amendments" to ensure "quarterly commit[ments]." Further, a 2023 Power Solution Group LTSA summary stated that an LTSA with Kodiak had "lower volumes" and concluded that there was an "increasing risk of [LTSA] amendments *as compliance drops*."

63

(c)    Meeting materials for Onsemi's Board's July 27, 2023 Audit Committee meeting, attended by Defendants El-Khoury and Trent reflecting that focus items for "Q'3 23 and Beyond" included "LTSA Compliance."

(d)    Statements made in connection with Onsemi's Board's May 18, 2023 Audit Committee meeting. During the meeting, attended by Defendants El-Khoury and Trent, presentation materials evidenced that LTSA amendment offsets were elevated as "Key Action[s]" to "Close the Gap" and help the Company's "2023 Recovery Plan" but these offsets were far from guaranteed, with the presentation giving only a *50% probability* of Onsemi obtaining at least one of these offsets.

(e)    Statements made in connection with the May 18-19, 2023 Board meeting. During the meeting, attended by El-Khoury, a sales update to the Board by management highlighted that demand was "softening in most markets including automotive[.]" Another slide listed items that "keeps us awake at night," including "customer retention" based on extended "lead time" for placing orders and a 180-day cancellations window. Another area of concern listed was "[m]anaging the LTSAs," which included successfully "negotiating amendments which preserve [O]nsemi revenue/margin/inventory goals while simultaneously ensuring no inventory build in the channel or end customer."

(f)    Statements made in connection with Onsemi's February 20, 2023 quarterly Board meeting. During the meeting, Defendants El-Khoury and Trent provided a "CEO/CFO Business Update" acknowledging that concerns of how to "ensure compliance" with LTSAs and that managing "revenue long-term in a stable supply/demand with LTSAs" had risen to the station of "Strategic Initiatives Goals" that needed to be shared with the Board. Further, the update also informed the Board that LTSAs were amended frequently, requiring the Company to perform an "LTSA Amendment true-up" and that Onsemi needed to enforce "LTSA Take-or-pay"

64

provisions or obtain a "short-term pricing increase in amendment requests" to achieve its gross margin expectations.

(g)    Analyst misimpressions. During Onsemi's February 20, 2023 quarterly Board meeting, Defendants El-Khoury and Trent advised the Board that pushback from investors "regarding our ability to sustain margin (and pricing) has moderated significantly" in light of Defendants' reassurances regarding LTSAs. Moreover, during the May 18, 2023 Audit Committee meeting—against the true facts known internally (including that current LTSA performance contained a "Gap" and the need for a "Recovery Plan" for 2023), the Board presentation highlighted that investors were "very pleased with SiC performance" with analysts on "[Wall] Street increasingly confident of our ability to hit" the Company's $1 billion revenue target. These known facts stood in stark contrast to prominent investment banks' post-Class Period reactions, including, but not limited to William Blair who asked "**What Happened to LTSAs?** The management team has been very confident in its LTSA strategy[,]" Truist who stated that the corrective disclosures "contrasts mgmt's confident messaging[,]" and UBS who reported a "Big Step Back in Confidence/Credibility on SiC story" because, as their analyst noted during the 2023 Q3 Earnings Call, Defendants "had always talked about LTSAs being legally binding and it didn't seem like they would be subject to any changes" in market fluctuations.

(h)    Proliferation of LTSA amendments. During Q1 2023, Onsemi signed 15 LTSA amendments and had another 38 amendments in process, figures that were so high they required Board escalation. Topping this already high amount, Onsemi signed 90 LTSA amendments in Q2 2023, and had another 110 in process, an increase over the prior quarter of 500% and 189%, respectively.

(i)    CW allegations. Indeed, CW1 reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water"

65

in that "there was no penalty to that customer for not ordering things." Further, CW1 stated that "nothing tied to the LTSA to make" customers place orders that were required under the LTSAs, which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(j)     Post-Class Period admissions. For example, during the 2023 Q3 Earnings Call, Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted for the first time that Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes in such a way that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit. Defendant El-Khoury also admitted that a SiC OEM customer was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded there was no offsetting "win" for Onsemi, because while Onsemi generally sought win-wins during renegotiations, El-Khoury allowed that such policy was "outside of silicon carbide in Q4[.]"

## H. September 7, 2023 Citi Conference

142.    On September 7, 2023, Defendants El-Khoury and Trent spoke in a panel discussion at the 2023 Citi Conference.

143.    During the 2023 Citi Conference, the host analyst questioned Defendants "[h]ow iron clad" Onsemi's LTSAs were:

> So one question on the long-term contracts. How iron clad are those? I mean I would imagine that in the part of your business like industrial that had somewhat of a correction, there might have been some renegotiations going on there. Are these tough nuggies guys. You said you're going to take the product, this is like the product you're going to take? Is it, okay, well, you don't have to take as much product, but we'll charge you some sort of cancellation fee or something like that? Or how does it work?

144.    In response, Defendant El-Khoury stated, in relevant part:

66

Historically, backlog disappeared 30 days before I ship it, and you're left holding the bag. So the LTSAs, somebody is going to get the bat phone and call and say, we got a problem, 6 months, 9 months from now, let's have a conversation. **So we'll have the conversation, but it has to be a win-win.**

What does that look like? Look, if demand is down, it doesn't really help us maybe in the short term, but it doesn't help the company in saying, "Well, you got to take, I don't care, put the inventory on your shelf" it doesn't help anybody to have inventory at the customer if demand is not there. So we'll have the conversation about, okay, well, we know we have 50% share on this product, **and we increase the share, offset the gap and so on and so forth**. So we have those conversations.

From a company perspective, we would rather ship product any day than have fees because those are onetime benefits. I really don't care for them, right? I like the sustainability of it, which is, okay, let's talk about revenue. Let's talk about share gains. Hey, maybe we extend the LTSA and you bolt on more, let's put more products that you maybe are not buying from us, but we can qualify because we have a new product.

So all of these are win-win. **Now, if the customer is not interested in a win-win, but a win/lose, that's where it's ironclad. It's a legally binding agreement that both parties in a win-win will renegotiate an amendment. But net of that, we're not going to be left holding the bag.**

145.    Defendant El-Khoury's statements were materially misleading because they gave the impression of a state of affairs where Defendants were holding customers "legally liable" under the LTSAs because they were "ironclad," and that Company management would only permit a customer to amend the LTSA if it could generate a corresponding "win" for Onsemi (never a "win/lose")—meaning, as Defendants often reiterated (including the foregoing misstatement), LTSA amendments always provided: an "offset" to any revenue "gap," such that the amendment was not financially dilutive; utilization of Onsemi's manufacturing capacity committed to LTSAs; and avoidance of inventory buildup. However, Defendant El-Khoury omitted presently-known facts contravening the notion that Onsemi's LTSA amendments always resulted in "a win-win" or that Onsemi was holding customers "legally liable" in the absence of a win. When Defendant El-Khoury chose to speak about the status of LTSA renegotiations, he had a duty to disclose the full

67

truth. Instead, Defendant El-Khoury disclosed a half-truth, omitting facts that Onsemi's ability to achieve a corresponding "win" during LTSA renegotiations was severely hampered, which misled investors as to the true state of affairs regarding the strength, durability, and benefits of Onsemi's LTSAs.

146.    The materially misleading nature of Defendants' statements is supported by many alleged facts, including:

(a)    Statements made in connection with Onsemi's September 9, 2023 Board Meeting. Board materials reflect a memo that Defendant El-Khoury prepared in advance of the meeting noting he was commissioning a strategic initiative to investigate how to "extend the viability of our LTSAs" which had been plagued by customers' "decommits" leading to Onsemi "losing more revenue" due to LTSA amendments and amassing more than $2 billion "of inventory that we built for customers who are no longer in need of it[.]"

(b)    Statements made in connection with Onsemi's Board's August 17, 2023 Audit Committee meeting. During the meeting, attended by Defendants El-Khoury and Trent, an ERM Update emphasized shifts in risk trends with "LTSA Customer Compliance" being one of the "largest increases in risk priority rank position" going from a rank of 26th in 2021 to a rank of 11th in 2022, driving home the fragility of the LTSAs.

(c)    Statements made in connection with the August 17-18, 2023 Board meeting. During the meeting, attended by Defendant El-Khoury, presentation materials noted key risks for 2023 and beyond, including revenue "non-linearity" (meaning revenue out of line with Onsemi's forecast) due to "customer LTSA/[i]nventory control[.]" Further, a 2023 Power Solution Group LTSA summary stated that an LTSA with Kodiak had "lower volumes" and concluded that there was an "increasing risk of [LTSA] amendments *as compliance drops*."

(d)     Meeting materials for Onsemi's Board's July 27, 2023 Audit Committee meeting, attended by Defendants El-Khoury and Trent reflecting that focus items for "Q'3 23 and Beyond" included "LTSA Compliance."

(e)     Statements made in connection with Onsemi's Board's May 18, 2023 Audit Committee meeting. During the meeting, attended by Defendants El-Khoury and Trent, presentation materials evidenced that LTSA amendment offsets were elevated as "Key Action[s]" to "Close the Gap" and help the Company's "2023 Recovery Plan" but these offsets were far from guaranteed, with the presentation giving only a *50% probability* of Onsemi obtaining at least one of these offsets.

