**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffery S. Lew, et al., | No. CV-24-00594-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| ON Semiconductor Corporation, et al., | |
| Defendants. | |

The Court considers Defendants' Motion to Dismiss (Doc. 67).  The Court **grants** the Motion for the reasons below.

## I.    BACKGROUND

This a class action arising under the Securities Exchange Act of 1934 (the "Act") brought by investors who purchased On Semiconductor ("Onsemi") common stock between May 1, 2023 and October 27, 2023 (the "Class Period"). (Doc. 63 at 5.)  The class representative is Plaintiff Jeffery Lew who purchased Onsemi stock during the Class Period. (*Id.* at 13.)  The lawsuit is predicated on alleged misstatements made by Onsemi, its CEO Hassane El-Khoury, and its CFO Thad Trent to investors during the Class Period. (*Id.* at 5.)

At the outset, this Court previously cautioned "that the Court will not be left putting together the pieces of Lew's puzzle as he hides under a cloud of vagueness and imprecision." (Doc. 62 at 34.)  The Court will not go so far as to label the Plaintiff's Third Amended Complaint ("TAC") a puzzle pleading despite clearly "cite[ing] lengthy

statements attributed to the defendants, followed by a generalized list of reasons that the statements may have been false or misleading or a generalized list of omissions that were required to make the statements not misleading." *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 949 (D. Ariz. 2024) (citation modified). Nonetheless, Plaintiff did not heed this Court's word of caution. The TAC is not a paragon of clarity; it spans over 110 pages and is rife with duplicative allegations and presents allegations in a temporally and topically disjointed manner. Nonetheless, the Court proceeds.

The TAC alleges as follows. Onsemi makes and sells semiconductors and related products. (Doc. 63 at 6.) Following the COVID-19 pandemic, the semiconductor industry surged and suppliers were unable to meet customer demand. (*Id.*) To protect themselves against supply shortages, customers placed duplicate orders with multiple suppliers. (*Id.*) Once their order was filled, customers canceled their alternate orders, which created predictability issues among suppliers. (*Id.*)

To combat this practice, Onsemi utilized long-term supply agreements ("LTSA") beginning in 2021. (*Id.*) LTSAs lock in purchase commitments over the term of the agreements, thereby curbing artificial market fluctuations and creating supply chain predictability. This case concerns Defendants' statements about the LTSAs during the Class Period.

The Court describes Defendants' statements regarding the LTSAs in more detail below. In short, Plaintiffs allege that Defendants heavily touted the LTSAs as a boon for Onsemi. (*Id.* at 6–7.) These statements intensified entering 2023 with Defendants claiming that the LTSAs were binding agreements "that ensured predictable revenues, locked-in volumes and pricing, [and] always generated 'win-win' outcomes." (*Id.*) Shortly thereafter, issues emerged as to the enforceability of the LTSAs and customer compliance. (*Id.* at 7–9.) Ultimately, Onsemi's stock price dropped from $83.52 per share on October 27, 2023 to $65.34 per share on October 30, 2023—"a $18.18 (nearly 22%) per share drop on heavy volume, erasing $7.9 billion in market capitalization." (*Id.* at 11.) At bottom, Plaintiffs allege: "Defendants' fraudulent and misleading statements served to artificially

inflate the price of Onsemi's common stock throughout the Class Period, causing massive investor losses when the price of the stock precipitously declined as the truth about Onsemi's LTSAs was revealed." (*Id.* at 12.)

Plaintiffs thus claim that all Defendants violated Section 10(b) of the Act and Rule 10b-5 and that Defendants El-Khoury and Trent violated Section 20(a) of the Act. (*Id.* at 110–12.) Section 10(b) and Rule 10b-5 prohibit making false or misleading statements regarding the sale of a security. *See In re Alphabet Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021). The Section 20(a) claim is derivative and it only applies as to El-Khoury and Trent as individuals; the Section 20(a) claim only stands if there is a Section 10(b) violation. *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024).

This Court previously dismissed Plaintiffs' Second Amended Complaint ("SAC") with leave to amend. (Doc. 62.) The SAC challenged four statements, which occurred during: (1) a May 1, 2023 Q1 Earnings Call; (2) a May 23, 2023 JPMorgan Chase Conference; (3) an August 30, 2023 Deutsche Bank Conference; and (4) a September 7, 2023 Citi Conference." (*See generally id.*) The Court found that the SAC failed to state a claim because these statements were not false or misleading; and even if they were, the SAC failed to establish that the statements were made with the requisite state of mind. (*See generally id.*) The TAC rechallenges these four statements and four new statements, which relate to: (1) the "Q1 Press Release"; (2) the "Quarterly Report on Form 10-Q for Fiscal Q1 2023"; (3) the "Q2 Press Release"; and (4) the "Quarterly Report on Form 10-Q for Fiscal Q2 2023." (*See generally* Doc. 63.)