(f)     Statements made in connection with the May 18-19, 2023 Board meeting. During the meeting, attended by El-Khoury, a sales update to the Board by management highlighted that demand was "softening in most markets including automotive[.]" Another slide listed items that "keeps us awake at night," including "customer retention" based on extended "lead time" for placing orders and a 180-day cancellations window. Another area of concern listed was "[m]anaging the LTSAs," which included successfully "negotiating amendments which preserve [O]nsemi revenue/margin/inventory goals while simultaneously ensuring no inventory build in the channel or end customer."

(g)     Statements made in connection with Onsemi's February 20, 2023 quarterly Board meeting. During the meeting, Defendants El-Khoury and Trent provided a "CEO/CFO Business Update" acknowledging that concerns of how to "ensure compliance" with LTSAs and that managing "revenue long-term in a stable supply/demand with LTSAs" had risen to the station of "Strategic Initiatives Goals" that needed to be shared with the Board. Further, the update also informed the Board that LTSAs were amended frequently, requiring the Company to perform an "LTSA Amendment true-up" and that Onsemi needed to enforce "LTSA Take-or-pay"

69

provisions or obtain a "short-term pricing increase in amendment requests" to achieve its gross margin expectations.

(h)    Analyst misimpressions. During Onsemi's February 20, 2023 quarterly Board meeting, Defendants El-Khoury and Trent advised the Board that pushback from investors "regarding our ability to sustain margin (and pricing) has moderated significantly" in light of Defendants' reassurances regarding LTSAs. Moreover, during the May 18, 2023 Audit Committee meeting—against the true facts known internally (including that current LTSA performance contained a "Gap" and the need for a "Recovery Plan" for 2023), the Board presentation highlighted that investors were "very pleased with SiC performance" with analysts on "[Wall] Street increasingly confident of our ability to hit" the Company's $1 billion revenue target. These known facts stood in stark contrast to prominent investment banks' post-Class Period reactions, including, but not limited to William Blair who asked "**What Happened to LTSAs?** The management team has been very confident in its LTSA strategy[,]" Truist who stated that the corrective disclosures "contrasts mgmt's confident messaging[,]" and UBS who reported a "Big Step Back in Confidence/Credibility on SiC story" because, as their analyst noted during the 2023 Q3 Earnings Call, Defendants "had always talked about LTSAs being legally binding and it didn't seem like they would be subject to any changes" in market fluctuations.

(i)    Proliferation of LTSA amendments. During Q1 2023, Onsemi signed 15 LTSA amendments and had another 38 amendments in process, figures that were so high they required Board escalation. Topping this already high amount, Onsemi signed 90 LTSA amendments in Q2 2023, and had another 110 in process, an increase over the prior quarter of 500% and 189%, respectively.

(j)    CW allegations. Indeed, CW1 reviewed an LTSA for a commercial customer in Onsemi's Q1 2023 and concluded that the LTSA "doesn't hold water"

in that "there was no penalty to that customer for not ordering things." Further, CW1 stated that "nothing tied to the LTSA to make" customers place orders that were required under the LTSAs, which CW1 confirmed from speaking with colleagues in sales and the business unit for the customer.

(k)    Post-Class Period admissions. For example, during the 2023 Q3 Earnings Call, Defendant El-Khoury blanketly described the process for when any of "the LTSAs" were renegotiated and admitted for the first time that Onsemi's LTSAs allowed the Company to accept lower customer purchase volumes in such a way that any corresponding benefit to Onsemi could be realized over an indefinite "longer term" of unspecified duration, making the "win" to Onsemi an illusory benefit. Defendant El-Khoury also admitted that a SiC OEM customer was not forced to "take or pay" for $200 million of purchase orders that were purportedly required to be placed in 2023, and conceded there was no offsetting "win" for Onsemi, because while Onsemi generally sought win-wins during renegotiations, El-Khoury allowed that such policy was "outside of silicon carbide in Q4[.]"

## VI. DEFENDANTS REVEAL THE TRUTH

147.    On October 30, 2023 at 9 a.m. E.T., Onsemi held an earnings call before the stock market opened for trading that day to disclose the Company's financial and operating results for its third fiscal quarter of 2023 ended September 29, 2023. During the 2023 Q3 Earnings Call, Defendants shocked investors and analysts when they revealed that the LTSAs, which Defendants had spent over two years extolling and which investors believed provided predictability and stability to Onsemi's financial planning because of the LTSAs' purportedly "ironclad" buffer against demand fluctuations that would always generate a "win-win" during any LTSA amendment discussions, in reality did not provide the durability that Defendants misrepresented throughout the Class Period.

148.    Specifically, Defendant El-Khoury explained that "for the full year, a single automotive OEM's recent reduction in demand will impact our $1 billion [FY2023 SiC]

71

target and we now expect to ship more than $800 million of silicon carbide in 2023[.]" Thus, Onsemi would fall $200 million—or 20%—short of the Company's previously-disclosed $1 billion 2023 SiC revenue forecast.

149. During the 2023 Q3 Earnings Call, Defendants at first coyly avoided answering whether Onsemi would receive an offsetting benefit for agreeing to amend the "legally binding" LTSA with the automotive OEM. In other words, Defendants refused to say whether Onsemi had achieved a "win-win" to compensate for the $200 million shortfall. Specifically, in response to a question from Piper Sandler & Co. analyst Harsh V. Kumar regarding whether Defendants saw any "broad-based weakness[,]" Defendants El-Khoury and Trent stated:

**Hassane S. El-Khoury**
. . . . As far as the EV, yes, it is a single customer. I wouldn't say it is broad as far as in this immediate quarter. But we still expect it to grow in Q4. So it is not a -- I don't want to paint it as any decline or any issue in demand for EVs. EV demand is going to grow. It's going to grow in the fourth quarter and it's going to grow in 2024. It just didn't grow as much as we expected it to. And *that's demand-driven, whether it's short-term demand or anything different, we'll have to wait* until we get closer to '24.

**Thad Trent**
Just to be clear, on the silicon carbide, the expectation of being over $800 million, the impact there is 1 customer. It's the *recent demand softness* at 1 customer.

150. When further pressed about the durability of Onsemi's LTSAs by UBS Securities analyst Timothy Michael Arcuri, Defendant El-Khoury attempted to rehabilitate the LTSAs' credibility by saying that "in general" the Company seeks "win-wins" during renegotiations. However, El-Khoury allowed that the "general" rule fell "outside of silicon carbide in Q4" of 2023. In other words, Defendant El-Khoury admitted that Onsemi did not achieve a "win-win" regarding the automotive OEM who cancelled SiC orders in Q4 and caused the Company's $200 million SiC revenue shortfall. Defendant El-Khoury admitted, in pertinent part:

72

**Timothy Michael Arcuri**
I just wanted to ask a question also on the 2023 silicon carbide cut from $1 billion down to $800 million. You guys had always talked about the LTSAs being legally binding and it didn't seem like they would be subject to any changes in EV ramps. It sounded like a little bit of a higher bar than what we hear from others. So can you talk about that? …

**Hassane S. El-Khoury**
… So the LTSAs are legally binding. Therefore, for us to agree or even acknowledge that pushout or even the demand in general, ***outside of silicon carbide in Q4***, there has to have been, which there is, a win-win for us and the customer.

151.    In other words, when El-Khoury stated that "for us to agree or even acknowledge that pushout or even the demand in general" he was discussing the Company's "general" practice during LTSA renegotiations when customers wanted to delay or otherwise amend order volumes. And while the "general" policy was to achieve a "win-win[,]" El-Khoury specifically excluded Q4 SiC revenues from the foregoing statement ("outside of silicon carbide in Q4"), thereby admitting that Onsemi had not achieved a win-win for both Onsemi and the automotive customer who cancelled "Q4" SiC orders representing $200 million of fiscal 2023 revenues.

152.    Indeed, as set forth in Section VII.B., *infra.*, Defendants never expected Onsemi to receive an offsetting benefit for this cancellation. Although Defendant El-Khoury equivocated during the 2023 Q3 Earnings Call as to whether the $200 million SiC revenue would be recovered in the future—stating "[w]e're not commenting on that" when asked—he later admitted, on November 28, 2023, that the corrective disclosures "talked [about] on ***the call***[,]" meaning the 2023 Q3 Earnings Call, were intended to convey that Defendants were "***not assuming that we're pushing it*** [the $200M cancellation] ***out and it's going to recover in 2024***."

153.    Furthermore, in his response to Mr. Arcuri, Defendant El-Khoury admitted for the first time that Onsemi's LTSAs could be renegotiated in a way that permitted the "win" achieved for Onsemi to be pushed out over an indefinite "longer term" horizon, with no outer bound whatsoever. This formulation had never been disclosed to investors before

and rendered Defendants' promises of "win-wins" wholly illusory, because Defendants could claim LTSA order commitments were perpetually valid as long as Onsemi contended the orders would be made in the future, regardless of how unlikely it was that the orders would be placed or how long of a timeframe that would entail. Specifically, Defendant El-Khoury stated:

> We've always said, if anything, the LTSAs give us a phone call. We get the phone call way ahead of time in certain areas when the customer knows that it's coming. And we're able to manage with the customer for a win-win, ***whether that win-win is*** a quarter later or a year later ***or a longer term*** that depends on case by case. So we manage it with the customer because what we don't want is, of course, enforce the LTSA at the expense of just shipping inventory if demand is lower. So we take it very cautiously. We have – it has to be a win for us but also a win for the customer and that's what keeps the strategic customers engaged.