## II.   LEGAL STANDARD

To survive a Federal Rule of Civil Procedure ("Rule") 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of Rule 8(a)(2). Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). This notice exists if the pleader sets

forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A complaint that sets forth a cognizable legal theory will survive a motion to dismiss if it contains sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility does not equal "probability," but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility . . . .'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In ruling on a Rule 12(b)(6) motion to dismiss, the well-pleaded factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). A court ordinarily may not consider evidence outside the pleadings when ruling on a Rule 12(b)(6) motion to dismiss. *See United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). "A court may, however, consider materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908.

III.    DISCUSSION

A. Section 10(b)

The Court previously clarified the standard applicable to Section 10(b) claims and

- 4 -

repeats that standard here.  Section 10(b) of the Act prohibits "manipulative or deceptive" practices in connection with the purchase or sale of a security.  *See In re Alphabet Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021).  Rule 10b-5 of the implementing regulations is "coextensive" with Section 10(b).  *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024) (citation omitted).  The Rule prohibits making "any untrue statement of a material fact" or omitting material facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Glazer II*, 63 F.4th at 764 (quoting 17 C.F.R. § 240.10b-5(b)).  To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege: (1) a material misrepresentation or omission ("falsity"), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation.  *In re Genius Brands*, 97 F.4th at 1180.  Controlling individuals' liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 77*o*, is derivative of a primary violation of securities laws, like Section 10(b).  *Id.*

As a general matter, "securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory."  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021).  Under Rule 10b-5, an affirmative misrepresentation is an "untrue statement of a material fact," and a fraudulent omission is a failure to "state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Id.*; *see also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.   Both theories require falsity with respect to a "material *fact*."   *Id.* (citing 17 C.F.R. § 240.10-b5(b)).

Material misrepresentations are capable of objective verification.  *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).  To that end, however, there is a distinction between statements of fact and those of opinion.  *Omnicare,*

*Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 182–83 (2015); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (applying *Omnicare* to Section 10(b) claims).  A "fact" is a "thing done or existing" or "an actual happening."  *Omnicare*, 575 U.S. at 183 (explaining "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not.") (citation modified).  Conversely, an "opinion" is a "belief, a view, or a sentiment which the mind forms of persons or things." *Id.* (noting an opinion in ordinary usage does not imply definiteness or certainty and may rest on grounds that are insufficient for complete demonstration) (citation modified).

A sincere statement of pure opinion is not actionable because it is "not an 'untrue statement of material,' regardless of whether an investor can ultimately prove the belief wrong."  *Id.* at 186.  An opinion, however, may become actionable where it involves a representation of material fact.  *See Wochos*, 985 F.3d at 1188–9; *see also Omnicare*, 575 U.S. at 185 (explaining "that a statement can sometimes be 'most fairly read as affirming separately both the fact of the [speaker's] opinion and the accuracy of the facts' given to support or explain it" (citation omitted)).  As the Ninth Circuit has explained:

> First, every statement of opinion "explicitly affirms one fact: that the speaker actually holds the stated belief."  Second, "some sentences that begin with opinion words like 'I believe' contain embedded statements of fact."  As the [Supreme] Court explained, a statement that "I believe our TVs have the highest resolution available because we use a patented technology" could give rise to misrepresentation liability if the speaker's technology was not patented.  Third, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view."  For example, if a company declares that "We believe our conduct is lawful," a reasonable investor "likely expects such an assertion to rest on some meaningful legal inquiry."  Accordingly, if in fact that company made "that statement without having consulted a lawyer," the statement "could be misleadingly incomplete," potentially giving rise to liability under an omission theory.

*Id.* (quoting *Omnicare* 575 U.S. at 184, 185, 188) (citation modified).

Additionally, statements of opinion may involve inactionable "puffery," i.e., the statement involves "expressing an opinion" that is not "capable of objective verification." *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098–99 (9th Cir.

2022) (quoting *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)). Puffery also involves "vague statements of optimism like 'good,' 'well-regarded,' or other feel-good monikers," which "are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Id.* (citation omitted); *see also Hewlett-Packard*, 845 F.3d at 1276 (explaining puffery may involve statements that are "inherently aspirational" and "expresses opinions as to what actions are preferable" (citation omitted)). General statements of optimism may be actionable, however, where, taken in context, the statement addresses "specific aspects of a company's operation that the speaker knows to be performing poorly." *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143–44 (9th Cir. 2017) (citation omitted).