154. Notwithstanding Defendants' Class Period misrepresentations, analysts understood that Defendants' disclosures during the 2023 Q3 Earnings Call, including the $200 million reduction in the Company's 2023 SiC revenue, revealed Onsemi's true state of affairs: that its LTSAs did not "firmly commit" revenue, did not ensure "very, very predictable" or "stable" order volumes, and did not always provide a "win-win" when LTSAs were amended that would "offset the gap" in financial impact to Onsemi. In fact, in a report dated October 31, 2023, William Blair noted—using Defendant El-Khoury's "ironclad" language against him in quotations—that "We have seen 'iron-clad' LTSAs fall apart in cyclical downturns," and postulated that Onsemi's LTSAs were "fallible" similar to other companies' historical counterparts.

155. Additionally, on October 30, 2023, BofA Securities analysts put it bluntly regarding the basis for the Company's stock valuation: "[b]y guiding down Q4 [Onsemi] has created doubts about the durability of its [SiC LTSAs], a key part of the bull thesis." UBS Securities likewise noted that "[t]he bloom is 'off the rose' with respect to [Onsemi]'s [LTSAs]" and that it was "cutting [their] C2024 [earnings per share]," while Goldman

74

Sachs & Co. LLC concluded that the disclosure "brings into question . . . the viability of LTSAs."

156.    On this news, the price of Onsemi common stock plummeted $18.18 per share, or nearly 22%, from a close of $83.52 per share on October 27, 2023, to close at $65.34 per share on October 30, 2023.

## VII.    POST CLASS PERIOD EVENTS

### A.    Board Materials Confirm That the Impression Held By Investors During the Class Period Concerning the LTSAs' Durability Conflicted With Reality

157.    On November 15–16, 2023, the Board convened a meeting attended by Defendant El-Khoury. The Board was provided a Morgan Stanley report emphasizing Onsemi's failure to "meet near-term SiC forecast" and noting that "LTSAs don't provide 100% protection[.]" A business and financial update provided to the Board stated that the $200 million reduction to the $1 billion target was "a surprise" to analysts "given the magnitude and timing" and the "[e]nforceability and predictability of LTSAs" was "questioned."

158.    During the November 15–16, 2023 meeting, the Board also received an ERM Update (the "November 2023 ERM Update") focusing on "LTSA Non-Compliance Revenue Impact" which included "[the] risk of financial damage, including lost revenue or penalties stemming from non-compliance to long-term supply agreements due to customer reneging, especially during market downturns . . . ." The update also emphasized the risk of LTSAs becoming an "unsustainable business strategy" due in part to "fluctuating and difficult-to-forecast customer demand" which could create "excess inventory, creating financial liability" for Onsemi.

### B.    Defendants Admit the $200 Million Onsemi Lost in 2023 When It Failed to Achieve a "Win-Win" with the SiC OEM Was "De-Risked" and Was Not "Push[ed] Out" or Assumed to "Recover" in Onsemi's 2024 Forecast

159.    During a November 28, 2023 conference call (the "2023 UBS Global Technology Conference Call"), after being asked yet again for more information about

Onsemi's massive SiC revenue shortfall in 2023, Defendant El-Khoury confirmed investors' understanding that Onsemi's LTSAs were not able to generate a benefit to offset the $200 million loss from the cancellations by the automotive OEM that were announced during the 2023 Q3 Earnings Call. Specifically, Defendant El-Khoury stated during the 2023 UBS Global Technology Conference Call, in pertinent part:

**Timothy Michael Arcuri**
I wanted to shift to autos and maybe there were 2 issues last quarter. There were 2 different issues that I think people sort of co-mingled maybe. In one issue, there was the silicon carbide issue at one OEM and then the -- number two, there was just general softness from Tier 1s in Europe that were not related to silicon carbide. So on those 2 points, really 2 questions. First, can you give any more color on the silicon carbide issue? It sounds like it was a U.S. OEM, maybe related to a new launch? And ***would you characterize it as cyclical, meaning that you get that back or structural meaning that it's gone***?

**Hassane S. El-Khoury**
Yes. Let me -- so it is one OEM. I don't want to characterize regional for the obvious reasons, but it is a single OEM. It is purely driven by demand. So it is not a supply. It is not a share loss or anything like that, purely end demand. What we have considered -- ***what we talked on the call is we derisk 2024***. ***What that means is we're not assuming that we're pushing it out and it's going to recover in 2024***. If it does, great, that's positive. But from a risk mitigation perspective, ***we just took it out of the number and the baseline is going to be just different.*** Now '24 number didn't change because we were able to allocate that capacity per se to other customers that needed it**.** So that's the puts and takes from that.

So overall outlook for that business, even short term in '24 and the longer term remains unchanged for us on silicon carbide because we've always said that it's capacity constrained. So there are other customers that we weren't servicing 100% that now said, "Hey, we'll take that because we have strength in our business." So we're able to recover the business in a different mix, not with that OEM, but with others. So the mix is different but the outlook remains the same.

160.    Accordingly, although Defendant El-Khoury confirmed that Onsemi's 2024 and future years' forecasts were not being revised, his comments also confirmed that

Onsemi was not forecasting the $200 million in lost *2023* SiC revenue to be recovered. Indeed, Defendant El-Khoury specifically admitted that in response to the $200 million shortfall in 2023 SiC revenue, Defendants had "derisk[ed]" Onsemi's 2024 revenue forecasts —*i.e.,* Defendants were "not assuming" Onsemi was "pushing it out" to later recover the $200 million in revenue, but rather, Defendants "just took it out of the" Company's financial model such that the "baseline is going to be just different."[3]

161. Defendant El-Khoury's statements during the 2023 UBS Global Technology Conference Call confirmed to investors that the Company had not achieved a "win" to offset the lost $200 million in 2023 SiC revenue when it amended the terms of the LTSA with the automotive OEM. Indeed, to date, Defendants have never confirmed that Onsemi received any benefit to offset the lost $200 million in 2023 SiC revenue caused by the automotive OEM's unilateral changes to its LTSA.

**C. Onsemi's Shrinking 2024 Sales Volumes and Revenue Belie Any Notion that LTSAs Could Ensure "Win-Wins" During LTSA Renegotiations, and Confirm that the Fundamental Weakness in the SiC OEM's LTSA Inhered in All Other LTSAs**

162. On February 10, 2025, Onsemi announced results for the fourth quarter and full fiscal year ended December 31, 2024. In the Company's 2024 Annual Report filed with the SEC that day on Form 10-K (the "2024 Form 10-K"), Defendants disclosed, among other items, that: (i) revenue was $7,082.3 million and $8,253.0 million for 2024 and 2023, respectively, with the year-over-year decrease of $1,170.7 million (or 14.2%) attributable to lower sales volumes across *all* segments and a decrease in demand in the automotive

---

[3] To derisk is to "[t]o reduce or *eliminate the possibility of an adverse outcome to*; to minimize the perils of." *Derisk*, BLACK'S LAW DICTIONARY, 12th ed. 2024; *accord* Derisk, CAMBRIDGE BUSINESS ENGLISH DICTIONARY, 2011 (defining derisk as "to make something safer by reducing the possibility that something bad will happen and that money will be lost"). Here, Defendants sought to make the achievability of Onsemi's 2024 revenue projections more likely by not including the $200 million 2023 SiC revenue in the Company's 2024 forecast—*i.e.*, Defendants sought to "eliminate the possibility" that the lost 2023 SiC revenue could cause Onsemi to miss its 2024 target.

and industrial end-markets; and (ii) gross profit was $3,216.1 million and $3,883.5 million for 2024 and 2023, respectively, representing a decrease of $667.4 million or approximately 17.2%—"primarily due" to the decline in sales volume in both Onsemi's existing products and new products which negatively impacted gross profit by approximately $630 million and $122 million, respectively.

163.    Accordingly, far from being "iron-clad" and always providing offsetting wins during renegotiations (even during "periods of macro uncertainty and end-market weakness"), the Company's LTSAs could not prevent devastatingly negative financial impact to revenue and profit when demand conditions deteriorated—in violation of one of the key pillars of a "win-win" as routinely described by Defendants to investors: that "any flexibility offered [during LTSA amendments] cannot be dilutive to [Onsemi's] financials." *See* Section IV.F., *supra*.

## VIII.  ADDITIONAL SCIENTER ALLEGATIONS

164.    The facts alleged herein create a strong inference that Defendants knew, or with severe recklessness disregarded, that as demand declined, Onsemi faced increasingly pervasive non-compliance with its LTSAs, demonstrating that the LTSAs were not "ironclad" and did not ensure an offsetting "win-win" in the event of amendment and that Defendants acted with scienter when making the misstatements alleged herein.