Pleading scienter requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Glazer II*, 63 F.4th at 766 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). To determine if the "strong inference" standard is met, courts first determine "whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter." *Id.* "If no individual allegation is sufficient, the court conducts a holistic review to determine whether the allegations combine to give rise to a strong inference of scienter." *In re Facebook*, 87 F.4th at 947 (citation modified). The alleged facts are sufficient to satisfy the "strong inference" standard where they demonstrate an "intent to deceive, manipulate, or defraud" or "deliberate recklessness." *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (citation omitted); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007) (noting a complaint survives a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" (citation modified)). "Deliberate recklessness is an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Webb*, 844 F.3d at 851 (citation modified).

Finally, the PLSRA provides a shield protecting against liability for false or misleading forward-looking statements. *In re Quality Systems*, 865 F.3d at 1141; *see also* 15 U.S.C. § 78u-5(c)(1)(B)(i), (i)(1)(A)–(F) (providing that a "forward-looking statement" includes statements involving projections of revenues, plans and objectives of management for future operations, future economic performance, and statements of the assumptions underlying or relating to such statements). Relevant here, the allegations must establish a strong inference that defendants made the forward-looking statements with "actual knowledge that the statement was false or misleading." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (quoting § 78u-5(c)(1)(B)(i)) (citation modified). Mixed statements, i.e., those combining both non-forward-looking and forward-looking statements, by virtue of including forward-looking statements do not provide safe harbor protections for non-forward-looking statements. *In re Quality Systems*, 865 F. 3d at 1142.

The Court now revisits the TAC's discussion of the LTSAs and Defendants' statements regarding the LTSAs.

## B.  The LTSAs

Onsemi introduced LTSAs in May 2021, which "specified minimum purchase commitments and product pricing." (Doc. 63 at 18.) At that time, "El-Khoury explained that the [LTSAs] were intended to increase confidence in the [Onsemi's] outlook, create better visibility into customer demand, and enable Onsemi to invest in building production capacity only if that additional capacity would be supported by customer demand." (*Id.* at 19.) The LTSAs piqued the interest of investors and analysts. (*Id.*)

In August 2022, Onsemi faced skepticism regarding the "durability" of LTSAs. (*Id.* at 22.) El-Khoury affirmed that LTSAs are "legally binding" and the customers are "liable" for agreed upon prices and quantities in the LTSAs. (*Id.* (citation modified).) El-Khoury and Trent expressed similar sentiments throughout 2021 and 2022. (*Id.* at 25.)

Defendants also discussed that the LTSAs could be amended so long as they constituted a "win-win" for Onsemi. (*Id.* at 31.) Defendants averred that "LTSA amendments would only be agreed to if the amendments: 'offset' any reduction in

revenue . . . ; maintained utilization of Onsemi's manufacturing capacity committed to LTSAs; and ensured Onsemi was not 'left holding the bag' of unsold inventory." (*Id.*) For example, El-Khoury at one point explained that Onsemi may amend an LTSA to reduce purchase volume for one product if the customer agreed to increase purchase volume for another product. (*Id.*) The TAC details a number of similar "'win-win' LTSA amendments" that Defendants discussed on various occasions. (*Id.* at 35.) However, Defendants affirmed that if such an amendment was not possible, or did not meet Onsemi's "'revenue/margin/inventory' goals," the customer would still be bound by the original terms of the LTSA. (*Id.* at 33, 36.)

However, Plaintiff alleges that Defendants failed to disclose "that the LTSAs were being frequently amended throughout the Class Period and were frequently not enforced against customers who cancelled orders or refused to place orders required under the LTSA." (*Id.* at 37.) The TAC details allegations from "CW1," an anonymous Onsemi employee, regarding product development for an anonymous "military customer." (*Id.*) CW1 claimed that product was "scheduled to ramp up production in 2023 pursuant to the terms of an LTSA" and that the customer was required to order 50,000 semiconductor wafers worth about $7 million. (*Id.*) Under the LTSA, the bulk of the customers orders were scheduled to be ordered in February and March of 2024. (*Id.*) Nonetheless, the customer never placed its orders, which were pushed out indefinitely. (*Id.*) CWI alerted management and "recalled that the response 'was crickets' and described management as 'shrugging their shoulders' at the situation in hopes that the order would come in 2024." (*Id.* at 38.) CW1 claimed that the customer did not experience a "penalty." (*Id.*)

"In addition to Onsemi failing to enforce the LTSA with the military customer, CW1 also explained that CW1 had reviewed one of Onsemi's LTSAs in Q1 2023 for a commercial customer, and CW1 did not see any provisions in the LTSA that would penalize the customer for not placing the purchase orders specified in the LTSA." (*Id.*) "Nor did CW1 see any provisions in the LTSA that guaranteed Onsemi would receive advance notice of softening demand." (*Id.*) "Thus, CW1 believed that Onsemi's

description of the LTSAs as 'watertight' was inaccurate because 'if you really read one, it doesn't hold water.'" (*Id.*)