165.    Facts demonstrating Defendants' scienter include, but are not limited to the following: (a) nonpublic information given to Onsemi's Board and its Audit Committee in connection with meetings attended by the Individual Defendants, including the Individual Defendants' own presentations and memos, that were alleged in the *Balsam-Respler* Complaint based upon Onsemi's own books and records that were produced in response to a demand made pursuant to 8 *Del. C.* §220; (b) Defendants El-Khoury and Trent were directly responsible for negotiating, signing, executing, and managing the LTSAs with customers, were aware of the LTSAs' terms and conditions, and tracked relevant metrics and KPIs; (c) Defendants frequently spoke publicly, in detail, about the LTSAs,

demonstrating their deep knowledge of the terms and conditions of the LTSAs and the manner in which the LTSAs were executed, (d) Defendants El-Khoury and Trent had previous experience—both at Onsemi and in their positions at other companies—in which customers entered into LTSAs and subsequently refused to place the required purchase orders or sought to amend those agreements due to changes in demand; (e) LTSAs were a core operation at Onsemi; and (f) the Defendants received notice before the Class Period that an automotive customer would not take delivery of $200 million of products in 2023, despite being subject to an LTSA.

## A. Board Documents Reveal That, Unbeknownst to Investors, Defendants Were Aware Onsemi Faced Significant Challenges With LSTA Amendments That Had Not Provided an Offsetting Benefit

166.    Prior to, throughout, and after the Class Period, Defendants El-Khoury and Trent provided and received nonpublic information in connection with meetings of Onsemi's Board and its Audit Committee that they attended, including, but not limited to, information concerning: the frequency and scope of LSTA amendments and of LTSA non-compliance; the substantial risks that LTSA amendments posed to Onsemi's financial and operating plans; the softening of Onsemi's orders that were required to be placed under LTSAs; the misimpressions held by financial analysts concerning benefits that LTSAs purportedly provided to Onsemi's financial outlook, and the correction of those misimpressions after the Class Period; the Individual Defendants' subjective views regarding the foregoing, including that certain such facts were items that "keep[] us awake at night[.]"

167.    For example, at the Onsemi Board's Q1 2023 meeting held February 20, 2023, the Individual Defendants presented a "CEO/CFO Business Update," explaining that the Company's "Strategic Initiatives Goals" included "ensur[ing] compliance" of customers to the LTSAs, which evidences that compliance to the legally-binding agreements had become dire enough to warrant "Strategic" focus. Defendants also

79

recognized that enforcing LTSAs was of critical importance to the Company and investors, noting that Onsemi had purportedly secured $2.5 billion in committed revenue, including a whopping 77% of total "2023 revenue coverage[.]" under the LTSAs. Defendants also admitted that LTSAs had "helped increase confidence" in the Company's "long-term revenue and margin outlook" and "moderated significantly" any pushback from investors regarding Onsemi's "ability to sustain margin (and pricing)" thereunder. The Individual Defendants also cautioned that Onsemi would need to enforce the LTSAs and hold "pricing[,]" and their Business Update included an "LTSA Amendment true-up[,]" indicating that LTSA amendments were so frequent that Onsemi had to perform reconciliation and adjustment ("true-up") in attempts to ensure that actual, post-amendment figures under the LTSAs were accurately reflected in the Company's books. That Onsemi needed strategies to ensure compliance to LTSAs, and that there were so many amendments that Onsemi needed to reconcile its internal metrics, indicates that El-Khoury and Trent recognized that the LTSAs were more inherently unstable than the Individual Defendants had lead investors to believe.

168.    On May 18, 2023, less than three weeks after the start of the Class Period, the Individual Defendants expressed, in their own presentation to the Board's Audit Committee, substantial concerns about the Company's ability to obtain win-wins while negotiating LTSA amendments. The Individual Defendants' presentation informed the Board that obtaining offsets benefitting Onsemi was *far* from guaranteed when negotiating amendments to LTSAs. In fact, Onsemi only had a 50% probability of obtaining at least one such offset. The Individual Defendants' presentation acknowledged that obtaining offsets in LTSA amendments were a "Key Action" to "Close the Gap" in attempts to meet the Company's "2023 Recovery Plan[,]" indicating that Onsemi was struggling to meet its internal goals on account of the LTSAs' infirmity, and was now in "Recovery" mode. These undisclosed concerns sharply contrasted with the impression given to investors regarding LTSA durability; Defendants noted in the same presentation that investors were "very

pleased with SiC performance[,]" with "[Wall] Street increasingly confident of our ability to hit" the Company's $1 billion revenue target for SiC, which Defendants had publicly represented was backed by the LTSAs.

169. Defendant El-Khoury also attended a May 18–19, 2023 meeting of Onsemi's Board, wherein Onsemi management noted in a sales update that one of the items that "keeps us awake at night" included "customer retention[,]" given Onsemi was experiencing extended "lead time" (*i.e.,* delays in customers placing orders, which indicated uncertainty around customers fulfilling their LTSA commitments) and that the LTSAs contained a provision giving customers an 180-day cancellation window. That Defendant El-Khoury was either part of the admittedly sleepless sales team providing the update, or was at least informed of it, indicates he knew the gravity of Onsemi's customer retention issues (and the corresponding financial impact). Indeed, another area of concern in the sales update was "managing the LTSAs" which included successfully "negotiating amendments which preserve [O]nsemi revenue/margin/inventory goals while simultaneously ensuring no inventory build in the channel or end customer." Management advised the Board that 15 amendments occurred in the first quarter of 2023, which "38 in process."

170. Attempting to ensure customers were adhering to LTSA terms remained a focus point and risk to the Company throughout the Class Period. Indeed, meeting materials for a July 27, 2023 meeting of the Board's Audit Committee, which the Individual Defendants attended, listed that focus items for "Q'3 23 and Beyond" included driving "LTSA Compliance." Similarly, the Audit Committee including the Individual Defendants met again on August 17, 2023, wherein they discussed an ERM Update demonstrating that "LTSA Customer Compliance" was amongst the "largest increases in risk … rank[ing]" to the Company, soaring from a rank of just 26th in 2021 to a rank of 11th in 2022, strongly indicating that LTSAs were not as stable as Defendants claimed.

171. Then, during an August 17–18, 2023 meeting of the Board which Defendant El-Khoury attended, the Board's materials discussed that key risks for 2023 and beyond

81

included the "non-linearity" of Onsemi's revenue due to "customer LTSA/[i]nventory control[.]" Thus, the Individual Defendants were well aware that LTSA amendments were causing unfavorable fluctuations in Onsemi's revenue and inventory, indicating that "win-win[s]" were far from guaranteed and creating considerable risk that Onsemi would deviate off the forecasted line. This was especially troublesome and risky given the sheer volume of ongoing LTSA amendments: according to a legal department update given to the Board, Onsemi had signed seventy-six LTSAs but had negotiated "90 amendments" with a whopping "110-in process." For example, a 2023 LTSA summary for Onsemi's Power Solutions Group business segment given to the Board discussed that the LTSA for one customer, Kodiak, had resulted in "lower volumes[,]" exemplifying an "increasing risk of [LTSA] amendments as [customer] compliance drops."

172.    On September 9, 2023, a mere two days after Defendant El-Khoury told investors that Onsemi's LTSA represented "a legally binding agreement that both [Onsemi and the customer] in a win-win will renegotiate an amendment" such that the Company was "not going to be left holding the bag[,]" Onsemi's Board met and discussed just how big of a "bag" the Company had been left holding to that point. In a memo Defendant El-Khoury prepared in advance of the meeting, he announced he was commissioning a strategic initiative to investigate how to "extend the viability of our LTSAs." Defendant El-Khoury further admitted that "[w]e have [more than $2 billion] of inventory that we built for customers who are no longer in need of it[.]" Defendant El-Khoury highlighted a critical need to "minimize the short-term impact of [customer] decommits[,]" and acknowledged that the Company's poor performance was clearly due to a Company-specific factor— LTSAs—rather than macroeconomic or industry factors, writing that Onsemi was "losing more revenue than the markets have caused and we need to put that back under control with a tighter amendment analysis."

173.    Thus, it is clear from nonpublic Board documents that the Individual Defendants were acutely aware that investors' confidence in Onsemi was premised on the

82

supposed stability and "win-win" protections purportedly provided by LTSAs, but that LTSA amendments were increasingly devastating to the Company's financial and operating performance and posed a severe risk to Onsemi's forecasts, rendering Defendants' statements knowingly or, at least, severely recklessly misleading when made.

**B. The Individual Defendants' Primary Roles in Negotiating, Signing, Executing, and Monitoring the LTSAs Raise a Strong Inference of Scienter**

**<u>Defendants Negotiated and Signed the LTSAs</u>**

174.    Defendants El-Khoury and Trent and Onsemi's Head of Sales were directly responsible for negotiating the Company's LTSAs, personally signed every LTSA, and required customers' board members or officers to countersign. On January 5, 2023 during a presentation at the 2023 J.P. Morgan Tech Forum, Defendant El-Khoury explained that Onsemi's LTSAs were not signed by low-level or mid-level employees of the contracting parties, but instead were signed by officers and board members of the companies involved in the agreement, including himself and Defendant Trent:

> And when I say by the customer signed, it's not -- not minimizing the title, but it's not a director of procurement that's going to sign the -- in Europe, it's a member of the Board. In North America, it has to be an officer of the company. ***For ourselves, it's me, Thad or our Head of Sales that sign***. So they are legally binding agreement, because they're liability for the customer because they're take or pay.