Plaintiff alleges that Defendants knew of this situation and others like it. The TAC goes on to discuss various board meetings, in which, El-Khoury and Trent "discussed, or were informed of, disappointing LTSA performance and execution." (*Id.* at 40.) For example, Plaintiff claims that Defendants knew that there were LTSA compliance issues based on a February 23, 2023 board meeting. (*Id.*) During that meeting, Defendants announced that ensuring LTSA compliance was a "Strategic Initiative Goal." (*Id.*) Additionally, Defendants were informed of a $480 million reduction in Onsemi's "Power Solutions Group revenue" which was "only partially offset by $200 million growth in the Automotive & Industrial segments." (*Id.*) Defendants were also "informed that a list of actions needed to achieve Onsemi's gross margin included 'LTSA Amendment true-up' and 'LTSA Take-or-pay or short-term pricing increase in amendment requests.'" (*Id.*) According to Plaintiff, these details notified Defendants that "LTSA 'compliance' issues were problematic enough to require Board escalation." (*Id.*)

The TAC then describes a May 18, 2023 meeting which "focused on LTSA amendment offsets as 'Key Action[s]' to 'Close the Gap' and help the Company's '2023 Recovery Plan' but these offsets were far from guaranteed, with the presentation giving only a ***50% probability*** of Onsemi obtaining at least one of these offsets." (*Id.* (emphasis in original).

The TAC then describes a May18–19, 2023 board meeting. (*Id.*) "A sales update to the Board by management highlighted weaknesses in the LTSAs with fifteen amendments signed in the first quarter and '38 in process.'" (*Id.*) "The update also noted that demand was 'softening in most markets including automotive.'" (*Id.*) "Another slide listed items that 'keeps us awake at night,' including 'customer retention' based on extended 'lead time' and a 180-day cancellations window." (*Id.*) "Another area of concern listed was 'managing the LTSAs,' which included successfully 'negotiating amendments which preserve Onsemi revenue/margin/inventory goals while simultaneously ensuring no

- 10 -

inventory build in the channel or end customer.'" (*Id.*(citation modified).)

"LTSA Compliance" was also cited as a focus item during meetings on July 27, 2023 and an August 17, 2023.  (*Id.*)  At the August meeting, "LTSA Customer Compliance" was listed as "one of the 'largest increases in risk priority rank position' going from a rank of 26th in 2021 to a rank of 11th in 2022." (*Id.*)

The TAC goes on to describe an August 17–18, 2023 board meeting, during which revenue non-linearity was discussed as a key risk to "customer LTSA/inventory control" which would require Onsemi to leverage LTSA amendments to ensure "quarterly commitments." (*Id.* at 41–42.)

The TAC then details a September 9, 2023 meeting, at which El-Khoury provided a memo to the board.  (*Id.* at 42.)  The memo focused on "the renewal of the LTSA." (*Id.* at 43.)  In particular, the memo noted that "we are losing more revenue than the markets have caused and we need to put that back under control with a tighter amendment analysis." (*Id.*)  The memo also noted that "We have [more than $2 billion] of inventory that we built for customers who are no longer in need of it, yet everyone assures me that we don't do amendments with stranded inventory." (*Id.*)

The TAC then proceeds to address the allegedly misleading statements giving rise to Plaintiff's claims.  The Court begins with the four statements raised in the SAC and reasserted in the TAC.

### C. May 1, 2023 Q1 Earnings Call

Plaintiff first challenges a statement made by El-Khoury during a May 1, 2023 earnings call regarding Onsemi's financial and operating results for its first fiscal quarter of 2023. (Doc. 63 at 47.)  During the call, El-Khoury was asked whether Onsemi had any changes to their automotive outlook for the next three quarters.  (*Id.*)  He responded:

> Absolutely, no changes. **It's actually very, very predictable, and that's really the benefit that we've been talking about with the LTSAs that have us really, with our customers, align on** pricing and **volume through the duration of the LTSAs**. So no conversations about pricing. **The focus has always remained on supply and that's holding up not just through the year, but through the extent of the LTSAs we have with the customers. So very, very stable and no pressure on that.** And by the way,

it's not just in automotive.

(*Id.*)[1] Plaintiff claims these "statements were materially misleading when made because El-Khoury omitted material facts in his possession that contravened the claim that LTSAs provided an observable 'benefit' in the form of 'very, very predictable' revenue outlooks, that LTSAs inherently 'align[ed]' Onsemi with customers on order volumes, and that Onsemi saw 'no pressure' on its purportedly 'very, very stable' order 'supply[.]'" (*Id.* at 47–48.)   Namely, El-Khoury "omitt[ed] that LTSA amendments were occurring frequently and harming Onsemi's operational and financial performance, which misled investors as to the true state of affairs regarding the strength, durability, and benefits of Onsemi's LTSAs." (*Id.* at 48.)