175.    At an August 29, 2024 presentation at Deutsche Bank's Technology Conference, Defendant Trent reiterated that LSTAs were only negotiated by the highest levels of Onsemi—*i.e.*, El-Khoury and himself—stating that LSTA negotiations "are not done at a procurement level. ***These are done at an executive level, highest level, CEO to CEO type level*** because they're multiyear and sometimes billions of dollars." These statements were consistent with Defendant Trent's statement during the December 6, 2022, NASDAQ Investor Conference that engagement between Onsemi and its customers

concerning LTSAs was "*much deeper*" than non-LTSA relationships, "*and it's at a C level.*"

176. Defendants' direct involvement in the negotiation, approval, signing, and amendment of the LTSAs raises a strong inference that the misrepresentations were made with scienter, because Defendants would have been familiar with the specific terms and conditions of the LTSAs and would have known that the LTSAs were not "ironclad" and did not guarantee a benefit or "win" for the Company if the parties renegotiated or amended an LTSA.

**Defendants Closely Managed the Execution of the LTSAs**

177. Defendants' close management of the execution of the LTSAs also raises a strong inference that the misrepresentations were made with scienter.

178. CW1 confirmed that El-Khoury managed the LTSAs through the heads of business units and sales. CW1 stated that CW1's business unit was led by Michel De Mey at one point, and Terry Danzer at another, and that these business unit leaders reported directly to Defendant El-Khoury.

179. CW1 also attended "all-hands" meetings every quarter during CW1's tenure at Onsemi which occurred four weeks after the end of each quarter, after the Company's earnings calls with investors. CW1 stated that Defendants El-Khoury and Trent spoke at nearly all these meetings. CW1 recalled Defendant El-Khoury was very focused on LTSAs, stating "Hassane [El-Khoury] talked about them all the time" and "that's all he really spoke about."

180. CW1 heard from Onsemi's sales teams that Defendant El-Khoury was pushing sales managers to obtain more LTSAs with customers. CW1 stated that Defendant El-Khoury was deeply involved in the details of the LTSAs.

181. Defendant El-Khoury confirmed his close involvement in obtaining and managing Onsemi's LTSAs with customers during an exchange with Rajvindra S. Gill on the August 1, 2022 Earnings Call, in which Gill asked Defendant El-Khoury about the

84

Company's growth in automotive. Defendant El-Khoury responded with a discussion of the Company's strategy in automotive and concluded that he knew the intricacies of Onsemi's margins in automotive because he monitored the LTSAs being signed with customers:

> And *the way I monitor that is, one, the LTSAs that customers are signing*, which includes volume and price over the length of the LTSA. And even on my prepared remarks, I talked about customers coming in and wanting to extend those LTSAs beyond the original time line that they had. And LTSA is not about image sensor or silicon carbide or highly constrained, it's some of them have 200 parts from onsemi. So customers are valuing the whole portfolio. They're valuing where we are economically even with the price-to-value discrepancies because we started way below market and that is sustainable, one from the LTSA side; and two, I know kind of a feel of where we are versus the market, and we're not an outlier.

182.    The Individual Defendants' deep involvement with and careful management of the execution of the LTSAs raises a strong inference that they knew the LTSAs' material terms as well as customers' compliance with the LTSAs, and, consequently, that Defendants' misrepresentations were made with scienter.

**Defendants Monitored Relevant Metrics and KPIs Concerning the Revenues and Product Ramps, Including Those Covered by the LTSAs**

183.    The Individual Defendants also admittedly tracked key performance indicators and used them to inform their decisions for Onsemi's business. On October 30, 2023, Defendant El-Khoury assured investors during the 2023 Q3 Earnings Call that "Thad [Trent] and I look at about 30 pages of KPIs that try to triangulate the health of the business…" and "these KPIs are what lead us to making … decisions." With respect to Onsemi's silicon carbide business in particular, Defendant El-Khoury had told investors during the August 1, 2022 Q2 Earnings Call that "I'm not worried about the metrics. *I personally review* those metrics. I'm a technology person other than a CEO, and we have a solid outlook with the solid financials that said projected."

184.    Indeed, Defendants' review of relevant KPIs and analytics began long before the Class Period, as evidenced by an exchange between Mark John Lipacis and Defendant El-Khoury during the August 2, 2021 Earnings Call, in which Defendant El-Khoury assured Lipacis that both Defendant El-Khoury and Defendant Trent reviewed the Company's analytics "more than once a week in order to make sure we don't miss anything":

**Mark John Lipacis**
Yes, great. That's really helpful. The -- what are you looking at ON for leading indicators to tell you that customers are getting over their skis on their orders? *And maybe can you talk about any dynamics you're seeing on any cancellations or pushouts or anything like that*?

**Hassane S. El-Khoury**
Yes. Look, there are many signs that we look at. *I have analytics to be able to see.* Obviously, you're not always going to see 100% around the corner. But I'm comfortable with the visibility we get. *Both Thad and I review it more than once a week in order to make sure we don't miss anything*. But not to be joking about it, but the biggest gauge is how many escalation calls I get from customers is the biggest indicator. When I -- when my phone start ringing, it stops ringing off the hook 50 times a day, then I know we're not where we are today. So both of these, you have the analytics, but you also have that, call it, subjective feel that you get, and both of those lead me to believe that this is going into the first half of '22.

185.    Moreover, both of the Individual Defendants' compensation was tied, in part, to the Company's revenues and other financial and strategic metrics, ensuring that Defendant El-Khoury and Defendant Trent carefully tracked Onsemi's customer relationships with LTSAs. Specifically, the Individual Defendants' compensation for 2023 was tied to the achievement of certain metrics in new product revenue, SiC product revenue ramp, design wins, and operating margin. Notably, Defendants admit that "100%" of SiC products were sold via LTSAs.

186.    Thus, through their tracking and review of Onsemi's KPIs and other relevant metrics, the Individual Defendants knew or recklessly disregarded that some customers—

86

like the military customer described by CW1—were not placing orders as required by the LTSAs, raising an inference that Defendants' misrepresentations were made with scienter.

187. In sum, the Individual Defendants' primary roles in negotiating, signing, executing, managing, and monitoring the LTSAs raises a strong inference that the misrepresentations were made with scienter. Given the Defendants' deep knowledge of and familiarity with the terms and provisions of the LTSAs and the execution and management of those LTSAs, Defendants would have known that the LTSAs were not "ironclad" and did not guarantee an offsetting benefit or "win" for Onsemi if the contracting parties agreed to renegotiate or amend the terms of an LTSA.

**C. Defendants' Extensive, Detailed Commentary on the LTSAs Raises a Strong Inference of Scienter**

188. Before and throughout the Class Period, Defendants El-Khoury and Trent spoke publicly and extensively about the LTSAs, demonstrating their knowledge of the details of the LTSAs. Defendants spoke to investors and answered detailed questions about the LTSAs on no fewer than twenty-seven occasions, including:

| DATE | DEFENDANT | PUBLISHER | EVENT/CALL |
|---|---|---|---|
| 9/7/2023 | El-Khoury, Trent | Onsemi / Citigroup Inc. / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Citi's 2023 Global Technology Conference |
| 8/30/2023 | El-Khoury, Trent | Onsemi / Deutsche Bank AG / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Deutsche Bank's 2023 Technology Conference |
| 8/7/2023 | Trent | Onsemi / KeyBanc Capital Markets Inc. / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at KeyBanc's Technology Leadership Forum 2023 |
| 7/31/2023 | El-Khoury | Bloomberg | Scale Not an Issue for ON Semi, Says CEO El-Khoury |

| DATE | DEFENDANT | PUBLISHER | EVENT/CALL |
|---|---|---|---|
| 7/31/2023 | El-Khoury | CNBC "Squawk on the Street" | Onsemi CEO: Strength in electrification of auto market has given us solid results and outlook |
| 7/31/2023 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q2 2023 Earnings Call |
| 6/12/2023 | El-Khoury | Fortt Knox by CNBC | Hassane El-Khoury, Onsemi CEO, on joining the Nasdaq 100 |
| 6/6/2023 | El-Khoury, Trent | Onsemi / BofA Securities / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Bank of America 2023 Global Technology Conference |
| 5/23/2023 | El-Khoury, Trent | Onsemi / JPMorgan Chase & Co / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at 51st Annual JPMorgan's Global Technology, Media and Communications Conference 2023 |
| 5/19/2023 | El-Khoury | Investor's Business Daily | Onsemi CEO: Silicon Carbide 'Still The Way That Everybody Is Going'—Including Tesla |
| 5/16/2023 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Analyst/Investor Day |
| 5/1/2023 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q1 2023 Earnings Call |
| 3/7/2023 | El-Khoury, Trent | Onsemi / Morgan Stanley / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Morgan Stanley Technology, Media & Telecom Conference |
| 2/6/2023 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q4 2022 Earnings Call |
| 1/5/2023 | El-Khoury, Trent | Onsemi / JPMorgan Chase & Co / S&P | ON Semiconductor Corporation Presents at |

| DATE | DEFENDANT | PUBLISHER | EVENT/CALL |
|---|---|---|---|
| | | Global Market Intelligence | JPMorgan 21st Annual Tech/Auto Forum |
| 12/6/2022 | El-Khoury, Trent | Onsemi / NASDAQ / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at NASDAQ 47th Investor Conference |
| 11/29/2022 | El-Khoury, Trent | Onsemi / Credit Suisse AG / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Credit Suisse 26th Annual Technology Conference |
| 10/31/2022 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q3 2022 Earnings Call |
| 9/8/2022 | El-Khoury | Onsemi / Citigroup Inc. / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Citi's 2022 Global Technology Conference |
| 8/31/2022 | El-Khoury, Trent | Onsemi / Deutsche Bank AG / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Deutsche Bank's 2022 Technology Conference |
| 8/8/2022 | El-Khoury, Trent | Onsemi / KeyBanc Capital Markets Inc. / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at KeyBanc Capital Markets 23rd Annual Technology Leadership Forum |
| 8/1/2022 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q2 2022 Earnings Call |
| 6/8/2022 | El-Khoury, Trent | Onsemi / BofA Securities / S&P Global Market Intelligence | ON Semiconductor Corporation Presents at Bank of America 2022 Global Technology Conference |
| 5/2/2022 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q1 2022 Earnings Call |
| 2/7/2022 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q4 2021 Earnings Call |