This statement is not actionable.  The Court previously found that this statement is "classic puffery, and thus not misleading." (Doc. 62 at 17.)  That analysis applies with equal force here.  In short, the foregoing statement is laden with forward-looking and aspirational monikers that are indicative of puffery.

Additionally, Plaintiff fails to address this Court's point that "the statement is also not capable of objective verification." (*Id.*)  Plaintiff asserts that El-Khoury's statement was misleading because there were "LTSA amendments" which "harm[ed] Onsemi's operation and financial performance." (Doc. 63 at 48.)  Plaintiff fails to corroborate this assertion beyond pointing to the fact that LTSA compliance was discussed at the February 2023 board meetings and that LTSA amendments were taking place.  These statements are bereft of any substance that would allow this Court to evaluate the allegedly misleading nature of El-Khoury's statement.  These assertions do not show that El-Khoury's statement was objectively false, was materially incomplete, or that El-Khoury did not believe what he professed. *See Barker v. Nextracker Inc.*, No. 24-CV-09467-PCP, 2026 WL 657744, at *7 (N.D. Cal. Mar. 9, 2026).

Additionally, Plaintiff does not directly connect his allegations to the substance of

---

[1]  The TAC provides: "the portions of the statements . . . that are bolded and underlined (**example**) are alleged to be misleading when made; all other portions of statements are included for context." (Doc. 63 at 43.)

El-Khoury's statement. he does not point to any concrete facts indicating that the automotive outlook for the remaining quarters of 2023 was unpredictable. Even if Plaintiff did, he still fails to establish that El-Khoury made the statement with actual knowledge that it was false or misleading. At best, Plaintiffs assertions suggest that LTSA compliance was discussed at board meeting; but this fact is not as potent as Plaintiff seems to think it is. As a practical matter, it seems logical that the board would discuss LTSA compliance and associated risks given the nature of those contracts. However, Plaintiff does not provide any information suggesting that Defendants were aware of information that necessarily made their statements false or misleading. Thus, the Court's previous discussion of scienter applies with equal force here. (*See* Doc. 62 at 19–20.) The remaining statements suffer from these same issues.

The Court also notes that Plaintiff attempts to establish that this statement was misleading based on events which took place after May 1, 2023. For example, Plaintiff relies on the fact that "Onsemi signed 15 LTSA amendments and had another 38 amendments in process." (Doc. 63 at 49.) This information, aside from suffering from the mentioned defects, was revealed during a May 18–19, 2023 sales update. (*Id.* at 41.) Plaintiff also relies on a variety of "Post-Class Period admissions." (*Id.* at 49.) While this information is potentially relevant, Plaintiff does a poor job connecting these admissions to the alleged falsity of the foregoing statement. Plaintiff seemingly expects this Court to search its 110-page Complaint to corroborate its allegations. Plaintiff similarly relies on post hoc events in discussing the remaining alleged misstatements. The Court does not address these points moving forward ecause Plaintiff fails to establish that: (1) these events prove that the statements were false at the time they were made; or (2) that Defendants knew the statements were false at the time they were made.

**D. May 23, 2023 JPMorgan Chase Conference**

The Court turns next to Trent's response during the May 23, 2023 JPMorgan Chase Conference when "asked how Onsemi was handling 'periods of macro uncertainty and end-market weakness' wherein 'customers are wanting to reschedule' and 'move backlogs,'

specifically querying whether customers' order placements being pushed out into the future had 'started to stabilize.'"

> Yes. So let's back up and talk about our business. Our LTSAs [are] what we're managing, right? And when customers are coming in, they need help with LTSAs. We're getting the call quarters in advance of something is going to get solved. **If we can create a win-win with that customer, we'll try and help that customer. And there's got to be a win for both companies.** We saw a lot of that happening late last year. We've actually seen in the first quarter and even so far in the second quarter is that's actually stabilized and actually coming down a little bit, which gives you some confidence in the second half as well. Again, think about the visibility we have with the LTSAs and the fact that we're getting less of those requests. There's pockets of them. But late last year, we saw a lot more uncertainty, and I think people remain cautious. So that allows us to really have a dialogue with our customers versus historically, they place a PO, and that PO would disappear 30 days before it shifted. Now we're getting that call in advance, and we're able to help those customers. But it is kind of slowing in terms of the rescheduled request.

(Doc. 63 at 53–54 (alteration in original).)  Plaintiff alleges this statement was "materially misleading because they gave the impression of a state of affairs where LTSA renegotiations always generated a 'win' for Onsemi—meaning, as Defendants often reiterated, LTSA amendments always provided: an offset to any revenue reduction, such that the amendment was not financially dilutive; utilization of Onsemi's manufacturing capacity committed to LTSAs; and avoidance of inventory buildup."  (Doc. 63 at 54.)  "However, Defendant Trent omitted presently-known facts contravening the notion that Onsemi's LTSA amendments always resulted in 'a win for both companies.'"  (*Id.*)

    This statement is not actionable because it is abstract and "transparently aspirational."  *See Barker*, 2026 WL 657744, at *4.  The Court's previous analysis as to both falsity and scienter apply with equal force here and the Court need not duplicate its effort.  As noted: "On its face, what constitutes a 'win-win' is subjective and so broad and ambiguous that it is incapable of objective verification.  Trent's statement does not provide a concrete definition of 'win-win' and seemingly encompasses many preferrable forms."  (Doc. 62 at 21.)