89

| DATE | DEFENDANT | PUBLISHER | EVENT/CALL |
|------|-----------|-----------|------------|
| 11/1/2021 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q3 2021 Earnings Call |
| 8/2/2021 | El-Khoury, Trent | Onsemi / S&P Global Market Intelligence | ON Semiconductor Corporation Q2 2021 Earnings Call |

189.    As an example of Defendants' commentary, on January 5, 2023 Defendant El-Khoury assured investors that the LTSAs required the approval and signature of one of three of Onsemi's top executive officers—and the signature of customers' board members or officers—and that the LTSAs were "legally binding" and enforceable. These statements were calculated to lend as much credibility as possible to the LTSAs to assure investors that the LTSAs provided Onsemi with material benefits, including reduced order volatility and locked in revenues "because they're take or pay" contracts.

190.    The Individual Defendants' pervasive public commentary about Onsemi's LTSAs demonstrates that Defendant El-Khoury and Defendant Trent were both deeply knowledgeable and intimately involved with the formation, execution, and amendment of the LTSAs, raising a strong inference that the misrepresentations were made with scienter.

**D. Defendants' Prior Notice of Large, "Significant" Customers Violating LTSAs Without Penalty Raises a Strong Inference that Defendants Made the Misrepresentations with Scienter**

191.    As described in Section IV.G, *supra*, in early 2023, just a few months before the beginning of the Class Period, a large customer failed to place the purchase orders required by an LTSA. CW1 explained that CW1 raised this issue to Michel De Mey who was Defendant El-Khoury's direct report. Thus, prior to the Class Period, the Individual Defendants knew or recklessly disregarded that a large, "significant" military customer indefinitely delayed orders required by the LTSA, evidencing that the LTSAs did not guarantee volumes and that there were still significant risks that customers would unilaterally cancel or indefinitely delay orders that were required by LTSAs.

192.    Importantly, as described in Section IV.C, *supra*, Defendants El-Khoury and Trent admitted Onsemi's LTSA's were uniform in nature; thus, CW1's observations about the LTSAs are relevant to all of the Company's LTSAs.

193.    The Individual Defendants' prior notice of large customers indefinitely delaying purchase orders required by the LTSAs raises a strong inference that the Defendants' misrepresentations were made with scienter.

**E. That Onsemi's Robust Risk Management Function Communicated ERM Risk Reports to the Individual Defendants on a Monthly Basis During Executive Risk Committee Meetings Raises a Strong Inference that the Misleading Statements Were Made with Scienter**

194.    During the Class Period, Onsemi maintained and utilized an ERM methodology that regularly apprised the Individual Defendants of risks to Onsemi's performance resulting from LTSAs, including customer noncompliance therewith and amendments thereto, and how LTSA-related risks elevated in prominence during the Class Period.

195.    The Individual Defendants were responsible as members of Onsemi's Risk Committee to work with a knowledgeable, cross-functional team to assess risks—including those relating to LTSAs—and actions to mitigate them on a monthly basis, and report such risks and mitigation strategies to the Board through Defendant El-Khoury on at least a quarterly basis. In fact, in recommending El-Khoury for reelection as a director in the 2023 Proxy Statement, the Board cited ERM as one of El-Khoury's skills and qualifications. Nonpublic documents demonstrate that risks discussed by Onsemi's top leadership, as identified through the Company's ERM process, included risks posed by LTSAs. As alleged in Section IV.H., *supra*, on August 17, 2023, the Board's Audit Committee, with Defendants El-Khoury and Trent in attendance, discussed an ERM Update that emphasized shifts in risk trends with "LTSA Customer Compliance" being one of the "largest increases in risk priority rank position" going from a rank of 26th in 2021 to a rank of 11th in 2022. Similarly, as noted in Section VII.A, *supra*, the Board at a November 15–16, 2023 meeting

discussed an ERM update focused on the "[r]evenue [i]mpact" resulting from customers' "LTSA [n]on-[c]ompliance[,]" which discussed Onsemi's "risk of financial damage, including lost revenue … stemming from … customer reneging, especially during market downturns…." The November 2023 ERM update also discussed the risk of LTSAs becoming an "unsustainable business strategy" due, at least in part, to the "fluctuating and difficult-to-forecast consumer demand" which ran the risk of creating "excess inventory" and thereby "financial liability" for the Company.

196. That: i) LTSA Customer Compliance was an increasing in risk immediately prior to the Class Period; ii) Onsemi had a robust ERM function prior to and throughout the Class Period, that assessed near-term risks such as LTSA compliance and rolled those up to the CEO in quarterly reports, and that iii) the Executive Risk Committee (including El-Khoury and Trent) met every month to track the "actual progress" toward mitigating "top tier risks." These facts support a strong inference that the Defendants' misleading statements throughout the Class Period were made with scienter.

**F. LTSAs Are Integral to Onsemi's Core Operations**

197. The LTSAs that the Individual Defendants repeatedly touted throughout the Class Period were critical to Onsemi's core operations, which raises a strong inference that the misrepresentations they made regarding the LTSAs throughout the Class Period were made with scienter.

198. As alleged in Section VIII.B, *supra*, the Individual Defendants had personal knowledge of the terms of Onsemi's LTSAs due to their close involvement with the agreements. By Company policy, the LTSAs had to be signed by the Individual Defendants or Onsemi's head of sales. That these critical sales agreements could only be signed by a group of just three of the Company's high-ranking executives, limited to Defendant El-Khoury, Defendant Trent, and just one other individual, indicates Defendant El-Khoury's and Defendant Trent's fastidious knowledge of, and involvement in, Onsemi's LTSAs.

199.    Defendants El-Khoury and Trent presented to Onsemi's Board on February 20, 2023 that *LTSAs represented a whopping 77% of the Company's "2023 revenue coverage*[.]" The Individual Defendants also presented that Onsemi at that time had "$16.6 billion in *committed* revenue" which, given Defendants' repeated public characterizations of LTSAs as making customers "committed" (*see e.g.* ¶¶ 43, 48, 51), likely meant that Onsemi had signed LTSAs initially valued at a total of $16.6 billion. This was a staggeringly large figure for a Company that had, according to its 2022 Form 10-K, brought in roughly $8.326 billion in revenue in the fiscal year just prior to the Class Period. Moreover, permitting customers to amend LTSAs without offsetting benefits to Onsemi resulted in the Company having unignorably massive levels of excess inventory. Indeed, Defendant El-Khoury presented to the Board that by September 9, 2023, "*[w]e have [more than $2 billion] of inventory that we built for customers who are no longer in need of it*…"—meaning Onsemi was sitting on so much inventory that it was worth nearly a quarter of the Company's total FY2022 revenues and that this problem was worthy of elevating to the Board. Thus, cut by any metric, it would be absurd for the Individual Defendants to not have been intimately knowledgeable of the terms of Onsemi's LTSAs and not have known that they had discretion to take a loss for Onsemi to retain a strategic customer (such as foregoing LTSA revenue and becoming saddled with excess inventory where a customer cancelled or delayed ordering on short notice), because LTSAs represented a substantial part of the Company's core operations.

200.    Indeed, the Company's 2022 annual report, filed with the SEC on Form 10-K on February 6, 2023 and signed by Defendants El-Khoury and Trent, provided an "Overview" of Onsemi's business by stating "*[o]ur primary focus* continues to be on profitable revenue growth in our focused end-markets of *automotive* and industrial infrastructure, *as well as obtaining longer-term supply arrangements* with strategic end-customers."

93

201.    Prior to and throughout the Class Period, Defendant El-Khoury repeatedly affirmed that he considered LTSAs, particularly for strategic automotive customers and for SiC products, to be "core" to Onsemi's operations. For example, Defendant El-Khoury reminded investors at a November 29, 2022 Credit Suisse technology conference how crucial LTSAs were to Onsemi, stating "on the core business, specifically on auto and industrial, you heard me talk about LTSAs," adding "I can tell you, for example, silicon carbide, 100% is LTSAs. Businesses where we are adding capacity are 100% on LTSA[,]" going as far as to say "we're not going to invest in [capital expenditure] unless there's a signed LTSA."