**E.  August 30, 2023 Deutsche Bank Conference**

The Court next addresses statements made by El-Khoury at an August 30, 2023 Deutsche Bank Conference.  During the conference, El-Khoury said the following when asked whether demand for Onsemi's  automotive products was plateauing:

> And we will talk about the LTSAs. We have engagements with customers. If they have a weak -- softness in their market and they have an LTSA, we're going to get the call 6 months in advance. And that call basically goes along, hey, our run rate is not where we thought it would be in this certain area. We're going to have potentially some inventory. What are the options? If I can ship that to somebody else that I've been under shipping to, we're going to redirect it. So somebody gets more supply to meet their demand, and somebody is not going to get oversupply that's going to sit in inventory.
>
> **So that LTSA and the conversations we're having with the customer to have a win-win, although we may take some down and amend it, saying, yes, no problem, net-net, it's a win-win. And that's exactly what the LTSAs have provided us. And the structure we put in, given that it's a legally binding agreement, have forced that conversations for us to have a -- to land in a much better spot than we would have otherwise been.**

(Doc. 63 at 65–66.)  Later in the conference, El-Khoury was asked "'what do you do if you've seen customers not want as much' under LTSAs, and 'to the extent demand weakens, how concrete are those enforced because you have a longer-term partnership with these companies?'"  He replied:

> **Because the customer is legally liable like you said, they're going to place the call at the first sign of softness they have because they have a small bag to carry also, not just ON Semi. And that makes the partnership a win-win as far as trying to find a solution.** If we don't have a solution, at least I can stop the new wafers until I flush the inventory because I'd rather stop wafers -- and you saw that in the utilization in certain cases -- use the [ WIP ] I have to ship to them versus keep the wafers. And now there is over inventory in the market, and that doesn't help anyone. That's a win-win, for example, and the customer will say, and I will add 2 years on top of the LTSA because that's the run rate. That's a win-win I'll take any time.
>
> Now if I don't have another customer to give that capacity to, then we have to talk about is it a different cost structure now because lower volume, different impact. So all of these are -- every customer has different constraints. And we are going to sit down and work with the customer -- because all these customers, like you said, are strategic. That's why we have

- 15 -

an LTSA with them to begin with. **So we're going to sit with the customer, and we're going to find a win-win.**

(*Id.* at 66.)  Plaintiff contends that these statements were "materially misleading because they gave the impression of a state of affairs where customers were 'legally liable' for order volumes under the LTSAs, that if a customer expected lower demand (i.e., 'softness') the 'structure' of the LTSA 'forced' customers to engage with Onsemi to put the Company 'in a much better spot than [it] would have otherwise been,' and that Company management would only permit a customer to amend the LTSA if it could generate a corresponding 'win' for Onsemi—meaning, as Defendants often reiterated, LTSA amendments always provided: an offset to any revenue reduction, such that the amendment was not financially dilutive; utilization of Onsemi's manufacturing capacity committed to LTSAs; and avoidance of inventory buildup." (*Id.* at 66–67.)

These statements are not actionable and the Court's previous analysis as to both falsity and scienter apply here.  (*See* Doc. 62 at 25–28.)  At bottom, these statements are primarily aspirational statements about how Onsemi hypothetically conducts amendment negotiations.  These statements, in large part, are not "capable of objective verification." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (citation modified).  Indeed, the evidence Plaintiff relies on does not demonstrate that the above statement was false or materially misleading.

### F.  September 7, 2023 Citi Conference

The Court next addresses a statement made at a September 7, 2023 Citi Conference. At the conference El-Khoury was asked "[h]ow iron clad" the LTSAs were and how renegotiations would work. (Doc. 63 at 70.)  He responded:

Historically, backlog disappeared 30 days before I ship it, and you're left holding the bag. So the LTSAs, somebody is going to get the bat phone and call and say, we got a problem, 6 months, 9 months from now, let's have a conversation. **So we'll have the conversation, but it has to be a win-win**.

What does that look like? Look, if demand is down, it doesn't really help us maybe in the short term, but it doesn't help the company in saying, "Well, you got to take, I don't care, put the inventory on your shelf" it doesn't help anybody to have inventory at the customer if demand is not

there. So we'll have the conversation about, okay, well, we know we have 50% share on this product, **and we increase the share, offset the gap and so on and so forth**. So we have those conversations.