202.    Similarly, Defendant El-Khoury stated in a February 6, 2023 earnings call that "LTSAs are not only for automotive, but they are for growth areas where we have been putting investments[,]" to which Defendant Trent clarified that "[t]he place that we are not doing LTSA, obviously, is the non-core business that we're trying to exit." Defendant El-Khoury also stated at the 2022 KeyBanc Forum that Onsemi had "doubled down on silicon carbide" as a "technology that we can … bring into our core market," while noting that "[s]trategically, auto and industrial is where … we're headed."

203.    Indeed, as a result of Defendants' focus on securing LTSAs for SiC products, Onsemi reported that, as of the May 16, 2023 Investor Day conference, $9 billion of the company's then "over $17 billion of LTSAs"—over *half*—were for SiC products. Of that $9 billion in SiC revenue, Defendants represented on several occasions prior to and throughout the Class Period that $1 billion was "committed" to be recognized in 2023.

204.    Thus, it would be absurd to suggest that the Individual Defendants, who were admittedly "doubling down" on SiC products in 2023 and considered automotive to be a "core" business, would not be aware that an automotive customer's LTSA— *representing at least* $200 million, or 20%, of Onsemi's 2023 SiC revenue—ran the risk of amendment or cancellation to the detriment of Onsemi.

94

205.    Thus, the LTSAs' critical importance to Onsemi's core operations raises a strong inference that the Defendants made the misrepresentations about the LTSAs throughout the Class Period with scienter.

**G. Defendants Received Notice Before the Class Period that a Large Automotive Customer Would Not Take Delivery of $200 Million in Minimum Purchase Commitments in 2023, But Continued Representing LTSAs Were "Ironclad"**

206.    By Defendants' own admissions, Onsemi's LTSAs guaranteed that Onsemi received notice of customers' weakening demand six or nine months in advance, which would purportedly allow the Company time to negotiate a win-win for Onsemi. For example, during the 2022 KeyBanc Forum on August 8, 2022, Defendant El-Khoury explained that if a customer was experiencing weakening demand, "the LTSA guarantees somebody is going to pick up the bat phone and call me because there's a liability in there." Defendant El-Khoury added that "I'm going to get a call ahead of everybody else"—*i.e.*, Onsemi's competitors—"to figure out what are we going to do about it."

207.    Leading up to the Class Period, Defendant El-Khoury repeatedly described that the "guarantee[d]" phone call from customers about weakening demand would come at least six months in advance and would give Onsemi the time needed to "move that capacity elsewhere[.]"

208.    Defendants El-Khoury and Trent repeated these assurances of an early warning phone call throughout the Class Period. For example, at the 2023 JPMorgan Conference, Defendant Trent stated that Onsemi was "getting the call quarters in advance of [softening customer demand]" and on September 7, 2023, during the 2023 Citi Conference, when asked "how iron clad are those [LTSAs]?[,]" Defendant El-Khoury explained that "[with] the LTSAs, somebody is going to get the bat phone and call and say, we got a problem, 6 months, 9 months from now, let's have a conversation."

209.    Thus, by Defendants' own admissions, Defendants received notice *before* the Class Period that a major automotive customer would not be purchasing $200 million of

95

SiC products in 2023 (the "Automotive Customer's Notice"), contrary to the customer's LTSA. Indeed, for Defendants to reveal the $200 million shortfall in the 2023 Q3 Earnings Call—which reported Onsemi's results for the quarter ended September 29, 2023—the Automotive Customer's Notice would have had to have been provided at least six months prior to the end of that quarter, or on March 29, 2023, thus giving Defendants notice well before the Class Period.

210. CW1 further corroborates that the Company received advance notice from customers under LTSAs when their demand for Onsemi product was expected to drop. As CW1 explained, when a customer wasn't going to place an order as contemplated by the LTSA, "I knew well in advance, a quarter before, that it wasn't going to occur."

211. Despite the Automotive Customer's Notice, which Onsemi received before the Class Period began, Onsemi did not: a) negotiate a "win-win" with the customer; b) reallocate its production capacity in 2023 to serve another customer in the capacity-constrained industry; or c) enforce the purported "take or pay" provisions of the LTSA. Indeed, Defendants revealed a whopping $200 million shortfall for 2023 (one *fifth* of that year's supposedly "committed" SiC revenue) without disclosing a corresponding "win" for Onsemi.

212. Thus, Defendants' extremely misleading representations throughout the Class Period were made with the knowledge or reckless disregard for the fact that Onsemi's LTSAs were not "ironclad" and did not guarantee that amendments to LTSAs would include a "win" or offsetting benefit for the Company.

**IX. LOSS CAUSATION**

213. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Onsemi's common stock and/or maintaining the artificial inflation in Onsemi's common stock prices, by publicly issuing and endorsing materially misleading statements and omitting to disclose material facts necessary to make those statements, as set forth herein, not materially misleading. Said statements and omissions

96

were materially misleading in that they failed to disclose materially adverse information and/or misrepresented the truth about the Company's business, operations, and prospects as alleged herein. Specifically, Defendants' statements were materially and objectively misleading when made, as set forth *supra*, and had the cause and effect of creating in the market an unrealistically positive assessment of Onsemi's LTSAs and the LTSAs' ability to negate demand risk.

214.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiff and the other members of the Class. As a result of their purchases of Onsemi common stock during the Class Period at artificially inflated prices, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

215.     Beginning before the market opened for trading on October 30, 2023, Defendants issued corrective disclosures in the Company's 2023 Q3 Earnings Call. These corrective disclosures revealed, *inter alia*, that contrary to Defendants' representations, Onsemi's LTSAs were not "ironclad" protection for the Company and that LTSA noncompliance and risk to the Company's "revenue/margin/inventory goals" were on the rise due to Onsemi's inability to always generate "win-wins" during LTSA renegotiations.

216.     Market analysts were surprised by Defendants' disclosures. During the 2023 Q3 Earnings Call itself, analyst Timothy Michael Arcuri of UBS stated plainly to Defendants that "[y]ou guys had always talked about the LTSAs being legally binding and it didn't seem like they would be subject to any changes in EV ramps."

217.     In a report published immediately prior to the 2023 Q3 Earnings Call, William Blair anticipated that "[k]ey items to be addressed on the call" included "[l]ong-term supply agreements – will these offer the assurances during a volatile market, particularly if all end-markets remain weak?" But after the Defendants revealed during the 2023 Q3 Earnings Call that Onsemi did not achieve a "win-win" with the "silicon carbide

[OEM] in Q4[,]" William Blair published a subsequent report, dated October 31, 2023, explaining that "protection from LTSAs is in question" and that "yesterday's surprise brings the power of LTSAs back down to earth." William Blair elaborated, furthering questioning the value of Onsemi's LTSAs:

> **What Happened to LTSAs?** The management team has been very confident in its LTSA strategy providing visibility and preventing demand surprises. We have questioned the efficacy of these LTSAs when push comes to shove, because if your customer cannot use the product, it is bad business to make them take it, and even worse business to sue your customer over contract fulfillment. We have seen "iron-clad" LTSAs fall apart in cyclical downturns, like polysilicon, telecom, LEDs, and even memory over the years. Management noted the LTSA worked and gave them an "early phone call" for visibility. In fact, it was positioned that a win-win arrangement was struck to allow for a push out of the $200 million in SiC devices. If we agree this is pushed out and not lost business, the LTSA did not prevent the 20% shock or provide enough time to redeploy the capacity. If an LTSA with Tesla is fallible, how should investors interpret the LTSAs with four of the top five Chinese EV players?

218. Truist also understood the Company's $200 million shortfall as revealing that the LTSAs did not provide the protection the Defendants had claimed, reporting on October 30, 2023 that "the [revenue] miss contrasts mgmt's confident messaging" and "LTSAs are proving not bulletproof." On this news, Truist lowered its price target for Onsemi's stock from $122 per share to $81, a decline of nearly 34%.

219. Writing in an October 31, 2023 report, Benchmark was similarly surprised by the Company's sudden $200 million reduction in revenue expectations and "disappointed the LTSA were unable to smooth [quarter-over-quarter] volatility[.]" Benchmark explained that "the 8.3% [quarter-over-quarter] December decline is the largest sequential 4Q decline since 2011, and well below seasonality despite the expected LTSA protection." With a new understanding the LTSAs could not smooth volatility and did not provide the revenue protection Defendants had previously claimed, Benchmark lowered its

price target for Onsemi's stock from $125 per share to $88 per share, a decline of nearly 30%.

220.    Likewise, after the Defendants revealed during the 2023 Q3 Earnings Call that the Company would miss its expected SiC revenues by $200 million, UBS published a report on October 30, 2023—titled "Big Step Back In Confidence/Credibility on SiC Story"—that corrected investors' previous understanding that LTSAs "locked in" revenues, explaining that "[t]he bloom is 'off the rose' with respect to ON's long term supply agreements." UBS explained that the Company would not be "putting this [$200 million of] product to the customer[,]" and, despite the Company "suggesting"—without any evidence—that it had obtained some undisclosed "value" from the customer, UBS concluded that "this Q shows the very limited value of LTSAs[.]" UBS elaborated that "rather than recommitting to the $4.5B LTSA for 2023-2025, ON is simply now suggesting it will 'outgrow the market' by 2x[.]'" Accordingly, UBS cut its price target for Onsemi's stock from $100 to $80, a 20% decline.