From a company perspective, we would rather ship product any day than have fees because those are onetime benefits. I really don't care for them, right? I like the sustainability of it, which is, okay, let's talk about revenue. Let's talk about share gains. Hey, maybe we extend the LTSA and you bolt on more, let's put more products that you maybe are not buying from us, but we can qualify because we have a new product.

So all of these are win-win. **Now, if the customer is not interested in a win win, but a win/lose, that's where it's ironclad. It's a legally binding agreement that both parties in a win-win will renegotiate an amendment. But net of that, we're not going to be left holding the bag**.

(*Id.* at 71.)    Plaintiff argues that "El-Khoury's statements were materially misleading because they gave the impression of a state of affairs where Defendants were holding customers 'legally liable' under the LTSAs because they were 'ironclad,' and that Company management would only permit a customer to amend the LTSA if it could generate a corresponding 'win' for Onsemi (never a 'win/lose')—meaning, as Defendants often reiterated (including the foregoing misstatement), LTSA amendments always provided: an 'offset' to any revenue 'gap,' such that the amendment was not financially dilutive; utilization of Onsemi's manufacturing capacity committed to LTSAs; and avoidance of inventory buildup." (*Id.*)

This statement is not actionable.  As the Court previously noted, these statements are inherently vague and highlight general corporate optimism and are thus inactionable puffery.  (*See* Doc. 62 at 28.)  This remains true here.  Again, these statements reflect a statement of opinion or optimism.  Additionally, Plaintiff does not readily direct this court to any facts suggesting that the LTSAs are not legally binding.  Plaintiff loosely refers to situations in which LTSAs were amended, or that customers were "decommitting"; however, Plaintiff does not explain how an LTSA loses its legal enforceability merely because a customer "decommits."

The Court next addresses the four new statements raised in the TAC.

- 17 -

### G. Four New Statements

The Court addresses the four statements together since they all rely on functionally the same language. The Court begins with the statements made in a May 1, 2023 press release. The press release "instructed investors to 'carefully consider the trends, risks and uncertainties described in [Onsemi's] 2022 Form 10-K,' thus incorporating such language from the 2022 Form 10-K by reference." (Doc. 63 at 44 (citation modified).) The 2022 Form 10-K stated:

> A significant portion of the Company's orders are firm commitments that are non-cancellable, including certain orders or contracts with a duration of less than one year. Certain of the Company's customer contracts are multi-year agreements **that include firmly committed amounts** ("Long-term Supply Agreements" or "LTSA's") for which the remaining performance obligations as of December 31, 2022 were approximately $16.6 billion (excluding the remaining performance obligations for contracts having a duration of one year or less). The Company expects to recognize approximately 31% of this amount as revenue during the next twelve months upon shipment of products under these contracts. **Total sales estimates** are based on negotiated contract prices and demand quantities, and **could be influenced by** manufacturing issues, supply chain constraints, and **modifications to customer agreements**, among other things. Accordingly, the amount represented by remaining performance obligations may not be indicative of the actual revenue recognized for future periods.

(*Id.*) Plaintiff contends that "Defendants' statements, that the LTSAs include 'firmly committed amounts' and the purely hypothetical warnings that total sales estimates 'could' be influenced by LTSA amendments, were materially misleading when made because Defendants omitted material facts necessary to make the statements not misleading. In particular, Defendants omitted presently-known facts undermining the 'firmness' of commitments under the LTSAs and demonstrating that Onsemi's sales estimates were already being negatively 'influenced' by LTSA amendments." (*Id.*)

This statement is not actionable. Even assuming that the 2022 Form 10-K contains a material misstatement, it is unclear that Onsemi made a misstatement by "incorporating" the form in the press release. Additionally, there are no facts suggesting that Onsemi "incorporated" the form in a manner that expressly reaffirmed each facet of the form. The

Complaint alleges that Onsemi merely instructed investors to "carefully consider the trends, risks and uncertainties described" in the form. (*Id.* at 44.) Inviting investors to consider the form is materially different than expressly reaffirming such language.

Even assuming otherwise, the statement itself is not misleading. To start, it is unclear why Plaintiff believes that Onsemi noting that total sales estimates could be influenced by modifications to customer agreements is a material misrepresentation. Indeed, the TAC recognizes that these statements are "purely hypothetical warnings." (*Id.*) Nonetheless, the TAC, in large part, is predicated on the fact that the LTSAs were modified. Accordingly, this statement seems to undermine the allegedly misleading nature of the prior statement that certain customer contracts were LTSAs "that include[d] firmly committed amounts." (*Id.*) Taken together, the 2022 Form 10-K modestly notes that many Onsemi contracts are LTSAs, and that these LTSAs could be subject to modification. Plaintiff does not explain how this statement is false; indeed, many of Plaintiff's allegations are predicated on this very assertion. Accordingly, this statement is not actionable.