221.    In other words, while the market had previously relied upon the Defendants' misrepresentations, the October 30, 2023 announcement that annual SiC revenues would fall short by 20% because a customer subject to an LTSA had canceled its orders revealed to investors that the LTSAs had "very limited value" and did not provide the assurance that Defendants had previously represented.

222.    As a result of the Defendants' corrective disclosures, the Company's stock price fell from a closing price of $83.52 per share on Friday, October 27, 2023 to a closing price of $65.34 per share on Monday, October 30, 2023, a decline of $18.18 per share, or nearly 22% on exceptionally heavy trading volume, thereby removing the artificial inflation caused and/or maintained by Defendants' misstatements and causing economic loss to investors who had purchased Onsemi common stock during the Class Period. Accordingly, Onsemi lost nearly $7.9 billion in market capitalization on October 30, 2023. The timing and magnitude of the stock price decline, the statements in Defendants'

corrective disclosures, and the market's reaction negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or facts specific to the Company that were unrelated to Defendants' fraudulent conduct.

223.  As shown in Figure 3, *infra*, Defendants' materially misleading statements about LTSAs served to artificially inflate the price of Onsemi's common stock throughout the Class Period and when the truth became known, the artificial inflation in Onsemi's stock price was removed.

**Figure 3.**



224.  Between August 1, 2022 and November 30, 2023, the period shown above in Figure 3, the average price of Onsemi's common stock *outside of the Class Period* was $70.69, while the average price *during the Class Period* was $91.93, more than $21.00 higher.

100

## X.  CLASS ALLEGATIONS

225.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Onsemi common stock during the Class Period (the "Class"), other than Defendants, and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

226.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Onsemi common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Onsemi or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

227.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

228.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

229.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

101

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Onsemi;

(c)    whether the Individual Defendants caused Onsemi to issue misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing misleading financial statements;

(e)    whether the price of Onsemi common stock was inflated during the Class Period due to the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

230.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. PRESUMPTION OF RELIANCE

231.    Lead Plaintiff and other members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, *inter alia*:

(a)    Onsemi common stock traded in an efficient market (discussed infra);

(b)    Defendants made public misrepresentations and/or failed to disclose facts during the Class Period to make their statements not misleading;

(c)    the facts that Defendants misrepresented and/or failed to disclose were material to investors;

102

(d)    the material misrepresentations and/or omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Onsemi common stock; and

(e)    without knowledge of the misrepresented and/or omitted facts, Lead Plaintiff and other members of the Class purchased or otherwise acquired Onsemi common stock between the time that Defendants made material misrepresentations and/or omitted material facts and the time that the true facts were disclosed.

232.    At all relevant times, the market for Onsemi stock was an efficient market as evidenced by, *inter alia*:

(a)    Onsemi common stock met the requirements for listing, and was listed and actively traded on The Nasdaq Stock Market, a highly efficient and automated market;

(b)    At all times throughout the Class Period, Onsemi had more than 430 million shares of common stock outstanding and a market capitalization exceeding $26 billion;

(c)    As a regulated issuer, Onsemi filed periodic public reports with the SEC and NASDAQ;

(d)    Onsemi regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)    Onsemi was followed by many securities analysts employed by major brokerage firm(s), including BofA Securities, Citigroup Inc., Deutsche Bank, Goldman Sachs Group, JPMorgan Chase & Co., Mizuho Securities USA, Morgan Stanley, Needham & Company, Piper Sandler & Co., Stifel, Nicolaus & Company, Robert W. Baird & Co., Susquehanna Financial Group, TD Cowen, Truist

Securities, UBS Securities, Benchmark, Wells Fargo Securities LLC, William Blair & Company LLC, and Wolfe Research LLC, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

233. As a result of the foregoing, the market for Onsemi common stock promptly digested current information regarding the Company from all publicly-available sources and reflected such information in the price of Onsemi common stock. Under these circumstances, all purchasers of Onsemi common stock during the Class Period suffered similar injuries through their purchase of the stock at artificially-inflated prices, and the presumption of reliance applies to such purchasers.

234. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are also grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Onsemi's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of revenue from Onsemi's LTSAs, that requirement is satisfied here.

## XII. NO STATUTORY SAFE HARBOR

235. The statutory safe harbor afforded by the PSLRA for forward-looking statements made under certain circumstances does not apply to Defendants' materially misleading statements as alleged in this pleading.

236. To the extent any statements alleged to be misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future

intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

237. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement[.]" 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include meaningful cautionary language required by the PSLRA.

238. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, *inter alia*, throughout the Class Period, Defendants had the discretion to amend or not enforce the terms of Onsemi's LTSAs in the interest of keeping strategic customers without obtaining a "win" or "offset[ting]" benefit for the Company.

239. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those misleading forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially misleading, or the forward-looking statement was authorized or approved by an executive officer of Onsemi who knew that the statement was misleading when made.

105

## XIII.  COUNTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**Against All Defendants**

240.    Lead Plaintiff realleges each allegation as if fully set forth herein.

241.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants.

242.    Defendants (a) employed devices, schemes and artifices to defraud; (b) made misleading statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

243.    Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

244.    Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were misleading.

245.    As a result of Defendants' dissemination of materially misleading information and their failure to disclose material facts, Lead Plaintiff and the Class were

106

misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

246.   Onsemi is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of respondeat superior, as those persons were acting as the officers, directors, and/or agents of Onsemi in taking the actions alleged herein.

247.   Lead Plaintiff and the Class purchased Onsemi common stock, without knowing that Defendants had misstated or omitted material facts about the Company's financial performance or prospects. In so doing, Lead Plaintiff and the Class relied directly or indirectly on misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements. Lead Plaintiff and the Class were damaged as a result of their reliance on Defendants' misleading statements and misrepresentations and omissions of material facts.

248.   At the time of Defendants' misleading statements, misrepresentations and omissions, Lead Plaintiff and the Class were unaware of their misleadingness and believed them to be true. Led Plaintiff and the Class would not otherwise have purchased Onsemi common stock had they known the truth about the matters discussed above.

249.   By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

250.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class have suffered damages in connection with their purchase of Onsemi common stock.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

251. Lead Plaintiff realleges each allegation as if fully set forth herein.

252. This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants El-Khoury and Trent.

253. Each of the Individual Defendants, by reason of their status as senior executive officers and positions on the Board, directly or indirectly, controlled the conduct of the Company's business and its representations to Lead Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the Company's statements alleged to be misleading as it related to Lead Plaintiff's and the Class's investments in Onsemi common stock within the meaning of §20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

254. The Individual Defendants controlled and had the authority to control the content of the Company's statements, as evidenced by their signatures to the Company's Forms 10-Q and 10-K. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review the Company's statements prior to their issuance or could have prevented their issuance or caused them to be corrected.

255. The Individual Defendants knew or recklessly disregarded the fact that Onsemi's representations to its investors were materially misleading and omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

256. By virtue of their high-level positions and their participation in and awareness of Onsemi's operations and public statements, the Individual Defendants were able to and did influence and control Onsemi's decision-making, including controlling the

108

content and dissemination of the statements that Lead Plaintiff and the Class contend contained materially misleading information and on which Lead Plaintiff and the Class relied.

257. The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

258. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchase of Onsemi securities.

## XIV.  PRAYER FOR RELIEF

**WHEREFORE,** Lead Plaintiff requests that the Court enter judgment as follows:

A.     Certifying this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as a representative of the Class;

B.     Requiring Defendants to pay damages sustained by Lead Plaintiff and members of the Class by reasons of the acts alleged herein;

C.     Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable experts' fees, costs, and attorneys' fees;

D.     Granting Lead Plaintiff leave to amend this complaint to conform to the evidence; and

E.     Awarding such other and further relief as the Court may deem just and proper.

## XV.  DEMAND FOR A JURY TRIAL

Lead Plaintiff hereby demands trial by jury in accordance with Federal Rule of Civil Procedure 38(b).

DATED: August 11, 2025          Respectfully submitted,

/s/ *Gary A. Gotto*

**KELLER RORHBACK L.L.P**
Gary A. Gotto
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: 602-484-0088
Fax: 602-284-2822
ggotto@kellerrohrback.com

*Local Counsel for Lead Plaintiff*
*Jeffery S. Lew and the Class*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
(State of Connecticut Juris No. 435545)
Gregory M. Potrepka (admitted *pro hac vice*)
(State of Connecticut Juris No. 437326)
David C. Jaynes (to be admitted *pro hac vice*)
(State of California Juris No. 338917)
P. Cole von Richthofen (to be admitted *pro hac vice*)
(State of Connecticut Juris No. 444159)

1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: djaynes@zlk.com
Email: cvrichthofen@zlk.com

*Lead Counsel for Lead Plaintiff*
*Jeffery S. Lew and the Class*

110