Plaintiff also does not provide any allegation establishing that a certain portion of Onsemi's LTSAs do not include firmly committed accounts. Importantly, Onsemi's statement does not represent that all customer contracts include firmly committed amounts. And even if Onsemi did make such a representation, Onsemi immediately goes on to qualify that these LTSAs are subject to modification.

Plaintiff raises essentially the same claim in regard to Onsemi's quarterly report filed with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2023. In that report, Onsemi similarly instructed investors to consider the highlighted statement from the 2022 Form 10-K. (*Id.* at 50.) As discussed, the 2022 Form 10-K is not misleading. Plaintiff goes on to highlight that the quarterly report includes materially the same alleged misrepresentations that were present in the 2022 Form 10-K:

> A significant portion of the Company's orders are firm commitments that are non-cancellable, including certain orders or contracts with a duration of less than one year. Certain of the Company's customer contracts are multi-year agreements **that include committed amounts** ("Long-term Supply Agreements" or "LTSA's"). The estimated remaining performance

obligations as of March 31, 2023, are approximately $17.6 billion (excluding the remaining performance obligations for contracts having an original duration of one year or less). This amount is subject to contractual increases based on negotiated contract prices and volumes, defined product mix flexibility, and the timing of new part introductions, among other contractual provisions. The Company expects to recognize approximately 33% of the remaining purchase obligation as revenue during the next twelve months upon shipment of products under these contracts. **Total revenue estimates could be influenced by** risks and uncertainties including manufacturing or supply chain constraints, **modifications to customer agreements**, and regulatory changes, among other factors. Accordingly, our actual revenue recognized for the remaining performance obligation in future periods may fluctuate from estimates.

(Doc. 63 at 50–51.)  This language is not materially different from the 202 Form 10-K and is thus not actionable.

Plaintiff again raises essentially the same claim in regard to a July 31, 2023 press release.  (*Id.* at 57.)  That press release similarly instructed investors to consider the highlighted statements from the 2022 Form 10-K. (*Id.*)  As discussed, the 2022 Form 10-K is not misleading.

Plaintiff also raises essentially the same claim in regard to Onsemi's quarterly report filed with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2023.  (*Id.* at 61.) Again, the report instructs investors to consider the highlighted statements from the 2022 Form 10-K. (*Id.*)  As discussed, the 2022 Form 10-K is not misleading.

As was the case with the March 31, 2023 quarterly report, the June quarterly report includes materially the same alleged misrepresentations that were present in the 2022 Form 10-K:

The estimated remaining performance obligations as of June 30, 2023 are approximately $20.0 billion (excluding the remaining performance obligations for contracts having an original duration of one year or less). This amount is subject to contractual increases based on negotiated contract prices and volumes, defined product mix flexibility, and the timing of new part introductions, among other contractual provisions. The Company expects to recognize approximately 32% of the remaining purchase obligation as revenue during the next 12 months upon shipment of products under these contracts. **Total revenue estimates could be influenced by** risks and uncertainties, including manufacturing or supply chain constraints,

- 20 -

**modifications to customer agreements**, and regulatory changes, among other factors. Accordingly, the actual revenue recognized for the remaining performance obligation in future periods may significantly fluctuate from these estimates.

(*Id.* at 62.)  This language is not materially different from the 202 Form 10-K and is thus not actionable.

### H. Remaining Issues

The remaining issues in this case can be addressed in short order.  Plaintiff realleges a core operations theory.  Again, this theory is only viable assuming falsity exists for all the challenged statements.  For the reasons provided, none of the challenged statements are actionable.  Accordingly, the Court will not repeat an in-depth analysis under the assumption that Plaintiff established falsity.  Additionally, the Court's previous analysis on this point applies with equal force here.  The same is true as to Plaintiff's holistic scienter theory.

As noted, "[c]ontrolling persons liability under Section 20(a) of the Exchange Act is derivative, such that there is no individual liability where there is no primary violation of securities law." *In re Genius Brands*, 97 F.4th at 1180. Seeing no primary violation, Plaintiff's § 20(a) claim against the Individual Defendants also necessarily fails and is dismissed.

The Court will dismiss the TAC with prejudice.  The Court has already provided Plaintiff an opportunity to amend.  Having failed to remedy these defects, dismissal with prejudice is appropriate.

### IV.    CONCLUSION

Accordingly,

**IT IS ORDERED granting** Defendants' Motion to Dismiss (Doc. 67) and dismissing the TAC with prejudice.

…

…

…

- 21 -

**IT IS THUS ORDERED** directing the Clerk of Court to terminate this case and enter judgment in accordance with this Order.

Dated this 23rd day of July, 2026.

Honorable Susan M. Brnovich
United States District Judge